No. 24-10455

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CHRISTOPHER RUSANOWSKY,

*Plaintiff-Appellant,*

v.

THE CITY OF DALLAS; SERGEANT ROGER A. RUDLOFF,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A DALLAS
POLICE DEPARTMENT POLICE OFFICER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:22-cv-1132, Judge Ed Kinkeade

## BRIEF OF APPELLANT

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

**Counsel for Appellant Christopher Rusanowsky**

## CERTIFICATE OF INTERESTED PERSONS

1. No. 24-10455, *Rusanowsky v. City of Dallas*

2. The undersigned counsel of record certifies that the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

   - Plaintiff-Appellant: Christopher Rusanowsky

   - Attorneys for Plaintiff-Appellant in the district court and on appeal: Peter B. Steffensen, Thomas S. Leatherbury

   - Additional Attorneys for Plaintiff-Appellant in the district court: David Henderson, Sebastian Van Coevorden, Ellwanger Henderson LLLP

   - Defendants-Appellees: The City of Dallas, Texas; Sergeant Roger A. Rudloff

   - Attorneys for Defendants-Appellees: J. Cheves Ligon, Kathleen M. Fones, Nicholas D. Palmer

   */s/ Peter B. Steffensen*
   Attorney of record for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a)(1), Appellant submits that oral argument would be helpful to the Court because this appeal involves a detailed factual record, and the application of the proper legal standards at summary judgment to those facts.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ......................................................... 10

INTRODUCTION ................................................................................. 10

ISSUES PRESENTED .......................................................................... 12

STATEMENT OF THE CASE ............................................................... 13

  A.  Rusanowsky, an experienced photojournalist, covers the George Floyd protests in Dallas on May 30, 2020. .......................................... 13

  B.  From the sidelines, Rusanowsky documents a group of protesters who obstruct the northbound lanes of I-35E ...................................... 15

  C.  Rusanowsky photographs Sgt. Roger A. Rudloff as he uses force on protesters. .......................................................................................... 17

  D.  "Yeah, yeah, press, press. You're going to jail": Rudloff arrests Rusanowsky in retaliation for photographing Rudloff using force against protesters. ................................................................................. 20

  E.  Rusanowsky's charges are dropped, and he brings suit. .............. 22

  F.  None of the officers who were at the scene agree on what happened. ............................................................................................. 24

  G.  Rusanowsky's photographic evidence and testimony provided the more reliable accounting of the events leading up to his arrest and, at any rate, created fact issues that entitled him to a trial. ....... 26

  H.  The court below held Sgt. Rudloff was entitled to qualified immunity, because it found—relying on an improper inference—that he had arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate. .......................................................... 30

  I.  By finding Sgt. Rudloff had arguable probable cause to arrest Rusanowsky, the court avoided grappling with the deep divisions in the parties' competing versions of events. .......................................... 35

SUMMARY OF THE ARGUMENT .......................................................... 37

STANDARD OF REVIEW .................................................................... 42

ARGUMENT ......................................................................................... 43

I.   THE DISTRICT COURT ERRED IN FINDING ARGUABLE
PROBABLE CAUSE TO ARREST RUSANOWSKY. ........................... 43

    a.   Applying ordinary summary judgment principles to
    Rusanowsky's false arrest claim, Rusanowsky was entitled to
    present his claims to a jury. .............................................................. 43

    b.   The parties agreed below that conditions on the interstate were
    dangerous. ......................................................................................... 50

    c.   The officers' conflicting memories of events were not credible,
    and therefore should have been left for a jury to scrutinize. ........... 57

    d.   Analyzed under the proper factual context, Rudloff was not
    entitled to summary judgment. ......................................................... 60

II.   THE SAME DEEP FACTUAL DIVISIONS THAT MILITATED
AGAINST A FINDING OF ARGUABLE PROBABLE CAUSE MADE
THE QUESTION OF ACTUAL PROBABLE CAUSE IMPOSSIBLE
TO ANSWER. ...................................................................................... 63

    a.   Rudloff lacked actual probable cause to arrest Rusanowsky. ... 64

    b.   A genuine dispute of material fact existed regarding Rudloff's
    retaliatory motive. ............................................................................. 68

III.   RUSANOWSKY'S MUNICIPAL LIABILITY CLAIM SHOULD
BE REVIVED. ...................................................................................... 72

CONCLUSION ..................................................................................... 73

CERTIFICATE OF SERVICE ............................................................. 75

CERTIFICATIONS UNDER ECF FILING STANDARDS .................... 76

CERTIFICATE OF COMPLIANCE ....................................................... 77

ADDENDUM .......................................................................ADD-1

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.,*
  398 U.S. 144 (1970) ............................................................. 48

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................. 42, 48, 58

*Bailey v. Iles,*
  87 F.4th 275 (5th Cir. 2023)................................ 42, 44, 45, 63

*Burbank v. Davis,*
  227 F. Supp. 2d 176 (D. Me. 2002) ..................................... 66

*California v. Hodari D.,*
  499 U.S. 621 (1991) ............................................................ 65

*Citizens United v. Fed. Elec. Comm'n,*
  558 U.S. 310 (2010) ............................................................ 38

*Club Retro, L.L.C. v. Hilton,*
  568 F.3d 181 (5th Cir. 2009) ....................................... passim

*Crostley v. Lamar Cty., Tex.,*
  717 F.3d 410 (5th Cir. 2013) .............................................. 46

*Davidson v. City of Stafford,*
  848 F.3d 384 (5th Cir. 2017) .................................. 42, 46, 67

*Deville v. Marcantel,*
  567 F.3d 156 (5th Cir. 2009) ........................................ 49, 59

*Dist. of Colum. v. Wesby,*
  583 U.S. 48 (2018) .............................................................. 46

*Jackson v. City of New York,*
  939 F. Supp. 2d 235 (E.D.N.Y. 2013).................................. 66

*Keenan v. Tejeda,*
   290 F.3d 252 (5th Cir. 2002) ....................................................... passim

*Loftin v. City of Prentiss, Miss.,*
   33 F.4th 774 (5th Cir. 2022)................................................. 73

*Maryland v. Pringle,*
   540 U.S. 366 (2003) ................................................................. 43

*Monell v. Dep't of Soc. Servs. of City of N.Y.,*
   436 U.S. 658 (1978) ................................................................. 37

*Moroughan v. Cty. of Suffolk,*
   514 F. Supp. 3d 479 (E.D.N.Y. 2021)..................................... 66

*Nieves v. Bartlett,*
   587 U.S. 391 (2019) ................................................................. 36

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ......................................................... 47, 63

*Ramirez v. Killian,*
   No. 22-10401, 2024 WL 3823609 (5th Cir. Aug. 15, 2024) .................. 47

*Saucier v. Katz,*
   533 U.S. 194 (2001) ................................................................. 47

*Scott v. White,*
   No. 1:16-CV-1287-RP, 2019 WL 122055 (W.D. Tex. Jan. 7, 2019) ..... 50

*Sibron v. New York,*
   392 U.S. 40 (1968) ................................................................... 44

*Spiller v. Harris Cty. Tex.,*
   No. 22-20028, 2024 WL 4002382 (5th Cir. Aug. 30, 2024) ........... 47, 54

*Tarver v. City of Edna,*
   410 F.3d 745 (5th Cir. 2005) ................................................. 59

*Taylor v. Riojas*,
  592 U.S. 7 (2020) ................................................................ 63

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ..................................................... passim

*Turner v. Lt. Driver*,
  848 F.3d 678 (5th Cir. 2017) ................................... 37, 64, 72

*Winzer v. Kaufman Cty.*,
  916 F.3d 464 (5th Cir. 2019) ............................. 41, 43, 59, 60

*Ybarra v. Illinois*,
  444 U.S. 85 (1979) ......................................................... 44, 65

## Statutes

Tex. Penal Code § 42.02 .......................................................... 67

Tex. Penal Code. § 42.03 ......................................................... 22

Tex. Transp. Code § 542.501 .................................................... 56

Tex. Transp. Code § 552.005 .................................................... 56

Tex. Transp. Code § 552.006(b) ...................................... passim

## Other Authorities

Miles Moffeit, Cassandra Jaramillo, & Dianne Solis, *'I felt like my chest
  was on fire': Photo Shows Dallas Police Officer Shooting Protester with
  Pepper-Ball Gun*, Dall. Morning News (Aug. 9, 2020),
  https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-
  like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-
  protester-with-a-pepper-ball-gun-at-close-range/ ............................... 19

## Rules

Fed. R. Civ. P. 56(a) ................................................................ 42

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291 because Appellant Rusanowsky appeals the district court's orders granting summary judgment to Appellees Sgt. Roger A. Rudloff and the City of Dallas, ROA.1071-1092, 1114-1115, and its entry of a final judgment against Rusanowsky, ROA.1116. Rusanowsky filed his notice of appeal within 30 days of the district court's final judgment. ROA.1117.

## INTRODUCTION

Appellee Sgt. Roger A. Rudloff arrested Appellant Christopher Rusanowsky, an experienced photojournalist, on May 30, 2020 while Rusanowsky covered the protests that erupted in Dallas following George Floyd's murder. At around 8:30 p.m., Rusanowsky had been following Rudloff with his camera, documenting Rudloff as he used force on several protesters and arrested them. When Rudloff realized that Rusanowsky had his camera lens trained on him, he arrested Rusanowsky, in retaliation for Rusanowsky exercising his clearly established right to photograph Rudloff in the exercise of his official duties.

