No. 24-10455

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CHRISTOPHER RUSANOWSKY,

*Plaintiff-Appellant,*

v.

THE CITY OF DALLAS; SERGEANT ROGER A. RUDLOFF,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A DALLAS
POLICE DEPARTMENT POLICE OFFICER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Action No. 3:22-cv-1132, Judge Ed Kinkeade

## RECORD EXCERPTS

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

**Counsel for Appellant Christopher Rusanowsky**

# TABLE OF CONTENTS

**Tab #**                                                              **ROA**

1          Docket Sheet ..................................................ROA.1

2          Notice of Appeal ...........................................ROA.1117

3          Final Judgment ..............................................ROA.1116

4          Order on Cross-Motions for Summary Judgment
           (Qualified Immunity) ......................................ROA.1071

5          Order on City of Dallas's Motion for Summary
           Judgment (Municipal Liability) ..........................ROA.1114

6          Declaration of Christopher Rusanowsky ...............ROA.921

7          Rusanowsky's Photographs
           of Protest and Arrests ....................................ROA.936

8          Photographs of Sgt. Rudloff
           Arresting Rusanowsky ....................................ROA.1024

9          Officer Declarations .......................................ROA.680

10         Certificate of Service

Tab 1

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:22-cv-01132-K

Rusanowsky v. The City of Dallas et al
Assigned to: Judge Ed Kinkeade
Case in other court:  USCA5, 24-10455
Cause: 42:1983 Civil Rights Act

Date Filed: 05/23/2022
Date Terminated: 08/31/2022
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other Civil
Rights
Jurisdiction: Federal Question

**Plaintiff**

**Christopher Rusanowsky**

represented by  **Jozef Sebastian Van Coevorden**
Ellwanger Law LLP
400 S Zang Boulevard, Suite 600
Dallas, TX 75208
469-998-6775
Fax: 469-903-6002
Email: svancoevorden@equalrights.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael Welles Shapiro**
SMU Dedman School of Law
First Amendment Clinic
PO Box 750116
Dallas, TX 75275
214-768-4077
Fax: 214-768-1611
Email: mshapiro@smu.edu
*TERMINATED: 06/29/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David Warren Henderson**
Ellwanger Henderson LLLP
400 S Zang Blvd
Suite 600
Dallas, TX 75208
469-903-6000
Email: dhenderson@equalrights.law
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Thomas S Leatherbury**
Thomas S Leatherbury Law PLLC
1901 N Akard St

Dallas, TX 75201
214-213-5004
Email: Tom@tsleatherburylaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Peter Blackmer Steffensen**
SMU Dedman School of Law
PO Box 750116
Dallas, TX 75275-0116
214-768-4077
Fax: 214-768-1611
Email: psteffensen@mail.smu.edu
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

| The City of Dallas | represented by | **John Cheves Ligon** |
| | | Dallas City Attorney's Office |
| | | 1500 Marilla Street |
| | | Dallas, TX 75201 |
| | | 214-670-1236 |
| | | Fax: 214-670-0622 |
| | | Email: john.ligon@dallas.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |

**Defendant**

**SGT Roger A. Rudloff**
*individually and in his official capacity as a*
*Dallas Police Department Police Officer*

represented by **John Cheves Ligon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Lindsay Erin Wilson Gowin**
Dallas City Attorney's Office
1500 Marilla Street
Room 7BN
Dallas, TX 75201
214-671-8225
Fax: 214-670-0622
Email: lindsay.gowin@dallas.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/23/2022 | 1 (p.11) | |

| | | COMPLAINT WITH JURY DEMAND against Roger A. Rudloff, The City of Dallas filed by Christopher Rusanowsky. (Filing fee $402; Receipt number 0539-12842972) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.11) Cover Sheet) (Henderson, David) (Entered: 05/23/2022) |
| 05/23/2022 | 2 (p.45) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Christopher Rusanowsky. (Clerk QC note: No affiliate entered in ECF). (Henderson, David) (Entered: 05/23/2022) |
| 05/23/2022 | 3 (p.47) | Request for Clerk to issue Summons filed by Christopher Rusanowsky. (Henderson, David) (Entered: 05/23/2022) |
| 05/23/2022 | 4 (p.49) | Request for Clerk to issue Summons filed by Christopher Rusanowsky. (Henderson, David) (Entered: 05/23/2022) |
| 05/23/2022 | 5 (p.51) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Horan). Clerk to provide copy to plaintiff if not received electronically. (ykp) (Entered: 05/23/2022) |
| 05/23/2022 | 6 (p.53) | Summons Issued as to Christopher Rusanowsky, The City of Dallas. (ykp) (Entered: 05/23/2022) |
| 06/24/2022 | 7 (p.57) | Unopposed Motion for Extension of Time to File Answer filed by Roger A. Rudloff with Brief/Memorandum in Support. Attorney John Cheves Ligon added to party Roger A. Rudloff(pty:dft) (Ligon, John) (Entered: 06/24/2022) |
| 06/24/2022 | 8 | ELECTRONIC ORDER granting 7 (p.57) Unopposed Motion for Extension of Time to File Responsive Pleadings. Roger A. Rudloff response due 7/13/2022. (Ordered by Judge Ed Kinkeade on 6/24/2022) (chmb) (Entered: 06/24/2022) |
| 06/27/2022 | 9 (p.62) | SUMMONS Returned Executed as to The City of Dallas, served on 6/27/2022 . (Henderson, David) Modified event on 6/28/2022 (ygl). (Entered: 06/27/2022) |
| 06/27/2022 | 10 (p.67) | SUMMONS Returned Executed as to Roger A. Rudloff, served on 6/8/2022. (Henderson, David) (Entered: 06/27/2022) |
| 06/29/2022 | 11 (p.68) | Unopposed MOTION to Substitute Attorney, added attorney Peter Blackmer Steffensen,Peter Blackmer Steffensen for Christopher Rusanowsky. Motion filed by Christopher Rusanowsky (Attachments: # 1 (p.11) Proposed Order)Attorney Peter Blackmer Steffensen added to party Christopher Rusanowsky(pty:pla) (Steffensen, Peter) (Entered: 06/29/2022) |
| 06/29/2022 | 12 | (Document Restricted) Attorney Contact Information (Sealed pursuant to SO 19-1, statute, or rule) filed by Christopher Rusanowsky (Steffensen, Peter) (Entered: 06/29/2022) |

| | | |
|---|---|---|
| 06/29/2022 | 13 | ELECTRONIC ORDER granting 11 (p.68) Unopposed Motion to Substitute Counsel of Record. Michael W. Shapiro is withdrawn, and Peter B. Steffensen is hereby substituted as Counsel of Record for Plaintiff Christopher Rusanowsky. (Ordered by Judge Ed Kinkeade on 6/29/2022) (chmb) (Entered: 06/29/2022) |
| 07/13/2022 | 14 (p.71) | ANSWER to 1 (p.11) Complaint with Jury Demand filed by Roger A. Rudloff. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Ligon, John) (Entered: 07/13/2022) |
| 07/18/2022 | 15 (p.87) | Motion to Dismiss for Failure to State a Claim filed by The City of Dallas with Brief/Memorandum in Support. Attorney John Cheves Ligon added to party The City of Dallas(pty:dft) (Ligon, John) (Entered: 07/18/2022) |
| 07/19/2022 | 16 (p.118) | ORDER REQUIRING SCHEDULING CONFERENCE AND REPORT FOR CONTENTS OF SCHEDULING ORDER. (Ordered by Judge Ed Kinkeade on 7/19/2022) (chmb) (Entered: 07/19/2022) |
| 07/20/2022 | 17 (p.124) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Roger A. Rudloff, The City of Dallas. (Clerk QC note: No affiliate entered in ECF). (Ligon, John) (Entered: 07/20/2022) |
| 08/08/2022 | 18 (p.127) | RESPONSE filed by Christopher Rusanowsky re: 15 (p.87) Motion to Dismiss for Failure to State a Claim (Attachments: # 1 (p.11) Proposed Order) (Henderson, David) (Entered: 08/08/2022) |
| 08/08/2022 | 19 (p.159) | Appendix in Support filed by Christopher Rusanowsky re 18 (p.127) Response/Objection (Attachments: # 1 (p.11) Exhibit(s) 1, # 2 (p.45) Exhibit(s) 2) (Henderson, David) (Entered: 08/08/2022) |
| 08/16/2022 | 20 (p.249) | NOTICE of Attorney Appearance by Jozef Sebastian Van Coevorden on behalf of Christopher Rusanowsky. (Filer confirms contact info in ECF is current.) (Van Coevorden, Jozef) (Entered: 08/16/2022) |
| 08/17/2022 | 21 (p.252) | Proposal for contents of scheduling and discovery order *filed Jointly* by Christopher Rusanowsky. (Henderson, David) (Entered: 08/17/2022) |
| 08/22/2022 | 22 (p.260) | REPLY with Brief in Support filed by The City of Dallas re: 15 (p.87) Motion to Dismiss for Failure to State a Claim (Ligon, John) Modified docket text on 8/23/2022 (oyh). (Entered: 08/22/2022) |
| 08/30/2022 | 23 (p.272) | ORDER - QUALIFIED IMMUNITY : Motions due by 12/22/2022. Discovery due by 12/1/2022. There appears to be no further reason at this time to maintain the file as open for statistical purposes. The Clerk is therefore instructed to submit a JS-6 form to the Administrative Office, thereby removing this case from the statistical records.Nothing in this Order shall be considered a dismissal or disposition of this case, and should further proceedings become necessary or desirable, any party or the Court may initiate such further proceedings in the same manner as if this Order had not been entered. Once the qualified immunity issue is resolved, the Court, if needed, will re-open this case and send a Scheduling Conference Order to the parties in order to put this case on a schedule and address the remaining issues in this case. See FED. R. CIV. P. 16(b)(2). (Ordered by Judge Ed Kinkeade on 8/30/2022) (chmb) (Entered: 08/31/2022) |

| | | |
|---|---|---|
| 08/31/2022 | | Civil Case Administratively Closed - See Order - Qualified Immunity. (chmb) (Entered: 08/31/2022) |
| 09/01/2022 | 24 | (Document Restricted) Attorney Contact Information (Sealed pursuant to order dated 8/31/2022) filed by Roger A. Rudloff, The City of Dallas (Ligon, John) (Entered: 09/01/2022) |
| 09/13/2022 | 25 | (Document Restricted) Attorney Contact Information (Sealed pursuant to order dated 8/31/2022) filed by Christopher Rusanowsky (Van Coevorden, Jozef) (Entered: 09/13/2022) |
| 09/29/2022 | 26 (p.276) | REPLY filed by Christopher Rusanowsky re: 14 (p.71) Answer to Complaint, (Steffensen, Peter) (Entered: 09/29/2022) |
| 10/31/2022 | 27 (p.289) | NOTICE of *Intent to File Summary Judgment* re: Terminated Case filed by Roger A. Rudloff (Ligon, John) (Entered: 10/31/2022) |
| 11/11/2022 | 28 (p.292) | Joint MOTION to Extend Time Deadline to File Motion for Leave to Conduct Limited Discovery filed by The City of Dallas with Brief/Memorandum in Support. (Ligon, John) (Entered: 11/11/2022) |
| 11/11/2022 | 29 | ELECTRONIC ORDER granting 28 (p.292) Joint MOTION to Extend Time Deadline to File Motion for Leave to Conduct Limited Discovery. Motion for Leave to Conduct Limited Discovery shall be filed by 11/21/2022. (Ordered by Judge Ed Kinkeade on 11/11/2022) (chmb) (Entered: 11/11/2022) |
| 11/21/2022 | 30 (p.296) | MOTION for Discovery filed by Christopher Rusanowsky (Attachments: # 1 (p.11) Exhibit(s) Ex. 1 - RFPs to City of Dallas, # 2 (p.45) Exhibit(s) Ex. 2 - Interrogatories to City of Dallas, # 3 (p.47) Exhibit(s) Ex. 3 - RFPs to Sgt. Roger A. Rudloff, # 4 (p.49) Exhibit(s) Ex. 4 - Interrogatories to Sgt. Roger A. Rudloff) (Steffensen, Peter) (Entered: 11/21/2022) |
| 12/12/2022 | 31 (p.326) | RESPONSE filed by Roger A. Rudloff, The City of Dallas re: 30 (p.296) MOTION for Discovery (Ligon, John) (Entered: 12/12/2022) |
| 12/15/2022 | 32 | ELECTRONIC Order Referring 30 (p.296) MOTION for Discovery to Magistrate Judge David L. Horan for hearing if necessary and determination. (Ordered by Judge Ed Kinkeade on 12/15/2022) (chmb) (Entered: 12/15/2022) |
| 12/16/2022 | 33 (p.347) | Unopposed MOTION to Extend Time of Qualified Immunity Summary Judgment Deadline filed by Christopher Rusanowsky (Attachments: # 1 (p.11) Proposed Order) (Steffensen, Peter) (Entered: 12/16/2022) |
| 12/16/2022 | 34 | ELECTRONIC ORDER - Before the Court is the Unopposed Motion to Modify Qualified Immunity Summary Judgment Deadline (the "Motion"). Doc. No. 33. The Court GRANTS the Motion. The deadline for the parties to file their motions for summary judgment regarding Defendant Roger A. Rudloff's defense of qualified immunity is hereby reset until thirty (30) days after Plaintiff receives the discovery ordered as a result of his pending Motion for Leave to Conduct Limited Discovery (the "Discovery Motion"), Doc. No. 30, or thirty (30) days after the Court denies Plaintiff's Discovery Motion. (Ordered by Judge Ed Kinkeade on 12/16/2022) (chmb) (Entered: 12/16/2022) |
| 12/28/2022 | 35 (p.353) | STATUS REPORT ORDER: The parties meet andconfer in person or by videoconference regarding the proposed discovery requests by January 27, 2023. Joint Status Report due by 2/3/2023. (Ordered by Magistrate Judge David L. Horan |