Rudloff, however, has no memory of this. Though acknowledging his presence on the scene, and his involvement in the arrests Rusanowsky captured with his camera, he does not recall ever interacting with Rusanowsky until after Rusanowsky had been placed in handcuffs. Nor could he, or any of his fellow officers on scene, recall what Rusanowsky was arrested for, or otherwise articulate any particularized facts to justify his arrest.

Despite the deep disagreements in the parties' recollections, the court below granted summary judgment to Sgt. Rudloff, holding that he was entitled to qualified immunity because he possessed arguable probable cause to arrest Rusanowsky for walking on the wrong side of a roadway. To reach that conclusion, the court resolved genuine issues of disputed material fact in favor of Sgt. Rudloff, the movant. That was reversible error. Rusanowsky's claims should go to a trial, given the profound material factual disagreements between the parties.

## ISSUES PRESENTED

1. The court below inferred from the summary judgment record that Rusanowsky was able to legally and safely cross the interstate's obstructed traffic lanes, even though both Rusanowsky and Rudloff largely agreed that this was not possible. **Did the district court err by finding an issue of disputed material fact where there was none, and then resolving that dispute in favor of Rudloff?**

2. After improperly resolving this dispositive issue of material fact against Rusanowsky, the court below applied that factual context to hold that Rudloff's actions were not objectively unreasonable. **Did the district court err by applying a factual context—placed in a light most favorable to Rudloff—to the question of Rudloff's objective reasonableness under the circumstances?**

3. Rusanowsky, Rudloff, and two other officers who witnessed the events of May 30, 2020 all had starkly different recollections of the circumstances leading to Appellant's arrest. **Did the district court err by finding Rudloff was entitled to qualified immunity, despite these deep factual divisions?**

4. After dismissing Rusanowsky's constitutional claims, the district court then granted summary judgment to the City of Dallas, because there was no predicate constitutional violation upon which Rusanowsky could maintain his municipal liability claim against the City. **Should Rusanowsky's municipal liability claim be revived?**

## STATEMENT OF THE CASE

A. **Rusanowsky, an experienced photojournalist, covers the George Floyd protests in Dallas on May 30, 2020.**

Rusanowsky is an experienced photojournalist based in North Texas. He has worked as a professional photographer for about 17 years, during which time his work has appeared in national publications such as the *Wall Street Journal*, *Newsweek*, the *Dallas Morning News*, and *People Magazine*. ROA.921.

Rusanowsky publishes his photos through ZUMA Press, a professional photography wire service that pays him royalties for the sale of any of the photos he offers through the service. ROA.922. As part of his arrangement with ZUMA Press, Rusanowsky is issued a press badge, which allows him to identify himself as a member of the media to anyone who may need to verify his credentials. ROA.922-923, 931.

As a journalist based in North Texas, Rusanowsky primarily covers stories of interest to the North Texas community. When George Floyd's killing on May 25, 2020 ignited protests around the country, Rusanowsky attended the protests in downtown Dallas to document their progression and impact. He first began documenting the protests on May 29, 2020, where he witnessed and photographed scenes of unrest. While there, he documented the police deploying tear gas on the crowds he followed. But because Rusanowsky lacked proper protective equipment to feel physically safe enough to remain in the area, he decided to leave and return the following day. ROA.923.

Upon his return to Downtown Dallas on May 30, Rusanowsky took additional steps to ensure his physical safety while covering the protesters and their interactions with law enforcement. He researched the potential routes of the protesters in advance, brought a medical kit along with him and, upon arriving Downtown, sought out other journalists he could walk with. ROA.922-923. He also prominently displayed his press badge in case law enforcement needed to identify him and verify he was not a protester. ROA.922-923. And he did his best to keep a safe distance between himself and the protesters at all times, so

that he could reduce the risk of being mistaken for a protester, and avoid being caught up in any moments of unrest or violence that occurred. ROA.923.

B. **From the sidelines, Rusanowsky documents a group of protesters who obstruct the northbound lanes of I-35E.**

On the evening of May 30, Rusanowsky and several other journalists followed a crowd moving along Main Street in Downtown Dallas. ROA.923. By around 8:25 p.m., the crowd had marched towards Reunion Tower, and was moving along Reunion Boulevard East. Rusanowsky, who was positioned towards the rear of the group, noticed a group of protesters break off and begin ascending a paved incline that led to the northbound lanes of I-35E. ROA.923, 934, 936.

From his vantage point, he could see that some of these protesters were moving onto the highway. ROA.923. Rusanowsky followed this group to document their actions: the acts of civil disobedience the protesters were willing to engage in were newsworthy, and thus important to capture, Rusanowsky believed. Rusanowsky moved up a paved embankment that led to the exterior of I-35E's northbound lanes. ROA.936. Initially, for his safety, Rusanowsky stood along the outside of a barrier that separated the paved embankment from the shoulder of the

highway. ROA.924. From there, he observed protesters within his line of sight obstructing traffic in the middle of the interstate while they carried on with their protest. ROA.924, 938-944.

While standing along the exterior of the barrier, Rusanowsky noticed more and more people crowding around him. As the number of protesters grew, he assessed this to be a potentially dangerous situation. ROA.924, 1054. As a seasoned journalist, Rusanowsky had learned always to have an exit or a means of escape, and his ability to find one had disappeared as the crowd swelled.

He thus did the safest thing he could think of: he put physical space between himself and the crowd, and immediately moved to a safer position. ROA.924. Rusanowsky thus stepped over the barrier onto the improved shoulder of the interstate, and walked tightly against the outermost edge of the shoulder for less than one minute, all the while being careful not to step onto the traffic lanes. ROA.924, 928.

Rusanowsky was particularly wary of stepping into traffic, because he worried that an angry driver, fed up with the protesters for obstructing the interstate, could decide to drive through the protesters or anyone else in their way. ROA.924. He did not believe it was possible,

legally or practically, to enter the traffic lanes of the roadway. ROA.928. Instead, he did what any reasonable person in his position would have done—ensure his own safety by taking the most direct possible route down the improved shoulder, until he could reach the safest egress point—a grassy area just down the road that it took Rusanowsky less than a minute to reach. ROA.924.

### C. Rusanowsky photographs Sgt. Roger A. Rudloff as he uses force on protesters.

As Rusanowsky made his way down the improved shoulder, he heard a sound resembling gunfire, prompting the crowd on the highway to begin running toward him. To avoid the onrush of people, Rusanowsky quickly found the closest point to move back over the highway's outer barrier. He found himself in a nearby grassy area adjacent to the interstate, and took refuge behind a pillar as the crowd of people escaping the highway ran past. ROA.924.

Up to the moment that protesters began fleeing the freeway in response to this commotion, Rusanowsky did not observe any law enforcement nearby. Nor did he believe, given his position at the rear of the protest, that an officer approaching from the front could have possibly seen him through the throngs of protesters in between them. ROA.925.

The first time Rusanowsky noticed the presence of law enforcement nearby came after he had moved off the highway's shoulder onto an adjacent grassy area. There, he observed an injured woman being assisted by a group of protesters. As Rusanowsky photographed this group, he noticed several police officers wearing distinctive tan pants and carrying weapons moving towards them. ROA.924-925.

As soon as these officers reached the group, they began arresting protesters immediately. One officer in particular—who Rusanowsky later identified as Appellee Sgt. Roger A. Rudloff—began escalating conditions as soon as he arrived. ROA.925. Rusanowsky documented the moment that Rudloff laid his hands on one of the men who had just rendered aid to the injured woman, without any apparent warning from Rudloff, or provocation from the protester. ROA.925. Rusanowsky kept his camera trained on the two as Rudloff, assisted by another officer, physically restrained this protester. ROA.925, 951-980.

Rusanowsky followed Rudloff with his camera as Rudloff moved swiftly around the scene to arrest others nearby, and seemed too willing to use force in doing so. While standing a safe distance away from the crowd, Rusanowsky captured the moment Rudloff shot another protester

with his less-lethal weapon three times at point-blank range. ROA.926, 984. This striking image was published on the front page of the August 9, 2020 edition of the *Dallas Morning News*, which recounted Rudloff's aggression and overreach in the moment. ROA.1004. *See* Miles Moffeit, Cassandra Jaramillo, & Dianne Solis, *'I felt like my chest was on fire': Photo Shows Dallas Police Officer Shooting Protester with Pepper-Ball Gun*, Dall. Morning News (Aug. 9, 2020), https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/. *See also* ROA.16, 18.

In a brief interview with the *Morning News* for the article, Rudloff explained he shot the protester simply because "she wasn't doing what we told her to do." Moffeit, et al.—a seeming violation of Dallas Police Department policy banning the use of less-lethal weapons on people who are merely "passively resisting or who are not posing a physical threat to persons." *Id.*

Rusanowsky continued to follow Rudloff with his camera as Rudloff aimed his weapon at another nearby protester and ordered her to the ground. ROA.926, 988-990. He kept his lens trained on Rudloff as Rudloff

moved to a fourth protester, pointed his weapon inches from the protester's body, and then grabbed him by the hair and forced him to the ground as well. ROA.926, 992-1002.