| | | |
|---|---|---|
| | | on 12/28/2022) (ndt) (Entered: 12/28/2022) |
| 02/03/2023 | 36 (p.359) | Joint STATUS REPORT *Regarding Discovery Requests* filed by Christopher Rusanowsky. (Van Coevorden, Jozef) (Entered: 02/03/2023) |
| 02/09/2023 | 37 (p.379) | MEMORANDUM OPINION AND ORDER: The Court CONDITIONALLY GRANTS IN PART AND DENIES IN PART Plaintiff Christopher Rusanowsky's motion for discovery as supplemented [Dkt. Nos. 30 (p.296) & 35 (p.353) ]. Consistent with this order as to the scope of limited discovery that is narrowly tailored to uncover only facts that the district court needs to rule on Defendant Roger A. Rudloff's entitlement to qualified immunity, the parties are ORDERED to meet and confer regarding specific discovery requests and file a second joint status report by March 3, 2023. (Ordered by Magistrate Judge David L. Horan on 2/9/2023) (mcrd) (Entered: 02/09/2023) |
| 03/03/2023 | 38 (p.396) | Joint STATUS REPORT filed by Christopher Rusanowsky. (Steffensen, Peter) (Entered: 03/03/2023) |
| 03/07/2023 | 39 (p.402) | MEMORANDUM OPINION AND ORDER: The Court GRANTS IN PART AND DENIES IN PART Plaintiff Christopher Rusanowsky's 30 (p.296) , 35 (p.353) , 38 (p.396) motion for discovery as supplemented and GRANTS Defendant Roger A. Rudloff's construed 38 (p.396) motion for discovery for the reasons set out above and in the February 9 Memorandum Opinion and Order. (Ordered by Magistrate Judge David L. Horan on 3/7/2023) (sxf) (Entered: 03/07/2023) |
| 03/30/2023 | 40 (p.407) | MEMORANDUM OPINION AND ORDER - The Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss. Doc. No. 15. The Court GRANTS Plaintiff leave to file an amended complaint within thirty (30) days of this Memorandum Opinion and Order. Should Plaintiff fail to timely amend, Plaintiff's failure to train claim against the City will be dismissed with prejudice and without further notice. (Ordered by Judge Ed Kinkeade on 3/30/2023) (chmb) (Entered: 03/30/2023) |
| 04/05/2023 | 41 (p.426) | NOTICE of Attorney Appearance by Thomas S Leatherbury on behalf of Christopher Rusanowsky. (Filer confirms contact info in ECF is current.) (Leatherbury, Thomas) (Entered: 04/05/2023) |
| 04/06/2023 | 42 (p.427) | NOTICE of *Discovery Response* filed by Christopher Rusanowsky (Steffensen, Peter) (Entered: 04/06/2023) |
| 04/06/2023 | 43 (p.429) | NOTICE of *Discovery Compliance* re: 39 (p.402) Memorandum Opinion and Order, filed by Roger A. Rudloff (Ligon, John) (Entered: 04/06/2023) |
| 04/12/2023 | 44 (p.431) | Unopposed Motion for Extension of Time to File Answer *or Responsive Pleadings* filed by Roger A. Rudloff, The City of Dallas with Brief/Memorandum in Support. (Ligon, John) (Entered: 04/12/2023) |
| 04/12/2023 | 45 | ELECTRONIC ORDER - Before the Court is Defendants' Unopposed Motion for Extension of Time to File Responsive Pleadings (the "Motion"). Doc. No. 44. The Court GRANTS the Motion. Defendant the City of Dallas' responsive pleading shall be due fourteen (14) days after Plaintiff files his amended pleading or fourteen (14) days after April 30, 2023, whichever is sooner. (Ordered by Judge Ed Kinkeade on 4/12/2023) (chmb) (Entered: 04/12/2023) |
| 05/08/2023 | 46 (p.435) | MOTION for Partial Summary Judgment filed by Christopher Rusanowsky with Brief/Memorandum in Support. (Attachments: # 1 (p.11) Proposed Order) |

| | | (Steffensen, Peter) (Entered: 05/08/2023) |
|---|---|---|
| 05/08/2023 | 47 (p.469) | Appendix in Support filed by Christopher Rusanowsky re 46 (p.435) MOTION for Partial Summary Judgment (Attachments: # 1 (p.11) Exhibit(s) Pages 1-31, # 2 (p.45) Exhibit(s) Pages 32-57, # 3 (p.47) Exhibit(s) Pages 58-73, # 4 (p.49) Exhibit(s) Pages 74-110, # 5 (p.51) Exhibit(s) Pages 111-135, # 6 (p.53) Exhibit(s) Pages 136-145, # 7 (p.57) Exhibit(s) Pages 146-161) (Steffensen, Peter) (Entered: 05/08/2023) |
| 05/08/2023 | 48 (p.632) | ORDER: On March 30, 2023, the Court issued its Memorandum Opinion and Order (the "Order"), Doc. No. 40, granting in part and denying in part Defendant City of Dallas's Motion to Dismiss Plaintiff's Complaint, and Brief in Support, Doc. No. 15. There, the Court dismissed Plaintiff's failure to train claim against the City of Dallas but granted Plaintiff leave to amend his Complaint within thirty (30) days. Doc. No. 40 at 16, 18-19 ("Should Plaintiff fail to timely amend, Plaintiffs failure to train claim against the City will be dismissed with prejudice and without further notice."). Today is May 8, 2023, and Plaintiff has not so amended. Therefore, the Court DISMISSES Plaintiff's failure to train claim with prejudice. (Ordered by Judge Ed Kinkeade on 5/8/2023) (chmb) (Entered: 05/08/2023) |
| 05/08/2023 | 49 (p.633) | MOTION for Summary Judgment *based on Qualified Immunity* filed by Roger A. Rudloff (Ligon, John) (Entered: 05/08/2023) |
| 05/08/2023 | 50 (p.636) | Brief/Memorandum in Support filed by Roger A. Rudloff re 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* (Ligon, John) (Entered: 05/08/2023) |
| 05/08/2023 | 51 (p.678) | Appendix in Support filed by Roger A. Rudloff re 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* (Attachments: # 1 (p.11) Exhibit(s) Appendix) (Ligon, John) (Entered: 05/08/2023) |
| 05/08/2023 | 52 (p.709) | Notice of Manual Filing of Appendix by Roger A. Rudloff re 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* (Ligon, John) (Entered: 05/08/2023) |
| 05/15/2023 | 53 (p.711) | ANSWER to 1 (p.11) Complaint with Jury Demand filed by The City of Dallas. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here:  Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Ligon, John) Modified text on 5/16/2023 (mms). (Entered: 05/15/2023) |
| 05/16/2023 | 54 (p.725) | Joint MOTION for Extension of Time to File Response/Reply to 46 (p.435) MOTION for Partial Summary Judgment , 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* filed by Christopher Rusanowsky (Attachments: # 1 (p.11) Proposed Order) (Steffensen, Peter) Modified text on 5/17/2023 (mms). (Entered: 05/16/2023) |
| 05/17/2023 | 55 | ELECTRONIC ORDER - Before the Court is the Joint Motion for Extension of Time to Respond (the "Motion"). Doc. No. 54. The Court GRANTS the Motion. The deadline for the parties to file their responses is hereby extended to June 5, 2023. (Ordered by Judge Ed Kinkeade on 5/17/2023) (chmb) (Entered: 05/17/2023) |
| 06/05/2023 | 56 (p.730) | RESPONSE filed by Christopher Rusanowsky re: 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* (Steffensen, Peter) (Entered: |

| | | |
|---|---|---|
| | | 06/05/2023) |
| 06/05/2023 | 57 (p.783) | Appendix in Support filed by Christopher Rusanowsky re 56 (p.730) Response/Objection (Attachments: # 1 (p.11) Appendix to Plaintiff's Response) (Steffensen, Peter) (Entered: 06/05/2023) |
| 06/05/2023 | 58 (p.789) | RESPONSE filed by Roger A. Rudloff re: 46 (p.435) MOTION for Partial Summary Judgment (Ligon, John) (Entered: 06/05/2023) |
| 06/12/2023 | 59 (p.833) | MOTION for Extension of Time to File Reply re: 46 (p.435) , 49 (p.633) Motions for Summary Judgment. (Ligon, John) Modified on 6/13/2023 (acm). (Entered: 06/12/2023) |
| 06/12/2023 | 60 | ELECTRONIC ORDER - Before the Court is the Joint Motion for Extension of Time to File Replies to Motions for Summary Judgment (the "Motion"). Doc. No. 59. The Court GRANTS the Motion. The parties' reply deadlines are hereby extended to June 30, 2023. (Ordered by Judge Ed Kinkeade on 6/12/2023) (chmb) (Entered: 06/12/2023) |
| 06/30/2023 | 61 (p.836) | REPLY filed by Christopher Rusanowsky re: 46 (p.435) MOTION for Partial Summary Judgment (Steffensen, Peter) (Entered: 06/30/2023) |
| 06/30/2023 | 62 (p.860) | REPLY filed by Roger A. Rudloff re: 49 (p.633) MOTION for Summary Judgment *based on Qualified Immunity* (Ligon, John) (Entered: 06/30/2023) |
| 06/30/2023 | 63 (p.892) | MOTION to Strike 46 (p.435) MOTION for Partial Summary Judgment *Declarations* filed by Roger A. Rudloff with Brief/Memorandum in Support. (Ligon, John) (Entered: 06/30/2023) |
| 07/21/2023 | 64 (p.897) | RESPONSE filed by Christopher Rusanowsky re: 63 (p.892) MOTION to Strike 46 (p.435) MOTION for Partial Summary Judgment *Declarations* (Steffensen, Peter) (Entered: 07/21/2023) |
| 08/01/2023 | 65 (p.905) | REPLY filed by Roger A. Rudloff re: 63 (p.892) MOTION to Strike 46 (p.435) MOTION for Partial Summary Judgment *Declarations* (Ligon, John) (Entered: 08/01/2023) |
| 08/16/2023 | 66 (p.914) | MOTION for Leave to File Cured Declarations filed by Christopher Rusanowsky with Brief/Memorandum in Support. (Attachments: # 1 (p.11) Exhibit(s) Rusanowsky Declaration, # 2 (p.45) Exhibit(s) Seipp Declaration, # 3 (p.47) Exhibit(s) Rusanowsky Supp. Declaration, # 4 (p.49) Proposed Order) (Steffensen, Peter) (Entered: 08/16/2023) |
| 09/05/2023 | 67 (p.1056) | RESPONSE filed by Roger A. Rudloff re: 66 (p.914) MOTION for Leave to File Cured Declarations (Ligon, John) (Entered: 09/05/2023) |
| 09/19/2023 | 68 (p.1064) | REPLY filed by Christopher Rusanowsky re: 66 (p.914) MOTION for Leave to File Cured Declarations (Steffensen, Peter) (Entered: 09/19/2023) |
| 03/04/2024 | 69 (p.1071) | MEMORANDUM OPINION AND ORDER - Before the Court are Plaintiff Christopher Rusanowsky's Motion for Partial Sum-mary Judgment ("Mr. Rusanowsky's Motion for Summary Judgment") and Appendix in support thereof, Doc. Nos. 4647, Defendant Sgt. Roger A. Rudloff's Response to Plaintiff's Motion for Partial Summary Judgment, Doc. No. 58, Mr. Rusanowsky's Reply in Support of His Motion for Partial Summary Judgment, Doc. No. 61, Sgt. Rudloff's Motion for Summary Judgment Based on Qualified Immunity ("Sgt. Rudloff's Motion for Summary Judgment") and Brief and Appendix in support thereof, Doc. Nos. 4951, |