D. **"Yeah, yeah, press, press. You're going to jail": Rudloff arrests Rusanowsky in retaliation for photographing Rudloff using force against protesters.**

As Rudloff maneuvered around the scene arresting every protester in sight—while applying force that appeared to at least breach departmental policy—Rusanowsky stood about ten feet away. He believed in his professional judgment this was a safe enough distance to document the scene, without appearing to be interfering with law enforcement as they carried out their arrests. ROA.926.

But upon completing his fourth arrest in about one minute, Rudloff—realizing that Plaintiff had all the while been photographing him—turned to Rusanowsky and told him he was arresting him, too. ROA.927. Rusanowsky immediately tried to clarify with Rudloff that he was a member of the press, and that he was simply there to document what he was seeing. ROA.927. He held his cameras up in the air to show compliance, then placed the camera in his left hand down so that he could show Rudloff his press badge. ROA.927, 1044-1052.

In response, Rudloff verbally acknowledged Plaintiff's status as a member of the press, but cast Rusanowsky's pleas aside—"yeah, yeah, press, press," he told Rusanowsky. "You're going to jail." ROA.927 [¶ 46]. Rudloff did not inform Rusanowsky of any basis for his arrest; he simply grabbed Rusanowsky by his shirt and threw Rusanowsky to the ground. ROA.927, 1044-1052.

Skye Seipp, a journalist who had walked with Rusanowsky earlier, saw Rusanowsky's arrest. He recounted that there was not a doubt in his mind Rudloff knew Rusanowsky was a member of the press at the time he moved in to arrest him. ROA.1012-1013. After Rudloff arrested Rusanowsky, Seipp remembers Rudloff threatening him and another nearby journalist with arrest as well if they did not leave the area. Having witnessed Rusanowsky's mistreatment at Sgt. Rudloff's hands, they both moved away. ROA.1013

After Rudloff had physically restrained Rusanowsky, another officer, Cpl. David Pillar, then handcuffed him. ROA.927. Along with the other arrestees, Rusanowsky was taken to a staging area where he was then transported to jail. ROA.927. He was held overnight on a $300 cash

bond, which he could not pay because he did not have enough money on him. ROA.927-928.

### E. Rusanowsky's charges are dropped, and he brings suit.

Rusanowsky did not learn what he was being charged with until he appeared for his magistrate hearing while detained in jail after his arrest. ROA.927-928. There, he found out he was arrested for Obstruction of a Highway, Tex. Penal Code. § 42.03. But the warrant affidavit filed in support of his arrest contained false information. ROA.692, 751-753. *See* ROA.787 (officer who provided information for warrant affidavit explaining he was stationed at command post). It alleged Rusanowsky was observed by Sgt. Scott Transou obstructing a roadway near 1700 Commerce St.—nearly a mile from the site of his arrest—at around 10:00 p.m.—more than an hour after he had been arrested by Sgt. Rudloff and taken into custody. ROA.692, 696. Rudloff's own summary judgment evidence proved these alleged observations wrong. ROA.683-685 (documenting where the officers observed and arrested Rusanowsky).

Whatever the reason for these factual inaccuracies, they suggest that neither Sgt. Rudloff, nor anyone on his team who assisted in Rusanowsky's arrest, articulated any factual basis for Rusanowsky's

arrest through the chain of custody at the time they detained him—a fact Rudloff himself later admitted. ROA.681. Unsurprisingly, then, the charges brought against Rusanowsky were later dropped. ROA.695.

Rusanowsky consequently brought this suit for deprivations of his civil rights due to his arrest. ROA.11-42. Central to this appeal, he alleged that Rudloff arrested him without probable cause, and that he did so in retaliation for the exercise of his clearly established First Amendment right to record the police in the exercise of their official duties. ROA.34-37. Rusanowsky also sued the City of Dallas on a theory of municipal liability—that the City failed to adequately train, supervise, and discipline Sgt. Rudloff, and these failures created the conditions which led to Rusanowsky's unconstitutional arrest. ROA.39-41.

The district court set the case on an expedited schedule to resolve Sgt. Rudloff's claim of qualified immunity. ROA.272-275. After the court partially denied the City of Dallas's motion to dismiss, ROA.379-395, and granted some limited discovery, ROA.402-406, the parties filed cross-motions for summary judgment, limited to the issue of Rudloff's qualified immunity. ROA.435-631 (Rusanowsky motion, brief, and appendix), ROA.633-710 (Rudloff motion, brief, and appendix), ROA.730-788

(Rusanowsky response and appendix), ROA.789-832 (Rudloff response), ROA.836-859 (Rusanowsky reply), ROA.860-891 (Rudloff reply).[1]

## F. None of the officers who were at the scene agree on what happened.

In his summary judgment motion, Sgt. Rudloff offered a version of events on May 30, 2020 that was diametrically opposed to Rusanowsky's. Sgt. Rudloff and two other officers—Cpl. Russell Barrett and Cpl. David Pillar—each filed affidavits memorializing their recollections of the events leading up to Rusanowsky's arrest. ROA.680-687. In recounting their geographical movements, Barrett testified to the path the officers traveled to push the protesters off the highway. ROA.683, 685. He explained that Rudloff and his team began on the west side of I-35E, near the intersection of W. Commerce St. and S. Riverfront Blvd., and moved east across the interstate over to its northbound lanes, where protesters were obstructing traffic. ROA.683.

---

[1] Rudloff also objected to Rusanowsky's declarations on technical grounds, and moved to strike them for that reason. ROA.892-913. Rusanowsky subsequently moved for leave to filed cured declarations. ROA.914-920, 1056-1070. The district court granted Rusanowsky's motion for leave contemporaneously with its order granting summary judgment to Sgt. Rudloff. ROA.1072.

Rudloff, Barrett, and Pillar all testified that they moved across the interstate as a group in order to clear the highway of protesters. ROA.680, 683, 686. Upon reaching the site of the protest, they recalled seeing "hundreds of individuals blocking I-35 North." ROA.680, 683, 686. Through those hundreds of protesters, and amid all the chaos and disorder they testified to, each of them apparently remembered—nearly three years later—seeing Rusanowsky specifically, in the less than one minute of time he walked along the interstate's improved shoulder—even amid the hail of projectiles protesters were allegedly hurling at police. ROA.680, 683, 686. Despite their apparent recollections, none of the officers was able to say with any level of specificity where on the highway they saw Rusanowsky, what direction they saw him moving, or how close they were to Rusanowsky when they first noticed him.

What level of detail they were able to provide showed that each officer had different, contradictory memories of what actually happened. Rudloff only remembered "witness[ing] a photographer on I-35" who he believes was Rusanowsky, and nothing more. ROA.680. Pillar recalled seeing Rusanowsky "in front of [him] on I-35." ROA.686. And Barrett recalled seeing Rusanowsky coming "up from the freeway over the

guardrails of I-35 towards us[,]" *after* the officers had reached the grassy area on the interstate's east side. ROA.683. In other words, the officers' own recollections simultaneously placed Rusanowsky on the highway moving away from them, and coming off the highway towards them—a physical impossibility.

Nor did the officers' recollections agree on other key details. For example, Rudloff does not remember arresting Rusanowsky *at all*. He disclaimed responsibility for Rusanowsky's arrest entirely, and identified Cpl. Pillar as the arresting officer. ROA.681. Pillar, for his part, agreed he was the one who arrested Rusanowsky, but remembered doing so *before* Rudloff deployed his crowd control weapon on one of the protesters who Rusanowsky himself had photographed—Jantzen Verastique. ROA.687, 984. Rudloff also recalls detaining another protester—Parker Nevills—before he moved to Verastique and shot her with his crowd control weapon. ROA.681. Barrett, however, remembered just the opposite: that Rudloff fired his crowd control weapon at Verastique first, before moving to arrest Nevills. ROA.683.

**G. Rusanowsky's photographic evidence and testimony provided the more reliable accounting of the events leading up to his arrest and, at any rate, created fact issues that entitled him to a trial.**

The photographic evidence and testimony Rusanowsky offered contradicted all three of these officers' accounts. *First*, Rusanowsky testified that he was at the rear of the protest group—fully on the opposite side of the protest crowd as Rudloff and his team approached. ROA.925. It was thus highly improbable that all three officers could have seen Rusanowsky specifically—let alone recalled that fact three years later—because they would have had to see him through the "hundreds" of protesters they witnessed as they reached the site of the interstate's obstruction. *Compare* ROA.925 *with* ROA.680, 683, 686.

*Second*, Rusanowsky testified that he moved to safety in the grassy area adjacent to the highway, right as a loud sound prompted the protesters to run en masse in his direction, apparently in response to the approach of Rudloff and his team. ROA.924. Rusanowsky thus could not have been seen leaving the interstate and moving towards the officers, contrary to Barrett's recollection, ROA.683, because by the time the officers started their sweep across the highway, Rusanowsky had already moved off of it. ROA.924-925.

*Third*, Rusanowsky's photographic evidence demonstrated that both Rudloff and Pillar misremembered who Rudloff interacted with, and

when. Contrary to both of their recollections, Rudloff first shot Verastique with his crowd control weapon, then restrained Nevills, and *then* arrested Rusanowsky. ROA.925-927, 984-1002, 1011-1013, 1016-1036, 1043-1052. Rudloff's and Pillar's competing recollections on this point simply sowed more uncertainty into the factual record, despite the clear photographic evidence demonstrating that their memories were wrong. ROA.1048-1052.