|  |  |  |
|---|---|---|
|  |  | Mr. Rusanowsky's Response in Opposition to Defendant Roger A. Rudloff's Motion for Summary Judgment and Appendix in support thereof, Doc. No. 5657, Sgt. Rudloff's Reply Brief in Support of His Motion for Summary Judgment Based on Qualified Immunity, Doc. No. 62, Sgt. Rudloff's Motion to Strike Plaintiff's Summary Judgment Evidence (the "Motion to Strike"), Doc. No. 63, Mr. Rusanowsky's Response to Defendant's Motion to Strike Plaintiffs Summary Judgment Evidence, Doc. No. 64, Sgt. Rudloff's Reply in Support of His Motion to Strike Plaintiff's Summary Judgment Evidence, Doc. No. 65, Mr. Rusanowsky's Opposed Motion for Leave to File Cured Declarations (the Motion for Leave), Doc. No. 66, Sgt. Rudloffs Response to Plaintiffs Opposed Motion for Leave to File Cured Declarations, Doc. No. 67, and Mr. Rusanowsky's Reply in Support of His Opposed Motion for Leave to File Cured Declarations. Doc. No. 68.The Court GRANTS Mr. Rusanowsky's Motion for Leave to file amended declarations in support of his motion for partial summary judgment. The proposed amendments simply conform the declarants' attestations of their testimonys truth to the statutory model provided in 28 U.S.C. § 1746(2). Doc. No. 66 at 3; see Hibernia Nat'l Bank v. Administracion Cent. Sociedad Anonima, 776 F.2d 1277, 1281 (5th Cir. 1985); BHL Boresight, Inc. v. Geo-Steering Sols., Inc., 2017 WL 3634215, at *4 (S.D. Tex. Aug. 24, 2017). The Court correspondingly DENIES as moot Sgt. Rudloff's Motion to Strike the unamended declarations based on the form of the attestations. The City MAY FILE a motion for summary judgment no later than twenty-one days after the entry of this order. The City shall confine its arguments in support of any such motion to ones that depend on the dismissal of the claims against Sgt. Rudloff and shall not otherwise raise arguments it could have but chose not to assert by earlier summary judgment motion. The Court will defer reopening this case in view of the possibility of a further summary judgment motion. (Ordered by Judge Ed Kinkeade on 3/4/2024) (chmb) (Entered: 03/04/2024) |
| 03/25/2024 | 70 (p.1093) | MOTION for Summary Judgment filed by The City of Dallas (Ligon, John) (Entered: 03/25/2024) |
| 03/25/2024 | 71 (p.1096) | Brief/Memorandum in Support filed by The City of Dallas re 70 (p.1093) MOTION for Summary Judgment (Ligon, John) (Entered: 03/25/2024) |
| 04/15/2024 | 72 (p.1105) | RESPONSE filed by Christopher Rusanowsky re: 70 (p.1093) MOTION for Summary Judgment (Steffensen, Peter) (Entered: 04/15/2024) |
| 04/15/2024 | 73 (p.1107) | Brief/Memorandum in Support filed by Christopher Rusanowsky re 72 (p.1105) Response/Objection *to City of Dallas Motion for Summary Judgment* (Steffensen, Peter) (Entered: 04/15/2024) |
| 04/18/2024 | 74 (p.1114) | ORDER granting 70 (p.1093) Motion for Summary Judgment. (Ordered by Judge Ed Kinkeade on 4/18/2024) (chmb) (Entered: 04/18/2024) |
| 04/18/2024 | 75 (p.1116) | JUDGMENT - By orders dated May 8, 2023, March 4, 2024, and April 18, 2024, the Court dismissed all of Plaintiff Christopher Rusanowsky's claims against Defendants City of Dallas and Sgt. Roger A. Rudloff with prejudice. Accordingly, the Court hereby ORDERS, ADJUDGES, and DECREES that Mr. Rusanowsky's claims are DISMISSED with prejudice in their entirety. Defendants may file a bill of costs in accordance with Local Civil Rule 54.1. Each party will bear its own fees. (Ordered by Judge Ed Kinkeade on 4/18/2024) (chmb) (Entered: 04/18/2024) |
| 05/17/2024 | 76 (p.1117) | NOTICE OF APPEAL as to 75 (p.1116) Judgment to the Fifth Circuit by Christopher Rusanowsky. Filing fee $605, receipt number ATXNDC-14628695. T.O. form to appellant electronically at Transcript Order Form or US Mail as |

|  |  | appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Steffensen, Peter) (Entered: 05/17/2024) |
|---|---|---|
| 06/06/2024 |  | USCA Case Number 24-10455 in USCA5 for 76 (p.1117) Notice of Appeal filed by Christopher Rusanowsky. (axm) (Entered: 06/06/2024) |

Tab 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CHRISTOPHER RUSANOWSKY, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>CITY OF DALLAS and SGT. )<br>ROGER A. RUDLOFF, individually )<br>and in his official capacity as a Dallas )<br>Police Department Police Officer, )<br><br>*Defendants*. )<br>) | Civil Action No. 3:22-cv-1132 |

## PLAINTIFF'S NOTICE OF APPEAL

Plaintiff respectfully files this Notice of Appeal to the United States Court of Appeals for the Fifth Circuit. Plaintiff appeals from this Court's Final Judgment of April 18, 2024 (Doc. No. 75), which dismissed Plaintiff's claims against Defendant Sgt. Roger A. Rudloff with prejudice pursuant to its Memorandum Opinion and Order of March 4, 2024 (Doc. No. 69), and which dismissed Plaintiff's claims against the City of Dallas with prejudice pursuant to its Order of April 18, 2024 (Doc. No. 74).

Dated: May 17, 2024

David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
J. Sebastian Van Coevorden
Texas State Bar No. 24128101
svancoevorden@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile: (469) 998-6775

Respectfully Submitted,

*/s/ Peter B. Steffensen*
Peter B. Steffensen
Texas State Bar No. 24106464
psteffensen@smu.edu
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275
Telephone: (214) 768-4077
Facsimile: (214) 768-1611

*/s/ Thomas S. Leatherbury*
Thomas S. Leatherbury
Texas State Bar No. 12095275
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 N. Akard Street
Dallas, Texas 75201
tom@tsleatherburylaw.com
Telephone: (214) 213-5004

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Peter B. Steffensen*
Peter B. Steffensen

Tab 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER RUSANOWSKY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil No. 3:22-CV-01132-K |
| | § | |
| THE CITY OF DALLAS and SGT. | § | |
| ROGER A. RUDLOFF, individually and | § | |
| in his official capacity as a Dallas Police | § | |
| Department Officer, | § | |
| | § | |
| Defendants. | § | |

### FINAL JUDGMENT

By orders dated May 8, 2023, March 4, 2024, and April 18, 2024, the Court dismissed all of Plaintiff Christopher Rusanowsky's claims against Defendants City of Dallas and Sgt. Roger A. Rudloff with prejudice.

Accordingly, the Court hereby **ORDERS**, **ADJUDGES**, and **DECREES** that Mr. Rusanowsky's claims are **DISMISSED** with prejudice in their entirety. Defendants may file a bill of costs in accordance with Local Civil Rule 54.1. Each party will bear its own fees.

**SO ORDERED**.

Signed April 18th, 2024.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE

24-10455.1116

Tab 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER RUSANOWSKY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil No. 3:22-CV-01132-K |
| | § | |
| THE CITY OF DALLAS and SGT. | § | |
| ROGER A. RUDLOFF, individually and | § | |
| in his official capacity as a Dallas Police | § | |
| Department Officer, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Christopher Rusanowsky's Motion for Partial Summary Judgment ("Mr. Rusanowsky's Motion for Summary Judgment") and Appendix in support thereof, Doc. Nos. 46–47, Defendant Sgt. Roger A. Rudloff's Response to Plaintiff's Motion for Partial Summary Judgment, Doc. No. 58, Mr. Rusanowsky's Reply in Support of His Motion for Partial Summary Judgment, Doc. No. 61, Sgt. Rudloff's Motion for Summary Judgment Based on Qualified Immunity ("Sgt. Rudloff's Motion for Summary Judgment") and Brief and Appendix in support thereof, Doc. Nos. 49–51, Mr. Rusanowsky's Response in Opposition to Defendant Roger A. Rudloff's Motion for Summary Judgment and Appendix in support thereof, Doc. No. 56–57, Sgt. Rudloff's Reply Brief in Support of His Motion for Summary Judgment Based on Qualified Immunity, Doc. No. 62, Sgt. Rudloff's Motion to Strike Plaintiff's Summary Judgment Evidence (the "Motion to Strike"), Doc. No. 63,

24-10455.1071

Mr. Rusanowsky's Response to Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence, Doc. No. 64, Sgt. Rudloff's Reply in Support of His Motion to Strike Plaintiff's Summary Judgment Evidence, Doc. No. 65, Mr. Rusanowsky's Opposed Motion for Leave to File Cured Declarations (the "Motion for Leave"), Doc. No. 66, Sgt. Rudloff's Response to Plaintiff's Opposed Motion for Leave to File Cured Declarations, Doc. No. 67, and Mr. Rusanowsky's Reply in Support of His Opposed Motion for Leave to File Cured Declarations.  Doc. No. 68.

The Court **GRANTS** Mr. Rusanowsky's Motion for Leave to file amended declarations in support of his motion for partial summary judgment.  The proposed amendments simply conform the declarants' attestations of their testimony's truth to the statutory model provided in 28 U.S.C. § 1746(2).  Doc. No. 66 at 3; *see Hibernia Nat'l Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1281 (5th Cir. 1985); *BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, 2017 WL 3634215, at *4 (S.D. Tex. Aug. 24, 2017).  The Court correspondingly **DENIES** as moot Sgt. Rudloff's Motion to Strike the unamended declarations based on the form of the attestations.

Upon consideration of the submissions properly before it, the Court **GRANTS** Sgt. Rudloff's Motion for Summary Judgment.  Mr. Rusanowsky is a professional freelance photographer who documented protests in Dallas following the death of George Floyd.   While Mr. Rusanowsky was photographing protesters on Interstate 35, Sgt. Rudloff and his fellow police officers attempted to clear them from the highway. As he was doing so, Sgt. Rudloff noticed Mr. Rusanowsky, who was admittedly walking

the wrong way down the shoulder of the interstate.  After Sgt. Rudloff, the other police officers, several protesters, and Mr. Rusanowsky all reached a grassy area off the interstate, Sgt. Rudloff and the officers arrested Mr. Rusanowsky and the protesters. Mr. Rusanowsky alleges that Sgt. Rudloff arrested him because he was photographing the protesters' arrests and contends that his arrest violated his constitutional rights. He asserts claims for arrest without probable cause ("false" arrest) and malicious prosecution in violation of the Fourth Amendment and retaliatory arrest in violation of the First Amendment.  Sgt. Rudloff enjoys qualified immunity from all three claims because his conduct did not violate clearly established law.  Since Sgt. Rudloff arguably had probable cause to arrest Mr. Rusanowsky, Mr. Rusanowsky's false and retaliatory arrest claims cannot succeed.  Mr. Rusanowsky's stroll the wrong way down the interstate was a misdemeanor under Texas law unless it was impossible for him to avoid walking as he did.  Sgt. Rudloff might well have believed that Mr. Rusanowsky could have crossed the interstate, then blocked by protesters, to walk the correct way, and Sgt. Rudloff could reasonably have concluded and that Mr. Rusanowsky's decision not to do so justified his arrest.  Qualified immunity likewise protects Sgt. Rudloff from Mr. Rusanowsky's claim for malicious prosecution.  Sgt. Rudloff could reasonably rely on legal authorities refusing to recognize such a claim at the time of the parties' encounter.  Having found that Sgt. Rudloff is immune from Mr. Rusanowsky's claims, the Court **DENIES** Mr. Rusanowsky's Motion for Summary Judgment because Mr. Rusanowsky asks the Court to find qualified immunity lacking.

## I.    BACKGROUND

Christopher Rusanowsky is a professional freelance photographer specializing in documentary photography.  Doc. No. 66-1 ¶¶ 2–3.  At the end of May 2020, Mr. Rusanowsky decided to photograph protests in Dallas inspired by the death of George Floyd.  *Id.* ¶ 6.  He followed a crowd of protesters as they transited Reunion Boulevard East toward Interstate 35 East.  *Id.* ¶ 17.  The crowd approached an incline leading up and onto the interstate, and some of the protesters climbed it.  *Id.*  Mr. Rusanowsky trailed them until he reached a barrier separating the incline from the interstate where he paused to photograph protesters milling about the interstate singly and in groups.  *Id.* ¶ 20; *id.* at 18–24.