*Fourth*, contrary to Rudloff's testimony that he did not interact with Rusanowsky *at all* until Rusanowsky had already been placed under arrest by Pillar, Rusanowsky offered photographic evidence placing beyond doubt that Rudloff was the very first officer to interact with Rusanowsky, and that Rudloff was the one to initiate his arrest. ROA.1043-1052. Indeed, the evidence offered by Rusanowsky showed Rudloff moving from Nevills to Rusanowsky, the two of them engaging in a brief verbal exchange, and then Rudloff physically laying his hands on Rusanowsky. ROA.1044-1052. Only after that exchange does Pillar come in to handcuff him. ROA.1008.

Despite the clear documentary evidence showing that Rudloff arrested Rusanowsky, Rudloff inexplicably "[had] no idea who charged

[Rusanowsky] with a crime or for what specific crime, if any." ROA.681. Nor could Pillar offer any clarity. Though Pillar—backed by Rudloff—claimed he was the arresting officer, not even he could explain why he purportedly arrested Rusanowsky. ROA.686-687. He offered no detail explaining why he arrested him, or what facts led him to believe he had probable cause to do so. ROA.686-687.

That lack of clarity spoke volumes. Not only did Rudloff and his witnesses fail to provide consistent accounts about what happened on May 30, 2020, none of the three officers could allege Rusanowsky committed *any* offense on that day. At most, each said they saw him on the interstate. ROA.680, 683, 686. But none could say they witnessed him obstructing traffic, or participating in any other conduct that they believe constituted a criminal offense. For all the detail each officer was able to provide about the acts of *other* protesters, and the conditions those officers claimed to experience on the ground, their declarations were devoid of particularized facts establishing Rudloff (or any other officer) had probable cause to arrest Rusanowsky that day. And to fill that void, Rudloff pointed to the facts alleged about Rusanowsky by Sgt. Scott Transou, whose recollections were quite obviously wrong, as Rusanowsky

explained in his response to Rudloff's motion below. ROA.751-753. *See* ROA.683-685 (Barrett account of geographic movements of officers prior to and during arrest), ROA.692 (arrest affidavit), ROA.787 (Hoffman narrative explaining he was stationed at command post).

The factual inconsistencies between the accounts of the three officers who *were* on the scene made their recollections lack credibility, particularly when held up against Rusanowsky's photographic evidence. That is especially true of Rudloff's testimony. He could not remember interacting with Rusanowsky at all, let alone arresting him. This called into question the reliability of his testimony altogether.

Indeed, if Rudloff could not remember laying hands on Rusanowsky, it raised doubts about his ability to recall seeing Rusanowsky on the highway at all—doubts which a jury was best positioned to resolve. And the fact that none of these officers could say why Rudloff arrested Rusanowsky, or provide particularized facts to justify his arrest, should have been the beginning and the end of the qualified immunity inquiry.

**H. The court below held Sgt. Rudloff was entitled to qualified immunity, because it found—relying on an improper inference—that he had arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate.**

The district court never reached these difficult, and troubling questions. Instead, it found that Sgt. Rudloff was entitled to qualified immunity, on the basis that Rudloff had arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate in violation of section 552.006(b) of the Texas Transportation Code—a Class C misdemeanor, which carries a fine-only penalty. ROA.1080-1081.

Section 552.006(b), at the time of Rusanowsky's arrest, required pedestrians "walking along and on a highway" to walk—"*if possible*"—on one of two designated areas: (1) "the left side of the roadway" or (2) "the shoulder of the highway facing oncoming traffic."[2] Applying this statute, the court below found that, when Rusanowsky stepped onto the improved shoulder, he walked the wrong way down the interstate, and on the wrong side. But under the circumstances, walking in the proper area and direction was not possible. For one, the closest and safest egress point once Rusanowsky had stepped onto the improved shoulder, was the grassy area he ended up on. *See* ROA.845-846. Nor was it possible to cross the interstate's obstructed traffic lanes. Rusanowsky testified he feared

---

[2] For the statute's full language in 2020, *see* Addendum.

for his safety were he to set foot onto the highway; and Rudloff and his fellow officers agreed that the conditions on the highway were dangerous. *Compare* ROA.924 *with* ROA.680, 683, 686.

Despite the photographic and testimonial evidence in the record from both parties demonstrating that crossing the interstate at the time was simply not possible, ROA.924, 940, 942, 944, 946, 680—and would have required Rusanowsky to jeopardize his physical safety to do so, ROA.924—the court below found just the opposite. The court speculated that, during the time traffic on the interstate was obstructed by protesters, Rusanowsky could have seized on that moment to venture to the "proper" side of the interstate. ROA.1081. By hypothesizing what Rusanowsky could have done, the court concluded that it was reasonable for Rudloff to make the same inference, and it was thus fair to later arrest him. ROA.1081.

In other words, the court below resolved a material factual inference—whether or not it was possible for Rusanowsky to cross the highway under the circumstances—*against* Rusanowsky, the non-movant. In doing so, the district court:

- Acknowledged, but cast aside, Rusanowsky's "colorable argument that it was impossible, as a practical matter, to walk on the proper side of the interstate." ROA.1081.

- Explained two sentences later that it was resolving a disputed inference in Rudloff's favor. ROA.1081 ("There were nonetheless circumstances from which Sgt. Rudloff could have *inferred* that a crossing was possible.") (emphasis added).

- Noted, but failed to credit, testimony from Rusanowsky— undisputed by Sgt. Rudloff or the other officers—that venturing onto the highway was too dangerous; ROA.924, 680, 683, 686, 1082. and,

- Retroactively required Rusanowsky to make an impossible choice: "venture" across the interstate, despite a reasonable and legitimate fear for his safety; or move to the closest and safest egress point off the highway, and suffer arrest. ROA.1082.

Had the court below taken that (improper) inference one step further, the impossibility of the crossing would have been even more apparent. On the court's own recitation of the facts, Rusanowsky made his way down the improved shoulder of the interstate at around the same

time that Rudloff and his team made their sweep across the highway. ROA.924, 680, 683, 686.[3] If Rusanowsky had indeed ventured across to the "proper" side, he thus would have done so right when law enforcement were clearing the highway of protesters—which would have left him stranded in the middle of an interstate filled with motorists who had just been forced to sit at a standstill.

What's more, the court's inference failed to acknowledge the other important reason Rusanowsky feared stepping into the interstate's traffic lanes: his concern that he could be confused for a protester, or appear to be obstructing the freeway that he was being especially careful to avoid. ROA.924, 928. By obligating Rusanowsky to make that dangerous crossing, the court's analysis further required him to step into an area where he would be less able to differentiate himself from the protesters, and could very well be mistaken for one—a fact which would very likely have given Sgt. Rudloff and his team *actual* probable cause to arrest him.

Rusanowsky made the choice any reasonable person would have made under the circumstances: he took the fastest and shortest route off

---

[3] Rusanowsky questioned their recollections on this point, too. ROA.1054.

the highway, rather than risk his physical safety, and possible arrest, by crossing the interstate. The language of section 552.006(b) permitted him to make this choice, because—as any reasonable person and officer would have understood—it was not possible to cross the highway safely under the circumstances. By only obligating him to cross "if possible," the statute accounted for situations where the safest choice for a pedestrian was simply to stay where they are. *See* ROA.845-846.

Even Rudloff appeared not to question this. His and the other officers' testimony explained that protesters were throwing objects at them the moment they arrived on the scene. ROA.680, 683, 686. If true, no officer would have required pedestrians to place themselves in the middle of that kind of volatile situation simply to ensure they were on the proper side of the road.

**I. By finding Sgt. Rudloff had arguable probable cause to arrest Rusanowsky, the court avoided grappling with the deep divisions in the parties' competing versions of events.**

The district court thus resolved the factual question—whether it was "possible" under the circumstances for Rusanowsky to be on the proper side of the road—in favor of Sgt. Rudloff, and granted him qualified immunity. That result fully disposed of Rusanowsky's false

arrest claim, and mostly disposed of his First Amendment retaliation claim, because the court never reached the question of whether the officers possessed *actual* probable cause to arrest Rusanowsky, and whether Rudloff arrested him in retaliation for photographing him in the exercise of his official duties. ROA.1071-1086.[4]

Had the court below gone that far, it would have been clear that the significant material factual disputes between Rusanowsky, Rudloff, and Rudloff's fellow officers, entitled Rusanowsky to a trial on the issue of Rudloff's immunity. That is in no small part because Rusanowsky's and Rudloff's memory of the arrest are diametrically opposed: Rusanowsky explained Rudloff arrested him in retaliation for capturing Rudloff on camera; Rudloff, on the other hand, did not remember arresting Rusanowsky, or have any idea why Rusanowsky was arrested to begin with. Nor could he offer particularized facts to justify Rusanowsky's arrest.

---

[4] The district court also assessed whether Rusanowsky's First Amendment retaliation claim could proceed despite the existence of probable cause to arrest him. ROA.1087-1089; *see Nieves v. Bartlett*, 587 U.S. 391 (2019). Appellant does not appeal that determination, or the dismissal of his malicious prosecution claim.

Instead, the district court rested its analysis on the existence of arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate. The court therefore granted Sgt. Rudloff's motion for summary judgment, and dismissed Rusanowsky's claims for false arrest and First Amendment retaliation.

That result likewise disposed of Rusanowsky's municipal liability claim against the City of Dallas, because he could not establish a predicate constitutional violation under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978); *see Loftin v. City of Prentiss, Miss.*, 33 F.4th 774, 783 (5th Cir. 2022). Following additional briefing, the court likewise granted summary judgment to the City of Dallas on that narrow issue, and entered a final judgment fully disposing of Rusanowsky's claims. This appeal followed.