More people continued to arrive at the barrier, and Mr. Rusanowsky says he became concerned that he did not have an exit from the crowd "if anything were to happen."  *Id.* 66-1 ¶ 21.  According to Mr. Rusanowsky, maintaining an exit route is standard journalistic practice.  *Id.* ¶¶ 21–22.  He scaled the barrier, stepped onto the shoulder of the interstate, and began walking along the barrier with the flow of traffic.  *Id.* ¶¶ 22–23.

His path would soon intersect with Sgt. Roger A. Rudloff's.  That evening, Sgt. Rudloff and a team of fellow members of the Dallas Police Department ("DPD") had learned that people on Interstate 35 had blocked part of the roadway.  Doc. No. 51-1 at 1, 4, 7.  Sgt. Rudloff and his team traveled to the interstate to clear it.  *Id.*

Once they reached their destination, Sgt. Rudloff and two DPD corporals saw Mr. Rusanowsky on the highway. *Id.*

The DPD team began trying to clear the road, and Sgt. Rudloff recalls that someone told the people on the interstate to disperse without success, although no other witness recalls hearing a dispersal order. *Id.* at 1. Some people started throwing rocks and bottles at the team and shouted at them, but the extent of this activity is unclear. *Id.* Mr. Rusanowsky did not observe it, and he describes the scene as "largely orderly." Doc. No. 66-3 ¶¶ 8–12. At some point, Sgt. Rudloff radioed a superior to ask "what [to] do with the people on the freeway," and the superior told him, roughly, "We need to round those folks up." Doc. No. 51-1 at 1.

Before any arrest documented in the record, the crowd on the interstate finally started to move in earnest. According to Mr. Rusanowsky and a journalist acquaintance, the crowd broke up when it heard a loud noise that Mr. Rusanowsky compares to gunfire. Doc. No. 66-1 ¶ 25; Doc. No. 66-2 ¶ 9. Some protesters began "fleeing" the noise. Doc. No. 66-2 ¶ 9. Some departed the interstate but attempted to return to it. Doc. No. 51-1 at 7. Mr. Rusanowsky left the shoulder of the interstate by climbing back over its barrier, and he hid behind a nearby pillar to avoid the crowd. Doc. No. 66-1 ¶ 25. After emerging from behind the pillar, Mr. Rusanowsky spotted protesters trying to assist a woman who had fallen. *Id.* ¶ 26. He began photographing them and followed them to a grassy area away from the interstate. *Id.* ¶¶ 26–27.

There he encountered Sgt. Rudloff and his team, who apparently arrived from another direction and sprang into action. *Id.* ¶¶ 27–31, 39–40; Doc. No. 51-1 at 4. Sgt. Rudloff arrested one of the protesters who had assisted the fallen woman. Doc. No. 66-1 ¶ 33. He shot another protester with non-lethal PepperBall rounds when he believed she adopted a "fighting stance" while approaching him. *Id.* ¶ 35; Doc. No. 51-1 at 2. He also helped a fellow officer arrest a third protester by kneeing the protester in the stomach when he failed to comply with orders. Doc. No. 66-1 ¶¶ 37–38; Doc. No. 51-1 at 2. Mr. Rusanowsky photographed all of the arrests from a distance of about ten feet. Doc. No. 66-1 ¶ 41.

Although the parties do not agree about the precise sequence of events, it is undisputed that Sgt. Rudloff subsequently had an exchange with Mr. Rusanowsky and that a DPD corporal handcuffed Mr. Rusanowsky. *Id.* ¶¶ 44–48; Doc. No. 51-1 at 2. Between the beginning of the exchange and the arrival of an escort to take Mr. Rusanowsky to jail, Mr. Rusanowsky informed Sgt. Rudloff that he was a photojournalist. Doc. No. 66-1 ¶ 45; Doc. No. 51-1 at 2. He also wore press badges that were visible to Sgt. Rudloff. Doc. No. 66-2 ¶ 15; Doc. No. 66-1 ¶ 45. After learning that Mr. Rusanowsky was a member of the press, Sgt. Rudloff retorted, "Yeah yeah, press press. You are going to jail." Doc. No. 66-1 ¶ 46. He added that Mr. Rusanowsky "still had no right to be illegally on the freeway." Doc. No. 51-1 at 2.

Two photojournalists observed the interaction between Mr. Rusanowsky and Sgt. Rudloff, one of whom captured photographs showing Sgt. Rudloff pointing at

6

something off camera while standing close to Mr. Rusanowsky and then grabbing Mr. Rusanowsky's shirt and forcibly pulling it.  Doc. No. 61 ¶ 47; Doc. No. 66-2 ¶¶ 8–17; Doc. No. 66-2 at 40–44.  Sgt. Rudloff threatened to arrest both photojournalists, and they departed the scene in response.  Doc. No. 66-2 ¶ 17.  Other observers included protesters throwing objects at the DPD officers.  Doc. No. 51-1.  It is unclear whether the officers arrested or threatened to arrest these protesters.

Mr. Rusanowsky spent twenty-six hours in jail after his arrest.  Doc. No. 66-1 ¶ 26.  In an incident report, DPD officers accused him of riot participation, and in an affidavit for an arrest warrant, they accused him of obstructing a highway.  Doc. No. 47-4 at 30–32; Doc. No. 51-1 at 13.  Sgt. Rudloff did not contribute to either document, and the State of Texas declined to charge Mr. Rusanowsky.  *See* Doc. No. 51-1 at 2; Doc. No. 47-4 at 21.  Mr. Rusanowsky says that his arrest and incarceration exposed him to COVID-19 in a crowded jail and prevented him from obtaining the highest possible royalties from his photographs of the protests by delaying their circulation.  Doc. No. 66-1 ¶ 55.  He also says that the arrest has negatively affected his mental health and discouraged him from accepting assignments requiring him to photograph events featuring a substantial police presence.  *Id.* ¶¶ 55–61.

Mr. Rusanowsky sued Sgt. Rudloff under 28 U.S.C. § 1983, alleging that Sgt. Rudloff violated his Fourth and First Amendment rights.  Doc. No. 1.  He brings two variations of his Fourth Amendment claim.  One variation is a claim for "false" arrest without probable cause, and one is a claim for malicious prosecution of the

charges against him that the State of Texas declined to pursue. *Id.* ¶¶ 96–10.  The First Amendment claim is that Sgt. Rudloff arrested him because he photographed Sgt. Rudloff's interactions with protesters. *Id.* ¶¶ 86–95.  Mr. Rusanowsky also sued the City of Dallas and asserted Fourth and First Amendment claims against it that are not currently at issue. *Id.* ¶¶ 111–17.

Sgt. Rudloff moved for summary judgment on all claims against him on the basis that he enjoys qualified immunity from suit, Doc. No. 49, and Mr. Rusanowsky moved for partial summary judgment denying Sgt. Rudloff qualified immunity.  Doc. No. 46.

## II.   LEGAL STANDARD

The Court grants motions for summary judgment when there is no genuine dispute between the parties about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if a reasonable jury could resolve the parties' factual disagreement in favor of either party and the resolution could affect the outcome of the suit they are litigating. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

As a public official sued in his individual capacity for taking discretionary action, Sgt. Rudloff enjoys qualified immunity from civil damages unless he violated clearly established law of which he reasonably should have known. *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc).  Mr. Rusanowsky has the burden to point out the clearly established law Sgt. Rudloff purportedly violated and to show that there is at least a genuine dispute of material fact about whether the violation occurred. *Kokesh v.*

*Curlee*, 14 F.4th 382, 392 (5th Cir. 2021).  In assessing whether Mr. Rusanowsky has carried that burden, the Court views the facts in the light most favorable to him.  *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc).

## III.   DISCUSSION

The Court grants Sgt. Rudloff summary judgment on Mr. Rusanowsky's false arrest, retaliatory arrest, and malicious prosecution claims.  The primary obstacle to the first two claims is that each stems from Mr. Rusanowsky's arrest near Interstate 35, and Sgt. Rudloff had reason to believe there was probable cause to make the arrest. The Court first discusses why Mr. Rusanowsky's false arrest claim cannot surmount this obstacle and then explains why his retaliatory arrest claim cannot either.  The Court concludes its discussion with a review of Mr. Rusanowsky's remaining claim for malicious prosecution and finds that Sgt. Rudloff is immune from the claim because it was not cognizable at the time of the arrest.

Throughout its discussion, the Court will assume that Sgt. Rudloff arrested Mr. Rusanowsky.  Although Sgt. Rudloff denies responsibility for the arrest because his superior ordered him to "round . . . up" people on Interstate 35 and another officer handcuffed Mr. Rusanowsky, the Court's decision does not turn on the nature of Sgt. Rudloff's involvement in the arrest.  Doc. No. 58 at 41–42.

### A.  False Arrest

The existence of facts arguably showing that Sgt. Rudloff had probable cause to arrest Mr. Rusanowsky makes Sgt. Rudloff qualifiedly immune from Mr. Rusanowsky's

false arrest claim. A warrantless false arrest violates the Fourth Amendment's prohibition on unreasonable seizures because an arrest without a warrant or probable cause is unreasonable. *See Club Retro LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009); *Loftin v. City of Prentiss*, 33 F.4th 774, 780 (5th Cir. 2022). If a reasonable person could conclude from the facts known to the arresting officer that the arrested person had committed or was committing an offense, probable cause exists, and the infirmity in the arrest disappears. *Loftin*, 33 F.4th at 780. Since Sgt. Rudloff reasonably could have believed he had probable cause to arrest Mr. Rusanowsky for walking the wrong way down Interstate 35, he did not violate Mr. Rusanowsky's clearly established Fourth Amendment rights by arresting him. *Voss v. Goode*, 954 F.3d 234, 239 (5th Cir. 2020).

Sgt. Rudloff observed Mr. Rusanowsky on the interstate while Mr. Rusanowsky was walking on its rightmost shoulder with the flow of traffic. Doc. No. 51-1 at 1; Doc. No. 66-1 at 4, 18–26. At the time of Mr. Rusanowsky's arrest, Section 552.006(b) of the Texas Transportation Code directed a "pedestrian walking along and on a highway" without a sidewalk to walk, "if possible," on "the left side of the roadway"—meaning the leftmost portion of the highway other than the shoulder—or "the shoulder of the highway facing oncoming traffic." Tex. Transp. Code §§ 541.302(11), 552.006(b). The Code defined a highway to include its shoulder. *Id.* §§ 541.302(5)–(6), (15).

Under the Code's directive, Mr. Rusanowsky was walking the wrong way on the interstate. While Mr. Rusanowsky expresses surprise that Sgt. Rudloff observed his misconduct, Sgt. Rudloff explicitly testifies that he saw Mr. Rusanowsky on the

10

interstate, and Mr. Rusanowsky confirms that as "soon as [he] stepped onto the shoulder, [he] walked tightly along the inside of the barrier" at the edge of the shoulder "with the flow of traffic" for "approximately one minute" before jumping to the other side of the barrier. Doc. No. 51-1 at 1, 10; Doc. No. 66-1 ¶ 23. So long as it was possible for Mr. Rusanowsky to walk a different way, his conduct was a misdemeanor for which Sgt. Rudloff had statutory authority to arrest him without a warrant. Tex. Transp. Code §§ 542.301, 543.001; *see State v. Jackson*, 2010 WL 1532404, at *3 (Tex. App.—Dallas Apr. 19, 2010, no pet.); *Martinez-Cornelio v. State*, 2019 WL 4891710, at *4 (Tex. App.—Texarkana Oct. 4, 2019, pet. ref'd).

Mr. Rusanowsky makes a colorable argument that it was impossible, as a practical matter, to walk on the proper side of the interstate. Doc. No. 61 at 10–11. Mr. Rusanowsky's photographs show a number of cars on the roadway, and one ordinarily does not cross an interstate when cars are approaching. *See, e.g.*, Doc. No. 66-1 at 18–26.

There were nonetheless circumstances from which Sgt. Rudloff could have inferred that a crossing was possible. Under Texas law, a pedestrian may cross a highway without using a crosswalk if he yields to vehicles when crossing might result in a collision with them. Tex. Transp. Code §§ 541.401(8), 552.005(a). Conditions on Interstate 35 indicated that a collision between a vehicle and a crossing pedestrian was unlikely. Mr. Rusanowsky admits that traffic on the interstate had stopped, and Sgt. Rudloff personally observed the same thing. Doc. No. 66-1 ¶ 20; Doc. No. 51-1 at 1.