## SUMMARY OF THE ARGUMENT

The First Amendment guarantees the right of the people to photograph law enforcement in the exercise of their official duties. *Turner v. Lt. Driver*, 848 F.3d 678, 690 (5th Cir. 2017). Though expressed as a right guaranteed under the First Amendment's speech clause, the right to film the police is an essential protection for members of the press,

who observe and report on matters of public concern involving law enforcement.

The recognition of this right serves a number of important democracy-reinforcing functions. As this Court underscored, "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Id.* (quoting *Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 339 (2010)). But in few cases does this right serve a higher purpose than when it protects the ability of the public to observe and document law enforcement acting at the apex of its power—when officers use official authority to apply force against members of the public, and to arrest them. The right to film the police thus "contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Id.*

This right should have shielded Rusanowsky from arrest on the evening of May 30, 2020. When he documented Sgt. Rudloff and his fellow officers arresting protesters, he did so from a respectful distance, while clearly identifiable as a member of the press. Nor did any officer ever ask

him to reposition himself, if they believed he was interfering with their duties. *See id.* at 688 (the right is subject "only" to reasonable time, place, and manner limitations).

Despite this, Sgt. Rudloff reflexively arrested Rusanowsky when he realized Rusanowsky's camera lens was trained on him, in violation of Rusanowsky's clearly established right to photograph Rudloff and his team that evening. Rudloff had no probable cause to do so and, at summary judgment, could neither remember arresting Rusanowsky, nor articulate particularized facts to justify Rusanowsky's arrest. None of the other officers who testified in support of Rudloff could do better. Instead, each officer proffered a version of events that conflicted with the other officers' memories, and Rusanowsky's own account and photographic evidence.

The deep factual divisions between the parties made for the precise kind of record that militated against a grant of summary judgment to Sgt. Rudloff. But the district court disagreed. Instead, the court ducked these material factual disputes—which suffused the record—in favor of finding that Sgt. Rudloff was entitled to qualified immunity because he had arguable probable cause to arrest Rusanowsky for a violation of

Texas Transportation Code Section 552.006. That offense made it a Class C misdemeanor to walk along certain areas of a highway not designated for pedestrian use—but only "if possible." *See* Addendum.

There was no real dispute between the parties that complying with the statute under the circumstances was not possible. And even if there was such a dispute, it was an issue of material fact that Rusanowsky, as the non-movant, was entitled to have resolved in his favor. Though the district court agreed that Rusanowsky made a "colorable argument" that it was not possible to comply with the statute, ROA.1081, and credited his instincts against crossing as "wise," ROA.1082, the court nonetheless held under the circumstances that it was reasonable for Rudloff to "infer[]" that compliance was possible. ROA.1081.

In other words, faced with making a factual inference—whether it was "possible" for Rusanowsky to comply with the Transportation Code under conditions Rudloff himself described as violent and lawless, ROA.680—the court below resolved that inference in favor of Rudloff, the movant, instead of Rusanowsky, the non-movant.

The court's improper inference then formed the factual context it applied to the question of Rudloff's "objective reasonableness" under the

circumstances; in effect, whether Rudloff had arguable probable cause to arrest Rusanowsky for violating the Transportation Code, even though he lacked all memory of arresting Rusanowsky to begin with.

The court's inference was improper, and therefore, summary judgment for Rudloff was improper, because the court below "define[d the] case's 'context' in a manner that import[ed] genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 658 (2014). In finding Rudloff could have inferred compliance was possible—even though Rudloff never made this argument and his testimony suggested he would have believed just the opposite—the district court erred in precisely the way that *Tolan* cautioned against. *See id.* 657-60. That alone is "reversible error," and requires correction by this Court. *Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (citing *Tolan*, 572 U.S. at 657). The Court should therefore reverse the judgment of the court below, hold that Sgt. Rudloff was not entitled to summary judgment on his defense of qualified immunity, and allow Rusanowsky's claims to proceed to trial.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Bailey v. Iles*, 87 F.4th 275, 282 (5th Cir. 2023). Typically, summary judgment is only "appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)). But, as here, when a defendant raises qualified immunity, the plaintiff "must rebut the defense by establishing a genuine dispute of material fact as to whether the official's allegedly wrongful conduct violated clearly established law." *Id*. (cleaned up).

A "material fact" is one "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a "genuine dispute of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Bailey*, 87 F.4th at 282. In determining whether a jury could resolve a material fact dispute in favor of the party defending against summary judgment, courts must "view[] all facts and evidence in the light most favorable to the non-moving party." *Davidson v. City of Stafford*, 848 F.3d 384, 390 (5th Cir. 2017).

# ARGUMENT

## I.   THE DISTRICT COURT ERRED IN FINDING ARGUABLE PROBABLE CAUSE TO ARREST RUSANOWSKY.

The district court incorrectly held that Rusanowsky's claims against Rudloff could not proceed, because Sgt. Rudloff had arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate, and therefore was entitled to qualified immunity. *See* Tex. Transp. Code § 552.006(b). ROA.1081-1082. It could not have done so without resolving a contested issue of material fact—whether it was "possible" for Rusanowsky to cross the interstate—in favor of Rudloff, the movant. As explained further below, that was reversible error. *Winzer*, 916 F.3d at 474; *see Tolan*, 572 U.S. at 658.

### a. Applying ordinary summary judgment principles to Rusanowsky's false arrest claim, Rusanowsky was entitled to present his claims to a jury.

Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003). Courts may only "examine the events leading up to the arrest" in determining the existence of probable cause. *Id*. at 371. Thus, only "facts and circumstances within [an] officer's knowledge

that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense" may establish probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).

Facts "must be known to the officer at the time of the arrest"— "post-hoc justifications based on facts later learned cannot support an earlier arrest." *Id*. Warrantless arrests "must be supported by probable cause particularized with respect to" the arrestee; "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (citing *Sibron v. New York*, 392 U.S. 40, 62–63 (1968)). Police officers "may not disregard facts tending to dissipate probable cause." *Bailey*, 87 F.4th at 286.

Under qualified immunity principles, the existence of "arguable" probable cause—when officers "reasonably but mistakenly conclude that probable cause is present"—may defeat a false arrest claim. *Club Retro*, 568 F.3d at 206. The reasonableness of an officer's belief in probable cause is reviewed by courts under an objective standard: it must be

"'assessed in light of legal rules clearly established at the time of the incident,' which includes the statute's text and state case law interpreting it." *Bailey*, 87 F.4th at 287.

Arguable probable cause is essentially a question pertaining to the objective reasonableness of an officer. That is, an officer who "reasonably but mistakenly conclude[s] that probable cause is present" is entitled to qualified immunity, because his conduct did not violate clearly established law. *Club Retro*, 568 F.3d at 206.

Applied to false arrest claims, the two steps of the qualified immunity analysis divide up neatly between actual and arguable probable cause. The first prong of the analysis—the existence of a constitutional violation—questions whether an officer possessed probable cause to arrest a person for the specific offenses they were alleged to have committed. *Bailey*, 87 F.4th at 287 (dividing the false arrest probable cause inquiry into whether there was actual probable cause, and whether the officer was objectively reasonable in believing there was). The court evaluates the knowledge and conduct of the officer in question, and applies an objective standard to determine if "the officer

was aware of facts justifying a reasonable belief that an offense was being committed[.]" *Club Retro*, 568 F.3d at 204.

The second prong of the qualified immunity analysis in false arrest claims—whether the officer was objectively reasonable in light of clearly established case law, *Davidson*, 848 F.3d at 391—questions whether, on the facts known to the arresting officer at the time, an objectively reasonable officer could have had probable cause to arrest an individual for any other offense. *See Crostley v. Lamar Cty., Tex.*, 717 F.3d 410, 422-23 (5th Cir. 2013) (applying an "objective reasonableness" standard to the second step of the qualified immunity inquiry); *see also Dist. of Colum. v. Wesby*, 583 U.S. 48, 65 (2018).

An officer who lacks *arguable* probable cause violates clearly established law guaranteeing the "Fourth Amendment right to be free from false arrest[.]" *Club Retro*, 568 F.3d at 206. In other words, an officer who "mistakenly" arrests someone, and cannot posit any other basis on which he could have lawfully made the arrest, fails the second step of the qualified immunity analysis. *See id.* at 206-07.

At the summary judgment phase, this inquiry is undertaken by applying ordinary summary judgment principles to each step of the

qualified immunity inquiry. *Tolan*, 572 U.S. at 656; *see Spiller v. Harris Cty. Tex.*, No. 22-20028, 2024 WL 4002382, at *2 (5th Cir. Aug. 30, 2024) (when video evidence does not "utterly discredit" the plaintiff's version of events, courts apply Rule 56 "unvarnished"). Courts may approach the qualified immunity analysis in any order they wish. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But regardless of which step a court starts with, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

This admonition requires especially careful attention when starting (and ending) with the second prong—whether an officer's actions were objectively reasonable in light of clearly established law. Although this Court recently reiterated that the second step of the qualified immunity inquiry is a "purely legal question," *Ramirez v. Killian*, No. 22-10401, 2024 WL 3823609, at *10 (5th Cir. Aug. 15, 2024) (emphasis removed), the question must still be answered with sensitivity to the "specific context of the case." *Tolan*, 572 U.S. at 657 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To that end, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.*

That bears emphasis: even though the second step of the qualified immunity analysis is a pure question of law, the factual context relied upon by a court to resolve that question (and any inferences drawn from it) must still "be viewed in the light most favorable to the party opposing the motion"—here, Rusanowsky. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 572 U.S. at 656 (quoting *Anderson*, 477 U.S. at 249).