While he was on or near the interstate, Mr. Rusanowsky photographed numerous pro-
testers walking or standing across the breadth of the interstate. Doc. No. 66-1 at 18–
26. Sgt. Rudloff himself crossed the interstate. Doc. No. 51-1 at 1. Even if
Mr. Rusanowsky was wise to be cautious about a crossing, Sgt. Rudloff reasonably
could have expected him to venture one.

      The absence of legal authority instructing Sgt. Rudloff to reach a different con-
clusion is decisive of the issue. Under qualified immunity principles, Sgt. Rudloff could
believe without fear of damages liability that there was probable cause to arrest
Mr. Rusanowsky for walking the wrong way down the interstate unless prevailing au-
thority "obviously" dictated that there was no probable cause under the specific cir-
cumstances confronting him. *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018);
*Loftin*, 33 F.4th at 781–82. The only authority Mr. Rusanowsky cites that interprets
the relevant provision of the Texas traffic statutes is *McBride v. State*, which held that
a police officer had probable cause to arrest a pedestrian when the officer witnessed the
pedestrian "walking on the wrong side of the street." 359 S.W.3d 683, 693 (Tex.
App.—Houston [14th Dist.] 2011, pet. ref'd). Other opinions have similar holdings.
*See, e.g.*, *Martinez v. City of Rosenberg*, 2023 WL 7290471, at *3 (S.D. Tex. Sept. 27,
2023) (granting qualified immunity from false arrest claim); *State v. Patterson*, 291
S.W.3d 121, 123 (Tex. App.—Amarillo 2009, no pet.); *Martinez-Cornelio*, 2019 WL
4891710, at *4; *Grisham v. State*, 2017 WL 1130371, at *5 n.7 (Tex. App.—Austin
Mar. 23, 2017, no pet.). These opinions do not explicitly address Mr. Rusanowsky's

argument that Sgt. Rudloff should have known crossing the interstate was impossible, but for that reason they do not obviously establish that Sgt. Rudloff would have erred in concluding otherwise. *See Villarreal v. City of Laredo*, --- F.4th ---, 2024 WL 244359, at *7 (5th Cir. Jan. 23, 2024) (en banc).

Mr. Rusanowsky responds by deriding the testimony of DPD officers who saw him on Interstate 35 as "untrustworthy" and "conclusory" and the affidavit for his arrest as "false." Doc. No. 56 at 15, 29. Sgt. Rudloff does not seriously dispute that there may be errors in the affidavit, and the Court has not relied on it as evidence of probable cause, so the Court sets that issue aside. *See* Doc. No. 62 at 23. The Court has relied on the officers' testimony—more precisely, Sgt. Rudloff's—because it cannot agree with Mr. Rusanowsky's characterization of that testimony.

There is no indication that Sgt. Rudloff's testimony or the testimony of his fellow officers is untrustworthy in any material respect. Mr. Rusanowsky doubts their testimony because he believes that Sgt. Rudloff contradicted the other officers. It is true that a contradiction of this sort might require the Court to deny Sgt. Rudloff summary judgment, but only if a jury could find in favor of Mr. Rusanowsky by accepting one of the competing testimonial accounts. *Royal v. Spragins*, 575 F. App'x 300, 304 (5th Cir. 2014); *Mills v. Patten*, 2019 WL 8138429, at *5 (S.D. Miss. Dec. 2, 2019), *rep. & rec. adopted*, 2020 WL 1046823 (S.D. Miss. Mar. 4, 2020). The Court does not find any inconsistencies in the officers' testimony satisfying that standard.

24-10455.1083

Some of the alleged inconsistencies in the officers' testimony have little to do with Mr. Rusanowsky's claims.  For example, Sgt. Rudloff recalls subduing a male protester before shooting a female protester with PepperBall rounds, while a corporal on the scene appears to recall these events occurring in the opposite order.  *Compare* Doc. No. 51-1 at 4, *with id.* at 6.  Whatever the correct order may be, it is immaterial to whether Sgt. Rudloff arrested Mr. Rusanowsky in violation of clearly established Fourth Amendment principles.  Mr. Rusanowsky makes other arguments purporting to find inconsistencies in the sequence of events recounted by the officers, and all suffer from the same defect.  Doc. No. 56 at 20.

The remaining alleged inconsistencies in the officers' testimony do not seem to be inconsistencies on closer inspection.  Mr. Rusanowsky understands Sgt. Rudloff to testify that his DPD team trailed behind the protesters on Interstate 35 and a fellow officer to testify that the team moved in front of the protesters, but even if this point is relevant, Sgt. Rudloff's testimony does not support Mr. Rusanowsky's interpretation.  Doc. No. 56 at 18.  Sgt. Rudloff testified that the team arrested individuals "coming from the highway" once the team reached a grassy area off the interstate.  Doc. No. 51-1 at 3.  The Court is similarly unconvinced by Mr. Rusanowsky's attempt to oppose Sgt. Rudloff's testimony to another officer's testimony that the individuals in the grassy area "appeared to be coming back to the highway."  Doc. No. 56 at 19–20; Doc. No. 51 at 9.  The individuals could only be "coming back to the highway" if they had

24-10455.1084

previously been "coming from the highway." The DPD officers have described contin-uous rather than conflicting movements by these individuals.

Insofar as Mr. Rusanowsky brands the officers' testimony "conclusory" rather than inconsistent, he appears to misunderstand what the term means at the summary judgment stage. Because the officers state that they saw Mr. Rusanowsky on the inter-state without offering much additional detail, Mr. Rusanowsky contends that their tes-timony is "conclusory on the one fact that arguably matters the most: whether these officers actually witnessed [him] on the highway." Doc. No. 56 at 15, 30–31; Doc. No. 55-1 at 1, 6, 9. He asks the Court to ignore this testimony or give it "little weight." Doc. No. 56 at 21–22.

This would be strange treatment of testimony describing direct personal obser-vations. The type of conclusory summary judgment testimony the Court generally disregards is testimony that draws factual inferences or reaches legal conclusions with-out providing a factual basis for the inferences or conclusions. *See Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024); *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991). Ignoring such testimony ensures that there is evidence rather than unfounded asser-tions for the jury to consider at trial. The officers' observations of Mr. Rusanowsky are not inferences or conclusions but facts declared to be true. A jury could accept those observations and find that the officers spotted Mr. Rusanowsky on the interstate. The officers' testimony on this point is proper summary judgment evidence. *Cf. Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *7 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.)

(overruling objection to testimony that declarant witnessed employee's presence during improper weighing of products).

Having found that Sgt. Rudloff could reasonably have believed he had probable cause to arrest Mr. Rusanowsky for walking the wrong direction on the interstate and having rejected Mr. Rusanowsky's criticisms of Sgt. Rudloff's evidence, the Court grants Sgt. Rudloff summary judgment on Mr. Rusanowsky's false arrest claim.

## B. Retaliatory Arrest

The Court's ruling on Mr. Rusanowsky's false arrest claim is practically disposi-tive of his First Amendment retaliation claim. Mr. Rusanowsky asserts that Sgt. Rud-loff arrested him in retribution for photographing Sgt. Rudloff subduing protesters. Doc. No. 1 ¶¶ 86–95. The First Amendment protected Mr. Rusanowsky's efforts to photograph Sgt. Rudloff, but Sgt. Rudloff remained free to arrest Mr. Rusanowsky upon finding probable cause to think he had committed or was committing a crime. *See Turner v. Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (First Amendment right); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (probable cause). The Court has found that Sgt. Rudloff could reasonably have believed he had probable cause to arrest Mr. Rusanowsky for walking the wrong way on the interstate under contemporaneous legal authority. *Supra* Section III.A. It must conclude that clearly established law stopped short of prohibiting the arrest regardless of Mr. Rusanowsky's photography. *See Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020); *Chuttoo v. Horton*, 627 F. Supp. 3d 655, 677 (E.D. Tex. 2022).

16

Mr. Rusanowsky tries to show that an exception to the probable cause bar applies. He points to the Supreme Court's statement that a First Amendment retaliatory arrest claim can proceed despite the existence of probable cause for the arrest "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 139 S. Ct. at 1727; Doc. No. 56 at 47; *see also Murphy v. Schmitt*, 2023 WL 5748752, at *2 (8th Cir. Sept. 6, 2023) (per curiam) (applying this rule and finding qualified immunity where officer arrested plaintiff for walking on the wrong side of the street), *reh'g en banc denied*, No. 22-1726 (8th Cir. Dec. 12, 2023). The Supreme Court added that probable cause is not dispositive "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727. The circuits differ somewhat in their interpretation of the Supreme Court's pronouncements, and the Supreme Court has granted certiorari to review the Fifth Circuit's interpretation. *See Gonzalez v. Trevino*, 42 F.4th 487, 493 (5th Cir. 2022) (rejecting the Seventh Circuit's more permissive interpretation in *Lund v. City of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020)), *cert. granted*, 144 S. Ct. 325 (2023). Whatever the Supreme Court may decide, it is unlikely to affect the analysis of Mr. Rusanowsky's claim. He relies on the type of comparative evidence that the circuits widely agree may show selective enforcement of the law against individuals exercising First Amendment rights. Doc. No. 56 at 47; *see, e.g., Villarreal*, 2024 WL 244359, at *14–15; *Gonzalez*, 42 F.4th at 493; *Turner v. Williams*, 65 F.4th 564, 588–89 (11th Cir. 2023); *Ballentine*

*v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022); *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1149 (10th Cir. 2020); *Lund*, 956 F.3d at 945–46.

The trouble with Mr. Rusanowsky's evidence is that it does not actually show selective enforcement. He distinguishes between two groups of individuals, primarily protesters, who had been on Interstate 35 with him. Doc. No. 56 at 48–49. The first, including Mr. Rusanowsky, moved to a grassy area off the interstate, and Sgt. Rudloff arrested them. *Id.* The second threw objects at Sgt. Rudloff's team, and Sgt. Rudloff apparently did not arrest them. *Id.* Since there is no indication that any of the arrested protesters were photographing or filming Sgt. Rudloff, comparing the two groups shows the opposite of what Mr. Rusanowsky hopes it will. Sgt. Rudloff arrested Mr. Rusanowsky and the protesters who reached the grassy area without distinguishing between individuals who recorded him and individuals who did not. Although Sgt. Rudloff threatened to arrest other photographers who did not reach the grassy area, it is undisputed that he ultimately declined to arrest them. *See* Doc. No. 66-2 ¶¶ 17–19.

Mr. Rusanowsky's suggestion that Sgt. Rudloff arrested the group in the grassy area because only this group exercised rights protected by the First Amendment does not withstand scrutiny. Doc. No. 56 at 49. Mr. Rusanowsky may be correct that the other group engaged in unprotected violence by throwing objects. *Id.* He nonetheless acknowledges that both groups largely comprised protesters, so, excepting the photographers in the groups, both still engaged in similar protected conduct. *Id.* at 48–49.

18

Sgt. Rudloff's decision to arrest some but not all protesters suspected of traffic viola-tions hardly demonstrates an intent to retaliate against individuals for protesting. *See Powelson v. Sausalito Police Dep't,* --- F. Supp. 3d ---, 2023 WL 7392289, at *12 (N.D. Cal. Nov. 8, 2023); *cf. also Spoon v. Bayou Bridge Pipeline, LLC,* --- F. Supp. 3d ---, 2023 WL 4569543, at *26 (M.D. La. July 17, 2023) (finding no exception to the probable cause bar on retaliatory arrest claims where officers arrested at least some protesters other than plaintiffs). Mr. Rusanowsky cites no evidence indicating that Sgt. Rudloff targeted the arrested protesters instead of the other protesters based on differences in their expressed opinions or any other suspicious circumstance. *Cf. Ballentine,* 28 F.4th at 62; *Akindes v. City of Kenosha,* 2021 WL 4482838, at *13 (E.D. Wis. Sept. 30, 2021).

There is no reason to exempt Mr. Rusanowsky's First Amendment retaliatory arrest claim from the general rule that arguable probable cause to arrest is a valid de-fense. The Court grants Sgt. Rudloff summary judgment on the claim.

### C. Malicious Prosecution

The Court lastly grants Sgt. Rudloff summary judgment on Mr. Rusanowsky's malicious prosecution claim because malicious prosecution was not a cognizable claim under the Fourth Amendment at the time Sgt. Rudloff arrested Mr. Rusanowsky.

Mr. Rusanowsky says Sgt. Rudloff maliciously prosecuted him because, after Sgt. Rudloff arrested Mr. Rusanowsky, other DPD officers swore out an affidavit for an arrest warrant falsely charging Mr. Rusanowsky with highway obstruction to justify jailing him overnight. *See* Doc. No. 56 at 50; Doc. No. 47-7 at 16.