The court below departed from those well-settled principles when it held that Rudloff possessed arguable probable cause to arrest Rusanowsky for walking on the wrong side of the interstate. In reaching that conclusion, it stated explicitly that it considered the question within a factual context "from which Sgt. Rudloff could have inferred that a crossing was possible." ROA.1081. But Rudloff's own summary judgment testimony appeared to agree with Rusanowsky that crossing the interstate under those circumstances was dangerous. And even if Rusanowsky and Rudloff disagreed over that point, that would create a

dispute of material fact that should have been resolved in Rusanowsky's favor.

What's more, the district court reached its conclusion amid significant concerns over the credibility of Rudloff's testimony, which raised questions about whether he had even seen Rusanowsky on the interstate's shoulder at all. That cuts to the heart of the arguable probable cause inquiry; indeed, "it is axiomatic that the officers must know the factual predicate for probable cause prior to arrest." *Club Retro*, 568 F.3d at 207. The inconsistencies in Rudloff's testimony, and the photographic evidence from Rusanowsky showing that Rudloff's version of events should be treated with "skeptical scrutiny," made it improper for the district court to credit as true the officers' memories that they identified Rusanowsky specifically through hundreds of protesters in the brief time he was on the highway. *See Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009).

Put simply, the district court resolved two genuine issues of material fact against Rusanowsky, and in favor of Rudloff: (1) that it was possible to cross the interstate's obstructed lanes under the perilous circumstances of the moment; and (2) that Rudloff and his fellow officers

saw Rusanowsky on the highway, even though Rusanowsky's testimony refuted that point, and the officers' disagreement on other key facts made "questions about [their] credibility loom large[.]" *See id.* (cleaned up). Had the district court applied the correct factual context to the "objective reasonableness" question, it should have found that fact issues precluded summary judgment in Rudloff's favor. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) ("diametrically opposed summary judgment affidavits" made it "impossible" to resolve the objective reasonableness question, because court could not determine from the disputed factual record whether probable cause existed); *Scott v. White*, No. 1:16-CV-1287-RP, 2019 WL 122055, at *14 (W.D. Tex. Jan. 7, 2019) ("[W]hether clearly established law would have given White fair notice that his conduct was unreasonable depends on the resolution of disputed facts about how a reasonable officer would have viewed Scott's conduct.").

### b. The parties agreed below that conditions on the interstate were dangerous.

First, the parties arguably agreed that crossing the interstate under the circumstances was not possible. Indeed, among all the factual disputes between Rusanowsky's recollection of events and Rudloff's, as well as the inconsistencies in memory between Rudloff, Barrett, and

Pillar, one of the few things they appeared to align on is that conditions were too perilous for anyone to attempt a crossing. Rusanowsky testified that he specifically avoided setting foot onto the traffic lanes of the interstate because he feared that an angry driver could advance on the protesters at any moment. ROA.924. Rudloff, Barrett, and Pillar each described a more explosive scene. They recalled seeing protesters "breaking vehicle windows and spray-painting multiple vehicles." ROA.680, 683, 686. When they arrived at the obstructed lanes of the interstate, each recounted protesters "throwing rocks, shaking cars, glass bottles, full water bottles, and other items at [their] group." ROA.680, 683, 686.[5]

Even though the parties did not agree on the precise conditions at the time, they did not dispute that conditions on the interstate were volatile, and either had devolved into chaos, or could devolve into chaos at any moment. *Compare* ROA.680 *with* ROA.924, 928. Either way, both a reasonable person in Rusanowsky's position, and a reasonable officer

---

[5] Rusanowsky did not recall witnessing protesters engaged in these violent acts. ROA.1054. But he nonetheless had a well-founded fear that making any sort of crossing under the circumstances would be dangerous. ROA.924, 928.

in Rudloff's position, would have understood that venturing across the interstate's traffic lanes at that moment would not have been possible.

Not only does the record appear to show agreement between the parties on this factual issue, Rudloff also declined to dispute the point in his briefing—despite three opportunities to do so. Neither his motion, nor his response to Rusanowsky's motion, nor his reply ever claimed—on the facts known to Rudloff at the time—that he believed it was possible for Rusanowsky to make the crossing. ROA.663-665, 808-811, 885-886. That was not for Rusanowsky's lack of effort to raise the point himself. Rusanowsky explicitly argued in his response to Rudloff's motion, and his reply to his own motion, that it simply was not possible for him to cross the interstate's traffic lanes. ROA.770, 845-846.

The district court's treatment of this issue created an issue of material fact where there was none, then resolved it in Rudloff's favor. The court below should have applied the proper factual context discussed above to decide whether Rudloff possessed arguable probable cause to arrest Rusanowsky for a violation of Transportation Code Section 552.006. *See Keenan*, 290 F.3d at 260 (criticizing the lower court for finding probable cause by accepting statements which "militated in favor

of probable cause and ignoring those which did not."). Instead, the court found that these were "circumstances from which Sgt. Rudloff could have inferred that a crossing was possible." ROA.1081; *but see Keenan*, 290 F.3d at 260 (finding grant of summary judgment improper when there were fact issues "concerning the constable's perception of Keenan's actions"). "Even if Mr. Rusanowsky was wise to be cautious about a crossing," the district court opined, "Sgt. Rudloff reasonably could have expected him to venture one." ROA.1082.

That finding was improper "under either prong" of the qualified immunity analysis, because "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. The court's analysis also resisted the weight of the record evidence, and briefing between the parties, showing there was little to no genuine dispute over the issue.

In support of its conclusion, the district court cited several facts supporting its analysis:

1. Cars were stopped on the interstate, and protesters were observed walking on the freeway, ROA.1081-1082,

2. Because cars were stopped, Rusanowsky had the right of way to cross, because the likelihood of a collision with a vehicle was low, ROA.1081,

3. Sgt. Rudloff himself crossed the interstate, and thus Rusanowsky implicitly should have been able to do so as well. ROA.1082.

But these findings interpreted photographic and video evidence in a way that overlooked both parties' descriptions regarding the conditions of the moment, and blurred together the different legal privileges Rusanowsky and Rudloff each possessed at the time.

For one, the court's conclusion, based on Rusanowsky's photographic evidence, that conditions on the highway were safe enough for him to cross the obstructed lanes, controverted both Rusanowsky's and Rudloff's testimony refuting those assertions. *Compare* ROA.1081-1082 *with* ROA.924, 928 *and* ROA.680, 683, 686. That in itself was error, because the documentary evidence did not "blatantly contradict [Rusanowsky's] version of events so that no reasonable jury could believe it." *Spiller*, 2024 WL 4002382, at *2. The court was thus obligated to apply Rule 56 "unvarnished" and credit all reasonable inferences towards

Rusanowsky. *Id.* Judge Willett explained why, in his concurrence in

*Spiller*:

> [W]hile [documentary] evidence can sharpen our decision-making by leaving less room for speculation and guesswork, it can often raise as many questions as it answers—for example, what about what the footage *doesn't* show … the events that took place during the run-up to the alleged misconduct? And even what the often-harrowing video *does* show can become a Rorschach test of sorts, as viewers filter objective evidence through subjective experience. Where some see damning digital proof, other see clear cut exoneration.

*Id.* at *5 (Willett, J., concurring). Reviewing Rusanowsky's photographic

evidence, the district court saw "clear cut exoneration" for Rudloff where

it shouldn't have. The very reason the highway was obstructed was that

a mass of protesters had themselves failed to yield the right of way to

traffic. How Rusanowsky could himself have *legally* possessed the right

of way at the same time that others were *illegally* failing to yield is

entirely unclear. And at any rate, Rusanowsky explained his well-

grounded fear—which the court below credited as "wise"—that a collision

was still possible given the volatility of the moment. ROA.1082. *See also*

ROA.770.[6]

---

[6] The court's finding here actually *undermines* the officers' ability to control the scene, because it offers no way for law enforcement reasonably to

Moreover, by highlighting *Rudloff's* ability to cross as factual support for *Rusanowsky's* ability to cross, the court elided the legal privileges that each possessed under the circumstances. Unlike pedestrians, who must yield to drivers when crossing at a point other than a crosswalk, Tex. Transp. Code § 552.005, Texas law prohibits drivers from refusing to comply with traffic directions given by police officers. Tex. Transp. Code § 542.501. It was possible for Sgt. Rudloff to cross the interstate because he was able to halt moving vehicles with legal authority, and the drivers of those vehicles had a duty to follow his orders. Rusanowsky, on the other hand, had no such authority. Rather, the law mandated that Rusanowsky at all times "yield the right-of-way to" the vehicles on the highway. ROA.1081; Tex. Transp. Code § 552.005(a); *see also* ROA.770. Rusanowsky had legal instruction to yield to cars, but cars had legal instruction to yield to Rudloff. Sgt. Rudloff's ability to cross thus had no bearing on the possibility of Rusanowsky crossing.

---

distinguish between unlawful obstructors, and those among the group who are simply taking advantage of that obstruction to cross the interstate lawfully.