As Sgt. Rudloff notes, the Fifth Circuit historically held that there is no "free-standing constitutional right to be free from malicious prosecution." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) (en banc); Doc. No. 50 at 37.  The Supreme Court did not abrogate this holding until it issued its decision in *Thompson v. Clark*, two years after Mr. Rusanowsky's arrest.  596 U.S. 36, 42 (2022); *see also Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023).  Mr. Rusanowsky nonetheless relies on *Thompson* and later authority in support of his malicious prosecution claim.  Doc. No. 56 at 49–50.  Assuming he is correct that Sgt. Rudloff maliciously prosecuted him under current legal standards, these authorities still do not show that Sgt. Rudloff violated law clearly established at the time he arrested Mr. Rusanowsky.  For that reason, Sgt. Rudloff has qualified immunity from Mr. Rusanowsky's claim.  *Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023); *Wallace v. Taylor*, 2023 WL 2964418, at *6 (5th Cir. Apr. 14, 2023).

Although Mr. Rusanowsky at best obliquely raises it, the Court addresses one additional point in the interest of completeness.  Prior to *Thompson*, the Fifth Circuit recognized that a claim for Fourth Amendment malicious prosecution might survive if it was not freestanding, meaning that the maliciously instituted proceedings led to an independent Fourth Amendment violation such as a detention based on a warrant procured by fraudulent affidavit.  *See Winfrey v. Rogers*, 901 F.3d 483, 492 (5th Cir. 2018).  To the extent Mr. Rusanowsky tries to bring his malicious prosecution claim within this rule, it does not fit.  Before and after *Thompson*, Courts have recognized that

24-10455.1090

liability for malicious prosecution extends only to defendants who commit their wrong-doing by legal process. An arrest pursuant to a warrant counts, but a warrantless arrest does not. It is not legal process. *See, e.g.*, *Baker v. Sebastian*, 2023 WL 6393886, at \*7 (S.D. Tex. Sept. 30, 2023); *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020); *Harrington v. City of Nashua*, 610 F.3d 24, 32 (1st Cir. 2010); *Reed v. City of Chi.*, 77 F.3d 1049, 1053 (7th Cir. 1996); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995). Sgt. Rudloff arrested Mr. Rusanowsky without a warrant. *See* Doc. No. 51-1 at 13. He had nothing to do with the affidavit that other officers later prepared in hopes of securing a warrant to hold Mr. Rusanowsky in jail. Doc. No. 51-1 at 2. Even if Mr. Rusanowsky could show that the affidavit was false or failed to establish probable cause for arrest, that would not be a basis for holding Sgt. Rudloff liable. *See Melton*, 875 F.3d at 262–65; *Baker*, 2023 WL 6393886, at \*7; *Reed*, 77 F.3d at 1053.

## IV.   CONCLUSION

The Court **GRANTS** Sgt. Rudloff's Motion for Summary Judgment and **DE-NIES** Mr. Rusanowsky's Motion for Summary Judgment. The Court **DISMISSES** Mr. Rusanowsky's claims against Sgt. Rudloff with prejudice in their entirety. In a footnote, Sgt. Rudloff argues that dismissal of Mr. Rusanowsky's claims against him requires dismissal of the Mr. Rusanowsky's claims against the City of Dallas, but the City has not filed a motion for summary judgment. Doc. No. 50 at 10 n.1. The City **MAY FILE** a motion for summary judgment no later than twenty-one days after the entry of this order. The City shall confine its arguments in support of any such motion

to ones that depend on the dismissal of the claims against Sgt. Rudloff and shall not otherwise raise arguments it could have but chose not to assert by earlier summary judgment motion.  The Court will defer reopening this case in view of the possibility of a further summary judgment motion.

**SO ORDERED.**

Signed March 4th, 2024.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE

Tab 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER RUSANOWSKY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil No. 3:22-CV-01132-K |
| | § | |
| THE CITY OF DALLAS and SGT. | § | |
| ROGER A. RUDLOFF, individually and | § | |
| in his official capacity as a Dallas Police | § | |
| Department Officer, | § | |
| | § | |
| Defendants. | § | |

### <u>ORDER</u>

Before the Court are Defendant City of Dallas's Motion for Summary Judgment (the "Motion for Summary Judgment") and Brief in support thereof, Doc. Nos. 70–71, and Plaintiff Christopher Rusanowsky's Response to Defendant City of Dallas's Motion for Summary Judgment and Brief in support thereof.  Doc. Nos. 72–73.

Upon consideration of the parties' submissions, the Court **GRANTS** the City of Dallas's Motion for Summary Judgment.  Mr. Rusanowsky sued the City of Dallas (the "City") and Dallas Police Department ("DPD") Sgt. Roger A. Rudloff under 28 U.S.C. § 1983.  Doc. No. 1.  He alleged that Sgt. Rudloff deprived him of his First and Fourth Amendment rights by unlawfully arresting him.  *Id.* ¶¶ 86–110.  He also alleged that the City failed to properly train DPD officers and failed to discipline or supervise Sgt. Rudloff.  *Id.* ¶¶ 111–17.  The Court dismissed the failure to train claim with prejudice.  Doc. No. 40 at 16; Doc. No. 48 at 1.  Sgt. Rudloff later moved for summary

24-10455.1114

judgment, but the City did not.  Doc. No. 49.  The Court granted Sgt. Rudloff's motion and dismissed the claims against him.  Doc. No. 69.  Because Mr. Rudloff argued that the summary judgment required dismissal of Mr. Rusanowsky's surviving claims against the City, the Court allowed the City to file a summary judgment motion, "confin[ing] its arguments in support of any such motion to ones that depend on the dismissal of the claims against Sgt. Rudloff."  *Id.* at 21–22.  The City's summary judgment motion is now pending before the Court.  Doc. No. 70.  Mr. Rusanowsky "does not contest the City's very narrow argument that applicable precedent appears to compel" summary judgment.  Doc. No. 72 at 1.  The Court agrees with the parties. Mr. Rusanowsky has not established an underlying constitutional violation that might support his municipal liability claims against the City.  *Grisham v. Valenciano*, 93 F.4th 903, 912 (5th Cir. 2024); *Loftin v. City of Prentiss*, 33 F.4th 774, 783 (5th Cir. 2022). The Court grants the City summary judgment dismissing his claims against the City with prejudice and will issue a final judgment separately.

　　　　**SO ORDERED.**

　　　　Signed April 18th, 2024.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE

24-10455.1115

Tab 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CHRISTOPHER RUSANOWSKY,      ) <br><br>        *Plaintiff*,       ) <br><br> v.                         ) <br><br> CITY OF DALLAS and SGT. <br> ROGER A. RUDLOFF, individually <br> and in his official capacity as a Dallas <br> Police Department Police Officer,    ) <br><br>        *Defendants*.      ) | Civil Action No. 3:22-cv-1132 |

**DECLARATION OF CHRISTOPHER RUSANOWSKY**

1.  My name is Christopher Rusanowsky. I am older than the age of eighteen (18) and a resident of the state of Texas. I am of sound mind and capable of testifying regarding the matters set forth in this Declaration. I submit this Declaration based on my own personal knowledge.

2.  I have been a professional photographer for 16 years. I started pursuing photography by taking pictures of action sports. I would post the photographs I took online, and would receive messages from people requesting that I cover their events as well. I realized then I could potentially pursue photography as a career, and so I started practicing all different types of photography to expand my skillset and hone my craft.

3.  After September 11, 2001, I shifted my focus from sports to documentary photography. At the time, my father served in the military and was eventually called to serve in Iraq, which had an impact on my outlook on the world. As a photographer, I reconsidered how I could use my art to better tell human stories. I remember a photo essay called Sleeping Soldiers by a photographer I deeply respect named Tim Hetherington resonated with me and changed my own ideas about the type of photographer I wanted to be.

4.  Across my career, my work has appeared in publications such as the *Wall Street Journal*, *Newsweek*, the *Dallas Morning News*, *Vox Media*, *People Magazine*, and *Mother Jones*. I am also a member of the National Press Photographers Association, a trade group that represents and advocates for the interests of photojournalists such as myself across the country.

24-10455.921

5.  Currently, I am employed as a professional freelance photographer. I have a contract with ZUMA Press, Inc., a photography wire service that distributes photographs I take to news media around the world. I am compensated primarily under a royalty model—ZUMA Press pays me royalties for each image I provide them that gets sold through their service. Occasionally, ZUMA Press also pays me a "day rate" for covering longer term events. This rate is approximately $150-$200 per day, which I receive in addition to any royalties from my photographs.

6.  Through my relationship with ZUMA Press, I seek out and pitch newsworthy stories. In particular, I look for stories that are important and relevant to the people of North Texas, where I live. On May 29 and May 30, 2020, when the protests over George Floyd's killing arose in Dallas, I recognized the historic importance of this moment and went to the protests to observe and document them, as any good journalist would have done. In advance, I informed ZUMA Press CEO Scott McKiernan that I would be covering these events.

7.  I was aware of the protests occurring in other parts of the country due to the media's significant coverage of them. These protests frequently resulted in physical altercations between protesters and police, as well as damage to property. Because of this coverage, I approached my assignment with the belief that the protests in Dallas would be no different.

8.  I also knew from recent personal experience that the potential for unrest in Dallas during these protests was high. The day before, on May 29, 2020, I photographed the unrest in Downtown Dallas, where I witnessed and photographed the police using tear gas on people assembled to protest George Floyd's killing. Because I lacked proper protective equipment to feel physically safe enough amid this unrest to continue my assignment, I opted to leave the area.

9.  My awareness of the widespread, national unrest due to these protests, and my recent personal experience covering them in Dallas, caused me to be particularly concerned for my safety when returning to Dallas on May 30, 2020.

10. As a result, before returning to the protests on May 30, 2020, I more carefully planned out my day. I researched what routes the protests were likely going to move along, I established an exit plan for myself in case I needed to withdraw from the protests quickly, I picked in advance a place to park my car that I thought was reasonably likely to be in a safe location, and I evaluated what kinds of groups said they were going to be present. To conduct this planning and research, I relied on social media, other news outlets reporting on the protests, and attempted to assess the trends of protests occurring in other states—all to gauge the level of risk to my safety when I attended the protests on May 30.

11. Upon arriving in Downtown Dallas on May 30, 2020, I took certain additional steps to ensure I could safely cover the protest events of the day. I brought my medical kit along with me. I also immediately sought out other journalists who were there covering the protests, because I believed that by traveling together, we could look out for one another if anything were to happen, or if the violence escalated. I made sure to have my press badge

prominently displayed if law enforcement had any questions about my presence. And I wore personal protective equipment to minimize the risk of my exposure to COVID-19.

12. A true and correct copy of the press ID I wore on May 30, 2020 is attached as <u>Exhibit A</u>.

13. Another important step I took for my safety was to keep my distance, as much as possible, from law enforcement and from protesters. I felt this was important because I did not want law enforcement to mistake me for a protester, or get the impression that I was interfering in their ability to police the protest events of that day. I also did not want to get caught in the middle of any physical violence while covering the protests, given my experience the night before.

14. My concerns turned out to be well-founded. As soon as I began making my way to the protest events on the afternoon of May 30, I walked right into a standoff between police and protesters. I saw police firing tear gas and 40mm rubber bullets into the crowd. I remember thinking that the violence on May 30 was even more intense than the night before. At times it felt like I was in the middle of a war zone.

15. Along the way, I met several other journalists who were covering the protests: Skye Seipp, then of *Et Cetera*, and James Hartley of the *Fort Worth Star-Telegram*. I remember Tom Fox of the *Dallas Morning News* was also there. We met up and then would take up different positions throughout the crowd to get different vantage points.

16. We followed a large crowd of protesters which we found near the Eye Sculpture at 1601 Main Street. We followed this crowd from the front, where we could observe the people leading the protesters moving through the streets of Downtown Dallas. At this time, police were not interfering with the group, and seemed to leave the crowd largely unattended for nearly an hour.

17. At approximately 8:25 PM, the crowd I was following moved toward Reunion Tower on Reunion Boulevard East towards the Interstate 35 East (I-35E) highway. At the time, I had been focused on some protesters who were spray painting and vandalizing some of the buildings nearby. I turned and noticed some of the crowd run up the freeway overpass and onto the interstate. I took photographs of this crowd ascending a paved incline that led to the interstate at approximately 8:29 PM. Attached to this declaration as <u>Exhibits B and C</u> are true and correct copies of two photographs I took reflecting this four minute period.

18. At this point, I became separated from the other journalists I had been walking with. They followed the front of the protest group that entered the highway, while I continued to observe and photograph from the rear of the group.

19. I followed this group up the paved incline and stood against the exterior of a barrier that physically separated me from the highway. I did not take as many pictures while standing there. I was mostly attempting to assess the situation and evaluate what to do next.