At bottom, then, the district court applied the wrong factual context to the legal question of "objective reasonableness." At the summary judgment phase, the court below was obligated to resolve all factual inferences in favor of Rusanowsky when determining the proper factual context to consider the second prong of the qualified immunity analysis. The Supreme Court is clear why this is so important: "The witnesses on both sides come to [the] case with their own perceptions, recollections, and biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Tolan*, 572 U.S. at 650.

### c. The officers' conflicting memories of events were not credible, and therefore should have been left for a jury to scrutinize.

The district court also answered this question having found that the officers saw Rusanowsky on the highway, even though Rusanowsky's testimony refuted this assertion, and despite the fact that the inconsistencies between the officers' accounts of what happened raised doubts about their credibility. In effect, by failing to credit Rusanowsky's testimony refuting the officers' recollections on the highway, "the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor

of the moving party." *Tolan*, 572 U.S. at 657 (citing *Anderson*, 477 U.S. at 249).

In particular, the district court downplayed two of Rusanowsky's factual contentions, in favor of applying Rudloff's characterization of events. *First*, Rusanowsky testified that no police were within his line of sight until he had reached the grassy area adjacent to the interstate. ROA.924-925. *Second*, Rusanowsky explained why he thought it "extremely unlikely, if not impossible" that any officer approaching from the opposite side of the highway could have identified him specifically. ROA.925. He explained that his physical positioning in relation to the direction the officers approached from meant that, to see him, the officers would have had to zero in on Rusanowsky through the throng of protesters—numbered in the hundreds, according to the officers—positioned between Rusanowsky and the officers when they reached the highway.

The errors and inconsistencies in the officers' affidavits also made their recollections of that moment lack credibility. Rudloff's inability to recall laying hands on Rusanowsky and arresting him, itself a material fact, undermines his recollection that he identified Rusanowsky on the

highway with crystal clarity. The district court overlooked this error, finding that there was no indication that Rudloff's testimony was "untrustworthy in any material respect." ROA.1083. But Rudloff's lack of memory on an ultimate issue—whether he arrested Rusanowsky— should have cast doubt over the *only* other particularized fact he could recall about Rusanowsky: that he "witnessed" Rusanowsky on the highway. ROA.680. *See also* ROA.769-771. Though the court may have been correct not to disregard the testimony entirely, it was incorrect to hold that a jury could not "find in favor of Mr. Rusanowsky by accepting one of the competing testimonial accounts." ROA.1083.

Quite the opposite: a reasonable jury tasked with determining whose account was more credible—Rusanowsky's, or one of the three different accounts of events offered by Rudloff, Barrett, and Pillar—could have found for Rusanowsky. *See Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [Rusanowsky's] version of events is inappropriate for summary judgment."); *Winzer*, 916 F.3d at 473 (errors and inconsistencies in affidavit create "credibility issue[s]" which are "for the trier of fact, not the district court"); *Deville*, 567 F.3d at 165-166.

### d. Analyzed under the proper factual context, Rudloff was not entitled to summary judgment.

The "central error" in the district court's analysis is that it "adopt[ed] the officers' characterization of the events preceding" Rusanowsky's arrest, and downplayed Rusanowsky's testimony creating genuine disputes of material fact over those characterizations. *Winzer*, 916 F.3d at 474. Had the district court applied the proper factual context to its qualified immunity analysis, Rudloff would not have been entitled to summary judgment. The court below should have analyzed "objective reasonableness" in light of the genuine dispute over whether the officers actually saw Rusanowsky on the highway, ROA.749-751, 761-771, and the absence of any reasonable dispute between the parties that crossing the interstate at the time was not possible: Rusanowsky explicitly testified that he could not venture the crossing out of fear for his safety, and Rudloff declined every opportunity to refute that point. ROA.924, 663-665, 808-811, 885-886.

The district court's contrary findings were reversible error. *Winzer*, 916 F.3d at 474 (citing *Tolan*, 572 U.S. at 657). A genuine dispute of material fact existed over the officers' recollections that they saw Rusanowsky on the interstate, and there was therefore no adequate basis

to find that Rudloff was "objectively reasonable" under the circumstances. That is because the one fact Rudloff could offer in support of probable cause—the singular fact that he saw Rusanowsky on the interstate—required a jury's consideration to resolve.

Even if that finding was proper (it wasn't), the district court then should have asked whether an objectively reasonable officer—knowing that Rusanowsky would not have been able to cross the interstate under the circumstances or would be unable to reasonably infer that he could— could have possessed probable cause to arrest Rusanowsky for violating Section 552.006 of the Transportation Code.

On that framing, the question answers itself: an objectively reasonable officer would not have had probable cause to arrest Rusanowsky. The ability to cross the roadway was a necessary condition for an objectively reasonable officer to validly effectuate Rusanowsky's arrest. A reasonable officer lacking facts to believe a crossing was possible, would not then have been justified in proceeding with the arrest anyway.

Even if there was a genuine dispute of material fact between the parties on this very point, the resolution of that dispute should still have

been made in Rusanowsky's favor, not Rudloff's. As Rusanowsky explained, the conditions of the moment made it too dangerous for him to feel safe setting foot on the interstate's traffic lanes. Likewise, Rudloff, Barrett, and Pillar all explained that on their side of the highway—the side the court below found Rusanowsky should have crossed to—the officers arrived to a barrage of rocks, bottles, and other items that "began hitting at our feet and going over our heads." ROA.680, 683, 686. Even though Rudloff did not testify one way or another as to whether he believed Rusanowsky could have crossed, there were nonetheless sufficient facts in the record to permit—and under the proper application of the summary judgment standard, mandate—an inference that Rudloff would have believed a crossing was not possible.

The proper inference to be taken from the factual record, then, was that for Rusanowsky to cross towards the officers, he would have had to put himself in harm's way. He risked harm both from the vehicles on the road, per his testimony, as well as harm from the projectiles thrown by protesters, per Rudloff's testimony. Either way, the correct inference under the circumstances—the one taken in the light most favorable to Rusanowsky—was that Rusanowsky simply could not have made the

crossing. An objectively reasonable officer, recognizing this, would therefore have had no basis on which to arrest Rusanowsky for failing to take those perilous steps.

The court below thus did not need to reach further than the statute's text to hold summary judgment for Rudloff improper. *See Bailey*, 87 F.4th at 287 (analyzing arguable probable cause "includes [reviewing] the statute's text and state case law interpreting it"). Unlike cases where an ambiguity in the interpretation of a statute requires granting qualified immunity to the officer, *see Pearson*, 555 U.S. at 238, there was no such ambiguity here because an objectively reasonable officer would have known that an essential element of the statute—the possibility of crossing the interstate—was lacking. *See also Taylor v. Riojas*, 592 U.S. 7, 9 n.2 (2020) (noting that if a factual situation would make it obvious to an objectively reasonable officer that their conduct was improper, "ambiguity in the caselaw" is not a reason to conclude otherwise).

## II. THE SAME DEEP FACTUAL DIVISIONS THAT MILITATED AGAINST A FINDING OF ARGUABLE PROBABLE CAUSE MADE THE QUESTION OF ACTUAL PROBABLE CAUSE IMPOSSIBLE TO ANSWER.

The district court improperly dismissed Rusanowsky's claims against Rudloff by finding there was arguable probable cause to arrest Rusanowsky. Because that conclusion was essentially dispositive of both his false arrest and his First Amendment retaliation claims, the court never addressed the merits of either claim—that is, whether he had established the existence of a constitutional violation, or at least established a genuine dispute of material fact on the issue.

The summary judgment evidence presented by the parties demonstrated, at a minimum, deep factual rifts between Rusanowsky and Rudloff. Had the court below properly found a lack of arguable probable cause to arrest Rusanowsky, it likewise should have found that Rusanowsky had established a fact issue as to the existence of actual probable cause, and whether Rudloff retaliated against Rusanowsky for photographing him in the exercise of his official duties—a right that was clearly established at the time of Rusanowsky's arrest. *Turner*, 848 F.3d at 690.

### a. Rudloff lacked actual probable cause to arrest Rusanowsky.

The summary judgment record showed that there was a genuine dispute of material fact over an ultimate issue: the existence of actual

probable cause for Rudloff to arrest Rusanowsky for obstruction of a roadway. Far from offering particularized detail to justify his actions, Rudloff explained in his testimony that he lacked any memory of arresting Rusanowsky, and had "no idea who charged him with a crime or for what specific crime, if any." ROA.681. *See Club Retro*, 568 F.3d at 204 (Facts justifying arrest must be "known to the officer at the time of the arrest" and must be "particularized to the arrestee.") (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

Rusanowsky met his own summary judgment burden to establish a genuine issue of material fact on these claims. He provided photographic evidence and testimony showing that Rudloff arrested him. This is thus not a case where the parties agree on basic facts like the identity of the arresting officer. Here, Rudloff disclaims *any* involvement in Rusanowsky's arrest, even though uncontroverted photographic evidence establishes that he was the first to interact with Rusanowsky and lay hands on him. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("[T]he mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient" to constitute an arrest.).

Simply put, Rusanowsky says Rudloff arrested him. Rudloff says he didn't, and has no idea what Rusanowsky was arrested for. This is a clear factual dispute that requires resolution by a jury. *See, e.g.*, *Moroughan v. Cty. of Suffolk*, 514 F. Supp. 3d 479, 519 (E.D.N.Y. 2021) (fact issue over who was responsible for arrest precluded summary judgment in false arrest claim); *Burbank v. Davis*, 227 F. Supp. 2d 176, 183-84 (D. Me. 2002); *see also Jackson v. City of New York*, 939 F. Supp. 2d 235, 249 (E.D.N.Y. 2013).