20. From my position against the barrier, I could see that traffic was stopped and a group of protesters within my line of site were walking and standing directly in the traffic lanes. In the next two minutes—from approximately 8:29 PM to 8:31 PM—I took a few pictures from the exterior of the barrier of the protesters on the highway. Attached to this declaration as <u>Exhibits D, E, F, and G</u> are true and correct copies of photographs I took during this two minute timeframe.

21. While I stood against the barrier, I noticed more and more people crowding around me. I immediately assessed that this was a potentially dangerous situation to be in. As a journalist, it is standard practice when covering crowded events like protests to always have an exit or means of escape available. As the crowd built around me, I lost my ability to withdraw to safety if anything were to happen.

22. After evaluating the situation, I determined that the safest thing for me to do was to step over the barrier onto the improved shoulder of the interstate. I was taught that when a crowd is approaching you, you should find a barrier between you and them. That is precisely what I did.

23. As soon as I stepped onto the shoulder, I walked tightly along the inside of the barrier for approximately one minute. I walked northbound with the flow of traffic and away from the crowd that had just amassed around me. While I walked on the shoulder, at no time did I walk into the traffic lanes or obstruct traffic. I was especially afraid that a driver would lose their temper with the protesters and drive forward, so I remained against the guardrail for safety.

24. Attached to this declaration as <u>Exhibit H</u> is a true and correct copy of a photograph I took that shows the improved shoulder of the northbound lanes of I-35E at approximately 8:31 PM. This photograph shows a largely clear and unobstructed improved shoulder. On the other side of the barrier separating the improved shoulder from the raised embankment, a crowd of people can be seen assembled together.

25. As I walked down the improved shoulder, I heard a loud sound resembling gunfire and observed the crowd on the highway begin running my direction. For my safety, I immediately jumped back over the barrier and hid behind a nearby pillar to avoid being caught in the onrush of the crowd.

26. Once it was safe to do so, I moved away from this pillar and looked to my left where I saw a woman fall. I didn't know if she fell because tripped or had been shot. I watched as other protesters approached to assist her and carry her away from the interstate entrance towards a large grass area nearby. At 8:32:23 PM, I took a photo of this woman and the group assisting her. Attached to this declaration as <u>Exhibit I</u> is a true and correct copy of that photograph.

27. As I got nearer, I noticed for the first time several police, some of them wearing tan pants, moving in the direction of this group and carrying weapons that resembled paintball guns. While they approached, I continued to take pictures of the woman and the people helping

her. Attached to this declaration as <u>Exhibit J</u> is a true and correct copy of a photograph I took of the group aiding this woman.

28. In the approximately seven minutes that had passed since I began photographing the protesters on the highway, this was the first time I observed a police presence in my vicinity. During that short period of time, I do not recall any police being within my line of sight.

29. Because I was positioned at the rear of the protest group, and police approached from the front, it would have been extremely unlikely, if not impossible, for a police officer to have observed my presence in the vicinity of the interstate. It would have been even more unlikely that an officer observed my presence on the shoulder of the interstate during the approximately one minute of time that I was forced to step onto the shoulder for my safety.

30. From a vantage point approximately ten feet away, I saw and photographed the police officers in tan pants move towards the injured woman and the group assisting them. They immediately began arresting them. Attached to this declaration as <u>Exhibits K-12 and L</u> are true and correct copies of photographs showing the first two arrests made by the police who had just arrived on scene.

31. One officer in particular appeared to be the aggressor. From the moment he arrived on the scene, I recall he appeared to escalate interactions with civilians. I remember that without any hesitation or provocation, he began grabbing at people and initiating their arrests. I was surprised by the speed and intensity with which this officer handled the protesters. I now know this person to be the Defendant, Sgt. Roger A. Rudloff.

32. I do not believe there was any real reason for Sgt. Rudloff to act as aggressively as I remember him acting. The protesters nearby did not pose a threat to him or the other officers in the area. I also do not recall there being any other threats such as rocks, bottles, or projectiles being thrown at them. It is unlikely this happened because any projectiles being thrown in our direction would have run the risk of hitting me and other people too.

33. The first person I saw Sgt. Rudloff arrest was a Black man carrying a red backpack. Moments before, I captured a picture—<u>Exhibit J</u>—of this man aiding the injured woman down the grassy embankment, by supporting her left arm as she walked slowly down the hill. I believe his efforts to aid and care for her showed that he was both not a threat, and had no intention of evading the approaching police.

34. Police approached this man right about the time he escorted the injured woman to a nearby roadway that fed into I-35E's northbound lanes. I photographed him speaking to two officers, shortly before Sgt. Rudloff moved up to him from his right side, grabbed him by his shirt, and attempted to bring him to the ground. The man seemed surprised and caught off guard by Rudloff's attempt to physically restrain him. He reeled upwards and held his hands up as if to demonstrate that he was not a threat, right as another officer interceded and assisted Rudloff in bringing him down to the ground. True and correct copies of the photographs I took of this sequence are attached as <u>Exhibits K-1 to K-15</u>.

35. After this first arrest, I recall Sgt. Rudloff continued escalating the conditions at the scene while I stood at a safe distance documenting what was happening. Approximately one minute after he arrested the black man in the red backpack, at around 8:34 PM, I watched and photographed Sgt. Rudloff shoot another protester in the chest three times at point-blank range. I now know this protester to be Jantzen Verastique. Attached to this declaration as Exhibits M and N are true and correct copies of photographs I took showing Sgt. Rudloff shooting Verastique and following her as she turned away after being shot.

36. After Sgt. Rudloff shot Ms. Verastique, I observed and photographed him as he turned towards another protester standing near me and to my left, aimed his weapon at her, and ordered her to get on the ground and state she was under arrest too. Attached to this declaration as Exhibits O and P are true and correct copies of photographs showing this moment.

37. Sgt. Rudloff then turned away and moved towards another protester—whom I now know to be Parker Nevills—and acted to detain him too. I watched and photographed as Rudloff placed his hands on Nevills and, after ordering him to the ground, kneed him in the stomach. Attached to this declaration as Exhibits Q, R, and S are true and correct copies of photographs I took showing Rudloff walking towards Nevills, placing his left hand on him, and then brandishing his weapon at Nevills from close range.

38. Sgt. Rudloff then grabbed Nevills by the hair and pushed his upper body in a downward direction as two other officers on Sgt. Rudloff's team brought Nevills to the ground. Attached to this declaration as Exhibits T, U, and V are true and correct copies of photographs I took documenting this moment.

39. Everything I observed unfolded at a lightning-fast pace. Between 8:33:26 PM and 8:34:22 PM—less than one minute—I watched on with my camera as Sgt. Rudloff initiated the arrests of five people, shot one with his pepperball gun, and kneed and roughly handled another. I know this because of the timestamp data captured by my cameras with each photograph I took, which I believe to be accurate.

40. Another indicator of how fast Sgt. Rudloff was moving is that a number of my pictures were blurry. The scene unfolded so fast that as I was taking pictures, I sometimes did not have the time to adjust my camera's settings to the proper shutter speed to capture clear, sharp, in-focus photographs.

41. The whole time I was present documenting Sgt. Rudloff and his team, I was clearly visible to Sgt. Rudloff. I stood approximately ten feet away while I photographed these arrests. I believed this to be a safe enough distance so that police would not believe I was interfering with them. Nor did I want to be mistakenly identified as a protester.

42. One of the photographs I took of Sgt. Rudloff shooting Ms. Verastique at point blank range was published on the front page of the Dallas Morning News on August 9, 2020. A true and correct copy of the front page photo is attached as Exhibit W, and the full article can

be accessed at https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/.

43. While all this was happening, I recall looking to my left and seeing Tom Fox, one of the photographers I had met up with earlier in the day. I observed him photographing the same scene from a different angle and from about 20-30 feet away. A photograph I took of Ms. Verastique's hands being zip-tied shows Mr. Fox standing nearby also photographing the events unfolding before us. A true and correct copy of this photograph is attached as Exhibit X.

44. After detaining Nevills, Sgt. Rudloff looked at me and noticed that I had my camera trained on him. I recall Sgt. Rudloff then pointing at me and saying "you are going to jail too."

45. Immediately, I informed Sgt. Rudloff that I am a member of the press and that I was present to document what I was seeing. I stepped closer to be respectful and show him that I was not a threat. At the time, I held two large cameras, one in each hand. I raised my hands up to further demonstrate that I was peaceful and compliant. I then put my left camera down to pull my ZUMA Press ID badge in order to show Sgt. Rudloff that I was a photojournalist. My Press ID was on a pull string keychain which was attached to my belt for easy access in case I was asked by someone like Sgt. Rudloff for my press credentials.

46. In response, Sgt. Rudloff said, "Yeah yeah, press press. You are going to jail." He then closed the distance between us, grabbed me by the shirt, and threw me to the ground. I understood in the moment I was being arrested, but at no time did Sgt. Rudloff or any other officer inform me of the reason I was being arrested.

47. As I laid on the ground, I could see Tom Fox and Skye Seipp photographing my arrest. I saw them backing away. I believe they were fearful that the police might turn and arrest them next. One image Fox took shows me looking directly in their direction as I am laying on the ground being cuffed. This image was later published in an article I wrote for the July–August 2020 edition of *News Photographer*, a publication of the National Press Photographers Association. A true and correct copy of that article is attached as Exhibit Y.

48. I was placed in handcuffs by another officer, Officer Pillar. He removed my cameras and then took my information. I was informed that I could not keep my cameras with me and that they would be taken to police headquarters. I became fearful that the cameras would get lost or destroyed, or that the images on the cameras would be deleted.

49. I was then handed off to an escort who moved me to a staging location set up by the police. There, I was placed in a holding vehicle while I waited to be questioned by officers. The officers who questioned me said they did not know the charges against me or why I was being detained.

50. Eventually I was transferred to the jail, the Lew Sterrett Justice Center, where I was held overnight for approximately 26 hours. I was only released after my wife came to the jail

and paid a $300 cash bond that had been set in my case when I was brought before a magistrate judge.

51. I believe I was arrested for documenting Sgt. Rudloff's use of force against the protesters on the grassy lot adjacent to the Interstate.

52. At no time did I enter the traffic lanes of the freeway or obstruct traffic on the Interstate. During the brief period of time I stood on the shoulder of the Interstate, I consciously and intentionally avoided stepping into any of the traffic lanes. I also consciously and intentionally avoided obstructing the improved shoulder itself. I did this because I was concerned for my own safety, and mindful not to break any laws while I was documenting this historic moment. At no time did I intentionally obstruct the traffic lanes or the improved shoulder I briefly stood on.

53. Because of my arrest I have experienced a number of professional and personal consequences, some of which continue to this day.

54. While I was held in custody, I feared for my health and the possibility that I could be exposed to COVID-19 in the jail. At the time, the COVID-19 virus was still spreading rapidly across the world, and no vaccine existed yet. It was therefore my understanding that the best way to avoid contracting the virus was to wear personal protective equipment, keep my distance from others, and avoid enclosed, crowded spaces. I tried to do all these things while covering the protests. In the jail, I was unable to do any of these things. At the time, I feared deeply that I could contract the virus while in jail, and that if infected I could potentially spread it to my wife and young son, who was one year old at the time.

55. In the immediate aftermath of my arrest, I also lost potential earnings due to my detention and inability to return to work to cover the protests on May 30, 2020 and the following days when protest activity was at its peak. Because the demand for newsworthy photographs of the protests at the time was high, the faster I was able to upload my photographs to ZUMA Press, the more valuable they would likely be and the more royalties I could collect. The time I spent in jail delayed my ability to receive the maximum value in royalties from the photographs I took on May 30, 2020 because I was not able to send them to ZUMA Press for more than a day. I estimate that I lost between $500 and $1,500 in potential royalties due to my incarceration.

56. Additionally, I experienced chronic stress and anxiety which caused me to turn down about six months of assignments—from June 2020 to November 2020—involving protests or the police.

57. To date, I continue to lose potential earnings from assignments I have turned down due to my continued fear of covering events with a substantial police presence.

58. In addition to the professional and financial consequences of my arrest, I have also experienced significant personal consequences due to my arrest. I feel acute stress and

24-10455.928

anxiety when I am around police officers, and I have recurring nightmares of being locked in a jail cell.

59. I have sought medical treatment and incurred medical expenses to deal with my stress and anxiety. I have been prescribed Zoloft by my doctor, which I take to manage my stress and anxiety.

60. I also experience other forms of mental anguish due to my arrest. Since I was arrested, I frequently have depressive thoughts about whether or not my career path is worth the risk to my safety and my family's health and wellbeing.