What's more, in disclaiming responsibility for Rusanowsky's arrest, neither Rudloff, nor his fellow officers, offered a single particularized detail that would have established probable cause to arrest Rusanowsky for the offense for which he was originally arrested—obstruction of a roadway. ROA.692. Even though each officer claimed to observe Rusanowsky on the highway, none of the officers could recall anything more. They did not recall seeing him set foot on the interstate's traffic lanes, nor did any of them say he obstructed traffic, or had a reasonable basis to believe he did. Not even Cpl. Pillar, who (erroneously) claimed responsibility for Rusanowsky's arrest, could say why he arrested Rusanowsky. ROA.686.

Even if their testimony and Rusanowsky's testimony, taken together, permits an inference that they saw him on the *shoulder* of the highway—an inference the court below made, ROA.1081—clearly established law made it clear that was not enough to suspect Rusanowsky of obstruction. *Davidson*, 848 F.3d at 392-93 (requiring particularized facts that a person rendered a passageway "impassable" or "unreasonably inconvenient or hazardous").

Nor did any other officer have probable cause to arrest Rusanowsky for either obstruction of a roadway, or riot participation. *See* Tex. Penal Code §§ 42.02, 42.03. Below, Rudloff relied on an offense report—attributable to an officer who was not on the scene—which alleged Rusanowsky was observed obstructing a roadway and participating in a riot nearly a mile away from the site of his arrest, almost ninety minutes after he was arrested. ROA.692-693, 758-761. But the testimony of Rudloff, Barrett, and Pillar all agreed that Rusanowsky was arrested in the grassy area just east of the northbound lanes of I-35E, and had been taken into custody long before the events described in the offense report—a fact with which Rusanowsky agreed. ROA.680, 683,

686. *See* ROA.926 (describing arrests taking place between 8:33 and 8:34 p.m.).

The inconsistencies in the record—about what happened, what Rusanowsky was observed doing, who arrested Rusanowsky, and on what basis he was arrested—should have entitled Rusanowsky to present those issues to a jury. And as noted above, the clear photographic evidence offered by Rusanowsky, which directly refuted all three officers' memories of events, raised credibility issues regarding their testimony that a jury was best positioned to resolve.

The deep factual divisions between the parties, the inconsistent (at best) memories between the three officers, the clear photographic evidence refuting key aspects of the officers' recollections, and the presentation of evidence—Transou's materially incorrect narrative—which recounted facts not even the officers on scene could have agreed with, made this precisely the kind of case where qualified immunity was improper—at least until a jury could weigh the evidence and make its own conclusions about the factual record. *See Tolan*, 572 U.S. at 657-660.

### b. A genuine dispute of material fact existed regarding Rudloff's retaliatory motive.

So, too, should Rusanowsky's First Amendment retaliation claim be reinstated. The district court dismissed the claim on the existence of arguable probable cause, because a retaliation claim typically cannot proceed where probable cause is present, and the ability of an officer to conduct a lawful arrest under the circumstances overcomes any retaliatory motive. ROA.1086. But if this Court agrees that Rudloff lacked arguable probable cause to arrest Rusanowsky, the Court should likewise reinstate his retaliatory arrest claim, because there was at least a genuine dispute of material fact on the issue of Rudloff's retaliatory motive.

Rusanowsky's retaliatory arrest claim required him to establish three elements: (1) that he was engaged in constitutionally protected activity; (2) that his arrest caused him to suffer "an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (3) that Rudloff's "adverse actions were substantially motivated against [Rusanowsky's] exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258.

Rusanowsky was engaged in constitutionally protected activity, and that constitutional protection was clearly established at the time of

his arrest. ROA.459-464, 771-775. Rusanowsky had been photographing Rudloff and his team from a safe, unobstructive distance when Rudloff arrested him after he photographed Rudloff firing his crowd control weapon at one protester, and forcibly restraining another. Rusanowsky recounted how, when Rudloff realized Rusanowsky's camera was trained on him, he turned to Rusanowsky and moved in to arrest him. Rusanowsky attempted to identify himself as a member of the press, which Rudloff acknowledged before proceeding to lay his hands on Rusanowsky and bring him to the ground, where he was handcuffed by Pillar. ROA.924-928.

Rusanowsky therefore met his burden to provide evidence of unconstitutional motive. As this Court explained in *Keenan*, circumstantial evidence showing some causal link between the exercise of constitutionally protected conduct, and the retaliatory action, is sufficient to defeat a claim of qualified immunity. 290 F.3d at 261. There, the publication of "politically and financially damaging" information about an officer, followed by instances of harassment "a few months later" was sufficient evidence for the Court to "assume (at this stage of the

litigation)" that the defendants there were substantially motivated to retaliate against the plaintiffs. *Id.*

So, too, here. Rusanowsky described how, the moment Sgt. Rudloff realized Rusanowsky had been photographing him using force on protesters—photographs that, if published, could be "politically and financially damaging" to Rudloff—Rudloff turned to Rusanowsky to arrest him. Even though Rudloff disputes this claim, his contradictory evidence at a minimum created a genuine dispute of material fact. As explained above, Rudloff disputed that he played *any* role in Rusanowsky's arrest. Despite having no memory of this, he nonetheless disclaimed that he was motivated to arrest Rusanowsky because he was a member of the press. Rusanowsky and Rudloff thus offered two competing views regarding how Rusanowsky's arrest unfolded. A jury should decide which of the two was correct.

Nor is Rudloff entitled to qualified immunity from Rusanowsky's First Amendment retaliation claim on the basis that Rudloff's actions were "objectively reasonable." Not on the facts presented here. That is because Rusanowsky's First Amendment right to photograph Rudloff in the exercise of his official duties was clearly established at the time.

*Turner*, 848 F.3d at 687-90. Thus, Rudloff cannot find quarter in the second step of the qualified immunity analysis, because "government retaliation against a private citizen for exercise of his First Amendment rights *cannot* be objectively reasonable." *Keenan*, 290 F.3d at 261 (emphasis added).

As long as the question of Rudloff's motivation remains unresolved, Rudloff should not be entitled to qualified immunity. That is the proper outcome here, especially in light of the "diametrically opposed summary judgment affidavits" the parties offered, which should have made it clear to the court below that Rudloff's claim of qualified immunity was "impossible to determine" at this phase. *Id.* A fair application of basic summary judgment principles to Rusanowsky's claims makes reversal of the court below the just result.

## III. RUSANOWSKY'S MUNICIPAL LIABILITY CLAIM SHOULD BE REVIVED.

If the Court agrees that one or both of Rusanowsky's claims should be revived, the Court should likewise reverse the dismissal of Rusanowsky's municipal liability claim against the City of Dallas. After the court below granted qualified immunity to Sgt. Rudloff, the district court subsequently granted summary judgment to the City of Dallas and

dismissed Rusanowsky's municipal liability claim, because the parties agreed that the lack of a constitutional violation cut off his ability to advance that claim further. ROA.1110-1112 (citing *Loftin v. City of Prentiss, Miss.*, 33 F.4th 774, 783 (5th Cir. 2022)). The district court accordingly dismissed Rusanowsky's municipal liability claim, on that basis alone.

This Court should reverse the dismissal of Rusanowsky's municipal liability claim, if it agrees that the district court misapplied the summary judgment standard and therefore erred in granting qualified immunity to Sgt. Rudloff. Though the applicable precedent of this Court compelled dismissal of Rusanowsky's municipal liability claim in the absence of a constitutional violation, the revival of either of his constitutional claims should likewise entitle him to press his municipal liability claim anew.

## CONCLUSION

For the foregoing reasons, Appellant asks this Court to reverse the district court's orders granting summary judgment to Appellees, ROA.1071-1092, 1114-1115, and its entry of a final judgment against Rusanowsky, ROA.1116, and remand for further proceedings.

Respectfully submitted,

| /s/ Peter B. Steffensen | /s/ Thomas S. Leatherbury |
|---|---|

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC[7]
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Appellant*
*Christopher Rusanowsky*

---

[7] Counsel for Appellant wish to thank SMU Dedman School of Law 3L student Bradley Kucera for his assistance in drafting this brief, and 3L students Danielle Ball and Nicholas Smetzer for their research and editing assistance.

## CERTIFICATE OF SERVICE

I certify that on September 4, 2024, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Counsel for Appellant*

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,253 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Peter B. Steffensen*
*Counsel for Appellant*

# **ADDENDUM**

Texas Transportation Code

Title 7. Vehicles and Traffic

Subtitle C. Rules of the Road

Chapter 552. Pedestrians

Sec. 552.006. USE OF SIDEWALK. (a) A pedestrian may not walk along and on a roadway if an adjacent sidewalk is provided and is accessible to the pedestrian.

(b) If a sidewalk is not provided, a pedestrian walking along and on a highway shall if possible walk on:

(1) the left side of the roadway; or

(2) the shoulder of the highway facing oncoming traffic.

(c) The operator of a vehicle emerging from or entering an alley, building, or private road or driveway shall yield the right-of-way to a pedestrian approaching on a sidewalk extending across the alley, building entrance or exit, road, or driveway.