61. I declare under penalty of perjury that the foregoing is true and correct.


Date: 07/21/2023

Christopher Rusanowsky

Tab 7

24-10455.936



Case 3:22-cv-01132-K   Document 66-1   Filed 08/16/23   Page 20 of 88   PageID 935

24-10455.940



Case 3:22-cv-01132-K   Document 66-1   Filed 08/16/23   Page 22 of 88   PageID 937

24-10455.942



24-10455.946





24-10455.950



24-10455.974



24-10455.984



24-10455.988



24-10455.998

Tab 8

24-10455.1024



24-10455.1026



24-10455.1045



Case 3:22-cv-01316-X   Document 65-2   Filed 08/16/23   Page 40 of 44   PageID 1043

24-10455.1048



Case 3:22-cv-01132-K   Document 66-2   Filed 08/16/23   Page 42 of 44   PageID 1045

24-10455.1050

Case 2:21-cv-01133-K   Document 56-2   Filed 08/01/23   Page 46 of 74   PageID 1047

24-10455.1052



Tab 9

# DECLARATION OF ROGER A. RUDLOFF

My name is Roger A. Rudloff. I am over twenty-one (21) years of age and am fully competent to make this declaration. I have never been convicted of a felony or a crime of moral turpitude and have no legal disabilities that would prevent me from making this declaration. Unless explicitly stated otherwise, I have personal knowledge of the facts set forth herein, and all of the statements in this declaration are true and correct to the best of my knowledge and recollection.

On the day of May 30, 2020, I was an employee with the City of Dallas's police department ("DPD.") I was informed on the police radio that I-35 in Dallas County was shut down due to individuals blocking the freeway. On the way to the scene, I witnessed what appeared to be hundreds of individuals blocking I-35 North. We could see these individuals on the freeway defacing vehicles, such as breaking vehicle windows and spray-painting multiple vehicles. When we arrived on the west side of I-35 South, I still saw individuals blocking I-35.

Cpl. Pillar, Cpl. Eggleston, Cpl. Barrett, Cpl. Weltmann, several others, and I parked on the west side of I-35 North. We all displayed DPD markings; I was my police vest and helmet. We began moving east towards the group of individuals who were on the freeway to get them off the freeway and to stop them from damaging vehicles, as well as to prevent potential violence. Many within the group on the freeway began throwing rocks, shaking cars, glass bottles, full water bottles, and other items at our group. Individuals within the group were shouting insults, like "Fuck the police" and "fuck 12." These bottles and rocks began hitting at our feet and going over our heads. I was concerned that some of these individuals may break into cars or get run over. People were told to disperse from the highway, but they did not.

I witnessed a photographer on I-35 whom I later learned was Mr. Rusanowsky.

At this point, we did not have clear direction from DPD command staff about what to do with the people who had been on the highway. I did not know if we were supposed to start arresting any of these people because that would tie up police resources while other scenes might need attention. I got on the radio and said something to the effect of "Someone is going to need to clarify what we do with the people on the freeway." Chief Thomas Castro, one of my superiors on that day, came on police radio and commanded us to start arresting these individuals by saying something to the effect of "We need to round those folks up."

Once we were on the east side of I-35 on the grass, as we were instructed by DPD command staff, we began to take in custody that part of the same group that we observed had just been on the highway. The small group we encountered on the grass appeared to be coming from the highway.

RUD0000001

I was the coordinator/supervisor on the scene. I ordered several of the individuals who had been on the highway to lay on the ground; some complied.  My attention was brought to Mr. Nevills when I overheard a DPD officer giving loud verbal commands to him to get on the ground, which Mr. Nevills did not comply with. I went over to assist the other officer to get Mr. Nevills into custody. I told him multiple times to get on the ground, but he again refused to comply. I was forced to use a knee strike to gain compliance. He was placed under arrest.

At this point, I clearly heard a screaming female voice coming from behind me. I turned around and observed a large female in a dark shirt charging in my direction yelling "STOP." The female had her hands raised above her chest in a "fighting stance." I gave loud verbal commands for her to stop, she did not comply, and at some point I discharged my PepperBall launcher to gain compliance. Once compliance was gained, she got down on the ground and another officer placed her under arrest. This was my last interaction with her.

In addition to Mr. Rusanowsky and others, I specifically observed Mr. Nevills and the woman I later deployed my PepperBall launcher at on I-35 prior to our direct interaction.

My first direct interaction with Mr. Rusanowsky was after Cpl. Pillar had arrested him. Cpl. Pillar informed me that Mr. Rusanowsky was with the media. This was the first time I had any clue that Mr. Rusanowsky was supposedly a member of the press. At some point after Cpl. Pillar told me Mr. Rusanowsky was a member of the press, Mr. Rusanowsky told me he was a press member who sold pictures on the Internet. I explained to him that he still had no right to be illegally on the freeway.

I never filled out any arrest reports on Mr. Rusanowsky. I have no idea who charged him with a crime or for what specific crime, if any. My interaction with Mr. Rusanowsky was not precipitated or continued due to the fact he was a member of the press. I never sought his arrest because he was a member of the press. I never threatened Mr. Rusanowsky's property or threatened to delete any pictures from his cameras, nor did I witness any other officer do so.

I then moved on to further scenes of violent rioting.

I never arrested an individual because they were protesting police. I never sought to restrict anyone's right to protest or cover the news for any viewpoint or reason. I am unaware of a single DPD employee ever arresting anyone for any of these reasons, nor am I aware of any DPD employee seeking to restrict anyone's right to protest or cover the news as a journalist for any viewpoint or reason. My entire goal for this interaction was to get those obstructing the freeway off the freeway and to prevent further property destruction or potential violence.

RUD0000002

## <u>VERIFICATION</u>

I, Roger A. Rudloff, state under penalty of perjury that I have read the statements contained in the forgoing document and that all of those statements are true and correct.


Roger Rudloff (May 6, 2023 07:45 CDT)

Roger A. Rudloff

3

---

## DECLARATION OF RUSSELL BARRETT

---

My name is Russell Barrett. I am over twenty-one (21) years of age and am fully competent to make this declaration.  I have never been convicted of a felony or a crime of moral turpitude and have no legal disabilities that would prevent me from making this declaration.  Unless explicitly stated otherwise, I have personal knowledge of the facts set forth herein, and all of the statements in this declaration are true and correct to the best of my knowledge and recollection.

On the day of May 30, 2020, I was an employee with the City of Dallas's police department ("DPD.") Sgt. Roger Rudloff informed me that the I-35 in Dallas County was shut down due to individuals blocking the freeway. On the way to the scene, I witnessed what appeared to be hundreds of individuals blocking I-35 North. We could see these individuals on the freeway defacing vehicles, such as breaking vehicle windows and spray-painting multiple vehicles. When we arrived on the west side of I-35 South, I still saw individuals blocking I-35; they were expanding west towards the I-35 South lanes.

Sgt. Rudloff, Cpl. Eggleston, Cpl. Pillar, Cpl. Weltmann, several others, and I parked on the west side of I-35 North. We all displayed DPD markings. We began moving east towards the group of individuals who were on the freeway to get them off the freeway and to stop them from damaging vehicles, as well as to prevent potential violence. Many within the group on the freeway began throwing rocks, glass bottles, full water bottles, and other items at our group. Individuals within the group were shouting insults, like "Fuck the police." These bottles and rocks began hitting at our feet and going over our heads.

The crowd began to move east off the freeway after we began our attempt to clear the freeway. Once we were on the east side of I-35 on the grass, I was addressing a crowd that had been on the freeway that was using a wall as cover while throwing rocks, bottles, and other materials at us. Another group of individuals then came up from the freeway over the guardrails of I-35 towards us. This group included the photographer I later learned was Mr. Rusanowsky, whom I also saw coming from the freeway over the guardrails. I also witnessed a woman in a black t-shirt coming over the guardrail of the freeway; she began moving quickly towards us and speaking in an aggressive manner. After this, Sgt. Rudloff deployed his PepperBall gun at her. At or near this exact time, a white male with his hair in a bun-style came running back towards me in an aggressive manner and yelling in an aggressive manner. At this point, I deployed my PepperBall gun several times at the ground in front of him to protect myself and stop him from coming towards me. While this was happening, the crowd was still throwing materials at us and shouting obscenities.

DPD officers then began arresting those in the group that had come over the guardrails from the freeway. I never personally arrested anyone or put hands on anyone. The arrested individuals were then taken away in a paddy wagon.

I then moved on to further scenes of violent rioting.

The signed printout of Google Maps (Exhibit A) is my handwriting and depicts events as I recall them.

I never arrested an individual because they were protesting police. I never sought to restrict anyone's right to protest for any viewpoint or reason. I am unaware of a single DPD employee ever arresting anyone for any of these reasons, nor am I aware of any DPD employee seeking to restrict anyone's right to protest or cover the events as a journalist for any viewpoint or reason. My entire goal for this interaction was to get those obstructing the freeway off the freeway and to prevent further property destruction.

## **VERIFICATION**

I, Russell Barrett, state under penalty of perjury that I have read the statements contained in the forgoing document and that all of those statements are true and correct.

*Russell Barrett 8593*
Russell Barrett 8593 (May 5, 2023 10:36 CDT)

Russell Barrett

Google Maps



A: Starting Point
B: DPD officers Route
C: Place of Arrest

Z. Barrett 8593
11-10-2022

## DECLARATION OF DAVID PILLAR

My name is David Pillar. I am over twenty-one (21) years of age and am fully competent to make this declaration. I have never been convicted of a felony or a crime of moral turpitude and have no legal disabilities that would prevent me from making this declaration. Unless explicitly stated otherwise, I have personal knowledge of the facts set forth herein, and all of the statements in this declaration are true and correct to the best of my knowledge and recollection.

On the day of May 30, 2020, I was an employee with the City of Dallas's police department ("DPD.") Sgt. Roger Rudloff informed me that the I-35 in Dallas County was shut down due to individuals blocking the freeway. On the way to the scene, I witnessed what appeared to be hundreds of individuals blocking I-35 North. We could see these individuals on the freeway defacing vehicles, such as breaking vehicle windows and spray-painting multiple vehicles. When we arrived on the west side of I-35 South, I still saw individuals blocking I-35; they were expanding west towards the I-35 South lanes.

Sgt. Rudloff, Cpl. Eggleston, Cpl. Barrett, Cpl. Weltmann, several others, and I parked on the west side of I-35 North. We all displayed DPD markings; I was in my full DPD uniform. We began moving east towards the group of individuals who were on the freeway to get them off the freeway and to stop them from damaging vehicles, as well as to prevent potential violence. Many within the group on the freeway began throwing rocks, glass bottles, full water bottles, and other items at our group. Individuals within the group were shouting insults, like "Fuck the police" and "fuck 12." These bottles and rocks began hitting at our feet and going over our heads.

The crowd began to move off the freeway after we began our attempt to clear the freeway, but some returned to I-35.

Once we were on the east side of I-35 on the grass, we began to take in custody those that were part of the same group that we believed had just been on the highway. The small group we encountered on the grass appeared to be coming back to the highway. I recall seeing a man with two cameras within the group; at one point, he was in front of me on I-35. I took notice of this because members of the press usually stand to the side of crime scenes and police interactions with suspects.

I later learned this was a photographer named Chris Rusanowsky. I arrested him. As part of DPD arrest protocol, we take large items or items of significant value and place them in the DPD property room for safekeeping and so arrestees can safely get their property back. At the scene, we took Mr. Rusanowsky's cameras solely for the purpose of preserving them. At no point did we intentionally or accidentally cause any damage to them. We never attempted to erase any pictures

or otherwise tamper with the cameras. We placed the cameras in the back of a marked DPD patrol vehicle's trunk where we keep our duty bags to specifically ensure the cameras were not damaged.

At some point, I heard a commotion behind me. Sgt. Rudloff then deployed his PepperBall gun at someone. While this was happening, the crowd was still throwing materials at us and shouting obscenities.

I never deployed a PepperBall weapon on that day. The people we arrested were arrested for obstructing the highway and other crimes.

I then moved on to further scenes of violent rioting.

I never arrested an individual because they were protesting police or because they were a journalist attempting to cover the events. I never sought to restrict anyone's right to protest for any viewpoint or reason. I am unaware of a single DPD employee ever arresting anyone for any of these reasons that day, nor am I aware of any DPD employee seeking to restrict anyone's right to protest for any viewpoint or reason. My entire goal for this interaction was to get those obstructing the freeway off the freeway and to prevent further property destruction.

## **VERIFICATION**

I, David Pillar, state under penalty of perjury that I have read the statements contained in the forgoing document and that all of those statements are true and correct.

David Pillar (May 5, 2023 10:42 CDT)

David Pillar

# Tab 10

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 4, 2024, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Counsel for Appellant*