No. 24-10455

---

# In the United States Court of Appeals for the Fifth Circuit

---

**Christopher Rusanowky**,

Plaintiff - Appellant

v.

**The City of Dallas; Sergeant Roger A. Rudloff, individually and in his official capacity as a Dallas Police Department Police Officer**,

Defendants - Appellees

---

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division

---

## APPELLEES' BRIEF

---

TAMMY L. PALOMINO
City Attorney

JENNIFER C. HUGGARD
Chief of Litigation

NICHOLAS D. PALMER
Chief of Appellate Section

J. CHEVES LIGON
State Bar No. 24070147
Assistant City Attorney
john.ligon@dallas.gov

CITY ATTORNEY'S OFFICE
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
Telephone: 214-670-3519
Telecopier: 214-670-0622

ATTORNEYS FOR APPELLEES

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10455, *Christopher Rusanowsky v. City of Dallas, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| *Plaintiff – Rusanowsky* | *Counsel for Plaintiffs-Appellees* |
| | Peter B. Steffensen, SMU Dedman School of Law First Amendment Clinic. |
| | Thomas S. Leatherbury, SMU Dedman School of Law First Amendment Clinic; Thomas S. Leatherbury Law, PLLC. |
| | David Henderson, Sebastian Van Coevorden, Ellwanger, Henderson LLLP. |
| *Defendants - City of Dallas and Rudloff* | *Counsel for Defendants-Appellants* |
| | J. Cheves Ligon (Trial and Appellate) Nicholas D. Palmer (Appellate) |
| | City Attorney's Office |

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe oral argument is necessary because the factual and legal issues in this appeal involve settled issues of law. Oral argument will not assist the Court in determining whether the evidence raised a fact issue about the constitutionality of Sgt. Rudloff's actions.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ 2

STATEMENT REGARDING ORAL ARGUMENT ................................. 3

TABLE OF AUTHORITIES ..................................................... 7

RESPONSE TO RUSANOWSKY'S STATEMENT OF ISSUES ........... 13

1.  The district court correctly entered summary judgment for Appellees.

2.  The district court did not err by finding there were no disputed genuine issues of material fact.

3.  The district court did not view the evidence in the light most favorable to Appellees.

4.  The district court did not err in granting qualified immunity to Sgt. Rudloff, because there were no issues of material fact to dispute the constitutionality of Sgt. Rudloff's actions.

STATEMENT OF THE CASE ................................................ 14

I.   The district court entered summary judgment for Appellees on Rusanowsky's civil rights claims brought pursuant to 42 U.S.C. § 1983. .................................................. 15

II.  Evidence in the Summary Judgment Record ................................. 16

     A.   Rusanowsky's Testimony ..................................... 17

     B.   Sgt. Rudloff's Testimony ..................................... 20

     C.   Cpl. Barrett's Testimony..................................... 22

     D.   Cpl. Pillar's Testimony....................................... 23

SUMMARY OF ARGUMENT ...................................................... 25

ARGUMENT ........................................................................... 25

I.   A motion for summary judgment based on qualified immunity
     is reviewed de novo under a modified standard that changes
     the nature of the summary-judgment burden, how and when
     the burden shifts, and what it takes to satisfy the burden .......... 25

II.  The district correctly entered summary judgment for Sgt.
     Rudloff on Rusanowsky's Fourth Amendment claim. ................... 28

     A.   Sgt. Rudloff had probable cause to arrest Rusanowsky;
          therefore, Rusanowsky's Fourth Amendment false
          arrest claim fails. ................................................... 32

          1.   This Court's recent case law demonstrates that
               probable cause existed for Rusanowsky's arrest for
               obstructing a highway or other passageway. .............. 32

          2.   Rusanowsky admits, and the evidence confirms,
               that he was illegally on the shoulder of the
               freeway, such that there was probable cause to
               arrest him for his violation of the Texas
               Transportation Code. ........................................... 37

     B.   Rusanowsky's appellate arguments fail to point to
          evidence in the record that create any disputed issue of
          material fact as to probable cause. ............................... 41

          1.   Rusanowsky has not created a fact issue as to the
               officers' reliability, as their testimony is in fact
               corroborated by evidence. ..................................... 42

          2.   Rusanowsky cannot create a fact issue by
               speculating that the DPD officers did not see him ...... 47

3.  Rusanowsky's reliance on *Ybarra* and its progeny is unavailing. ........................................................................ 49

4.  Supposed fact issues over the identity of the arresting officer are immaterial. ................................................... 57

III. The district court correctly entered summary judgment for Sgt. Rudloff on Rusanowsky's First Amendment retaliation claim. ............................................................................ 59

IV. The district court correctly entered summary judgment for the City on Rusanowsky's *Monell* claim. ............................... 67

CONCLUSION ......................................................................... 68

CERTIFICATE OF SERVICE .................................................. 70

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................... 71

# TABLE OF AUTHORITIES

## CASES

*Alexander v. City of Round Rock*,
854 F.3d 298 (5th Cir. 2017) ........................................................ 60

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................... 26, 42

*Arizmendi v. Gabbert*,
919 F.3d 891 (5th Cir. 2019) .................................................. 30, 58

*Associated Press v. NLRB*,
301 U.S. 103 (1937) ..................................................................... 63

*Aujla v. Hinds County*,
61 F. App'x 917, 2003 WL 1098839 (5th Cir. Feb. 11, 2003) ......... 46

*Baude v. Leyshock*,
23 F.4th 1065 (8th Cir. 2022) ...................................................... 36

*Bernini v. City of St. Paul*,
665 F.3d 997 (8th Cir. 2012) ............................................ 36, 53, 56

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ..................................................................... 63

*Briseno v. State*,
No. 04-19-00042-CR, 2020 WL 1866276 (Tex. App.—San
Antonio Apr. 15, 2020, no pet.) .................................................... 39

*Brown v. Lyford*,
243 F.3d 185 (5th Cir. 2001) ....................................................... 29

*Carr v. District of Columbia*,
587 F.3d 401 (D.C. Cir. 2009) ..................................................... 37

*Cole v. Carson*,
802 F.3d 752 (5th Cir. 2015) ....................................................... 31

*Degenhardt v. Bintliff,*
  117 F.4th 747 (5th Cir. 2024)....................................................61, 65

*Devenpeck v. Alford,*
  543 U.S. 146 (2004) ............................................................................58

*Deville v. Marcantel,*
  567 F.3d 156 (5th Cir. 2009) ............................................45, 46, 47

*District of Columbia v. Wesby,*
  583 U.S. 48 (2018) ............................................................................30

Dunn v. Does 1-22,
  116 F.4th 737 (8th Cir. 2024)..........................................................54, 55

*Glenn v. City of Tyler,*
  242 F.3d 307 (5th Cir.2001) ............................................................29

*Glik v. Cunniffe,*
  655 F.3d 78 (1st Cir. 2011)..............................................................63

*Gonzalez v. Trevino,*
  602 U.S. 653 (2024) ..........................................................................65

*Graham v. Connor,*
  490 U.S. 386 (1989) ..........................................................................57

*Haggerty v. Tex. S. Univ.,*
  391 F.3d 653 (5th Cir. 2004) ..........................................................30

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ..........................................................................27

*Hathaway v. Bazany,*
  507 F.3d 312 (5th Cir. 2007) ..........................................................47

*Hope v. Pelzer,*
  536 U.S. 730 (2002) ..........................................................................26

*Illinois v. Gates,*
    462 U.S. 213 (1983) ....................................................................29

*Illinois v. Rodriguez,*
    497 U.S. 177 (1990) ....................................................................29

*Jeffery v. City of New York,*
    113 F.4th 176 (2d Cir. 2024) ....................................................66

*Joseph ex rel. Estate of Joseph v. Bartlett,*
    981 F.3d 319 (5th Cir. 2020) ....................................................27

*Keenan v. Tejeda,*
    290 F.3d 252 (5th Cir. 2002) ....................................................60

*Lance v. City of San Antonio,*
    No. SA-21-CV-00837-JKP, 2024 WL 714327 (W.D. Tex. Feb.
    20, 2024) ....................................................................................66

*Lindsey v. Sears Roebuck & Co.,*
    16 F.3d 616 (5th Cir. 1994) ......................................................26

*Loftin v. City of Prentiss,*
    33 F.4th 774 (5th Cir. 2022)......................................................14

*Lyall v. City of Los Angeles,*
    807 F.3d 1178 (9th Cir. 2015) ..................................................53

*Lytle v. Bexar County,*
    560 F.3d 404 (5th Cir. 2009) ....................................................28

*Malley v. Briggs,*
    475 U.S. 335 (1986) ..................................................................26

*Manis v. Lawson,*
    585 F.3d 839 (5th Cir. 2009) ....................................................28

*Martin v. Thomas,*
    973 F.2d 449 (5th Cir. 1992) ....................................................30

*Martinez-Cornelio v. State,*
No. 06-19-00061-CR, 2019 WL 4891710 (Tex. App.—
Texarkana Oct. 4, 2019, pet. ref'd) ................................................. 39

*Maryland v. Pringle,*
540 U.S. 366 (2003) ................................................................ 29, 52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ................................................................ 26, 42

*McBride v. State,*
359 S.W.3d 683 (Tex. App.—Houston [14th Dist.] 2011, pet.
ref'd) ............................................................................................. 39

*Monacelli v. City of Dallas,*
No. 3:21-CV-2649-L, 2022 WL 4668054 (N.D. Tex. Sept. 30,
2022) .............................................................................................. 66

*Nieves v. Bartlett,*
587 U.S. 391 (2019) ................................................................ 40, 57

*O'Dwyer v. Nelson,*
310 F. App'x 741 (5th Cir. 2009) ................................................. 31

*Parm v. Shumate,*
513 F.3d 135 (5th Cir. 2007) ....................................................... 30

*Parrish v. Premier Directional Drilling, L.P.,*
917 F.3d 369 (5th Cir. 2019) ....................................................... 42

*Pearson v. Callahan,*
555 U.S. 223 (2009) ..................................................................... 27

*Romero v. City of Grapevine,*
888 F.3d 170 (5th Cir. 2018) ....................................................... 26

*Sam v. Richard,*
887 F.3d 710 (5th Cir. 2018) ....................................................... 31

*Samples v. Vadzemnieks*,
    900 F.3d 655 (5th Cir. 2018) ......................................................... 28

*Singleton v. Darby*,
    609 F. App'x 190 (5th Cir. 2015) (per curiam) .............................. 64

*Spiller v. Tex. City*,
    130 F.3d 162 (5th Cir. 1997) ......................................................... 29

*State v. Patterson*,
    291 S.W.3d 121 (Tex. App.—Amarillo 2009, no pet.) ................... 39

*Terwilliger v. Reyna*,
    4 F.4th 270 (5th Cir. 2021) ................................................ 30, 53, 54

*Thomas v. Great Atl. & Pac. Tea Co.*,
    233 F.3d 326 (5th Cir. 2000) .................................................. 45, 47

*Thompson v. Upshur County*,
    245 F.3d 447 (5th Cir. 2001) ......................................................... 28

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ...................................................................... 26

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ......................................................... 63

*United States v. Hearn*,
    563 F.3d 95 (5th Cir. 2009) .................................................... 48, 56

*United States v. Smith*,
    110 F.4th 817 (5th Cir. 2024) ........................................................ 53

*Utley v. City of Houston*
    No. 21-20623, 2022 WL 2188529 (5th Cir. June 17, 2022)
    (per curiam) .................................................................................. 64

*Verastique v. City of Dallas*,
    106 F.4th 427 (5th Cir. 2024) .................................... 15, 66, 67, 68

*Wade v. City of Houston,*
110 F.4th 797 (5th Cir. 2024) (per curiam)...... 32, 33, 35, 36, 54, 66

*Ybarra v. Illinois,*
444 U.S. 85 (1979) .......................................................................51

*Zemel v. Rusk,*
381 U.S. 1 (1965) .........................................................................63

## CONSTITUTIONS

U.S. Const. amend. IV............................................................28

## STATUTES

Act of June 13, 2023, 88th Leg., R.S., ch. 815, § 1, sec. 552.006(b),
2023 Tex. Sess. Law Serv. ch. 815. ...............................38

Tex. Penal Code § 42.02 ......................................................37

Tex. Penal Code § 42.03 ...............................................33, 53

Tex. Transp. Code § 552.006 ......................................38, 53

## RULES

Fed. R. Civ. P. 56.................................................................25

## OTHER AUTHORITIES

Brian L. Owsley, *The Best Offense Is A Good Defense: Fourth
Amendment Implications of Geofence Warrants*, 50 Hofstra
L. Rev. 829 (2022).........................................................53

Teressa Ravenell & Riley H. Ross III, *Policing Symmetry*, 99 N.C.
L. Rev. 379 (2021).........................................................59

TO THE HONORABLE FIFTH CIRCUIT OF APPEALS:

Appellees, Sergeant Roger A. Rudloff ("Sgt. Rudloff") and the City of Dallas (the "City, and with Sgt. Rudloff, "Appellees") file this appellees' brief to show that the district court correctly entered summary judgment for Appellees on all claims asserted against them by Appellant Christopher Rusanowsky ("Rusanowsky"). Therefore, the Court should affirm the district court's judgment.

## RESPONSE TO RUSANOWSKY'S STATEMENT OF ISSUES

1.    The district court correctly entered summary judgment for Appellees.

2.    The district court did not err by finding there were no disputed genuine issues of material fact.

3.    The district court did not view the evidence in the light most favorable to Appellees.

4.    The district court did not err in granting qualified immunity to Sgt. Rudloff, because there were no issues of material fact to dispute the constitutionality of Sgt. Rudloff's actions.

5.	The district court did not err in granting summary judgment to the City because Rusanowsky failed to establish any constitutional violation and this Court has rejected his theory of *Monnell* liability.

## STATEMENT OF THE CASE

This lawsuit stems from Rusanowsky's arrest during the 2020 George Floyd protests in and around the City. (*See* ROA.11-43.) Rusanowsky's claims turn on whether probable cause existed at the time of his arrest. "To determine whether probable cause existed for an arrest, the court examines the events leading up to the arrest, and then decides whether these historical facts, viewed from the standpoint of a reasonable police officer, amount to probable cause." *Loftin v. City of Prentiss*, 33 F.4th 774, 780 (5th Cir. 2022) (cleaned up). Considering the undisputed facts, a reasonable law enforcement officer would have had more than sufficient probable cause to arrest Rusanowsky for multiple offenses. As such, his claims fail and the district court correctly rendered summary judgment for Appellees.

**I.    The district court entered summary judgment for Appellees on Rusanowsky's civil rights claims brought pursuant to 42 U.S.C. § 1983.**

On May 25, 2020, George Floyd died while being restrained by officers with the Minneapolis Police Department. (*See* ROA.15.) In the wake of Floyd's death, protests erupted across the country. As this Court explained,

> [i]n 2020, major metropolitan areas were consumed by demonstrations following the release of a video depicting the well-known George Floyd incident in Minneapolis. Texas was not spared: Some of its cities suffered, *inter alia*, "widespread [and] severe damage, injury, and property loss." In Dallas, demonstrations ultimately devolved into "several days of riots, destruction of property, and assaults on police."

*Verastique v. City of Dallas*, 106 F.4th 427, 430 (5th Cir. 2024) (footnotes omitted), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Oct. 7, 2024) (No. 24-398).

Rusanowsky filed suit on May 23, 2022, alleging his constitutional rights were violated on May 30, 2020, while he was covering the protests in Dallas as a photojournalist. (ROA.11-42.) Specifically, Rusanowsky alleged that (1) Sgt. Rudloff unlawfully arrested Rusanowsky without probable cause in violation of the Fourth and Fourteenth Amendments, and (2) Sgt. Rudloff arrested Rusanowsky in retaliation for Rusanowsky's

journalistic activities in violation of the First and Fourteenth Amendments.[1] (ROA.34-38.) Rusanowsky further alleged that the City is liable for Sgt. Rudloff's actions on the theory that the City inadequately supervised, disciplined, or trained officers of the Dallas Police Department ("DPD"). (ROA.39-40.)

On March 4, 2024, the district court granted summary judgment in Sgt. Rudloff's favor. (ROA.1091.) The district court subsequently granted summary judgment in favor of the City because "Rusanowsky ha[d] not established an underlying constitutional violation that might support his municipal liability claims." (ROA.1115.)

## II.   Evidence in the Summary Judgment Record

The record on appeal includes photographic and documentary evidence. However, the salient material is primarily the testimony of Rusanowsky (ROA.921-929) as well as DPD officers Sgt. Rudloff (ROA.680-682), Senior Corporal Russell Barrett ("Cpl. Barrett") (ROA.683-685), and Senior Corporal David Pillar ("Cpl. Pillar") (ROA.686-687).

---

[1] Rusanowsky also asserted a claim for malicious prosecution. (ROA.38-39.) He does not appeal the district court's judgment as to his malicious prosecution claim. (Appellant's Br. 36 n.4.)

## A.    Rusanowsky's Testimony

Rusanowsky is a freelance photographer who went to downtown Dallas on May 30, 2020, to cover the protests. (ROA.922.) He displayed a "press ID" and met other journalists who were there covering the events. (ROA.923.) At 8:25 p.m., "the crowd [he] was following" moved toward interstate highway 35 ("I-35"), where he witnessed protestors "spray painting and vandalizing some of the buildings nearby." (ROA.923.) He then saw "some of the crowd run up the freeway overpass and onto the interstate" and he took photographs of "this crowd." (ROA.923, 936.) He "followed this group up the paved incline and stood against the exterior of a barrier that physically separated [him] from the highway." (ROA.923.)

From that position, he "could see that traffic was stopped and a group of protestors within [his] line of sight were walking and standing directly in the traffic lanes." (ROA.924; *see* ROA.938-46 [photographs of protesters on I-35].) He "took a few pictures" from this vantage point. (ROA.924.) Those photographs depict the protestors amongst the vehicles on I-35, preventing traffic from continuing along the freeway. (*See* ROA.938-46.) Rusanowsky then "noticed more and more people crowding

around him" and "determined that the safest thing for [him] to do was to step over the barrier onto the improved shoulder of the interstate." (ROA.924.) Rusanowsky admits stepping over the concrete barrier onto the shoulder of the freeway and walking along the shoulder in the direction of traffic. (ROA.924.) He took at least one photograph while walking on the shoulder. (ROA.924; *see* ROA.946.)

Rusanowsky then heard "a loud sound resembling gunfire," saw a crowd rushing towards him, and "immediately jumped back over the barrier" to avoid the crowd. (ROA.924.) He witnessed a woman fall, and he "took a photo of this woman and the group assisting her." (ROA.924.) As he "got nearer" he "noticed for the first time several police . . . moving in the direction of this group and carrying weapons that resembled paintball guns." (ROA.924.) Among this cluster of police was Sgt. Rudloff, who began arresting individuals. (ROA.925.) Rusanowsky took photographs of the officers, including Sgt. Rudloff, making arrests. (ROA.925.)

Rusanowsky speculated that he did not personally believe that the officers had the vantage point to witness him when he was on the freeway:

Because I was positioned at the rear of the protest group, and police approached from the front, it would have been extremely unlikely, if not impossible, for a police officer to have observed my presence in the vicinity of the interstate. It would have been even more unlikely that an officer observed my presence on the shoulder of the interstate during the approximately one minute of time that I was forced to step onto the shoulder for my safety.

(ROA.925.)

Rusanowsky photographed Sgt. Rudloff make arrests and use force on protestors. (ROA.926.) The "whole time [Rusanowsky] was present documenting Sgt. Rudloff and his team," Rusanowsky "was clearly visible to Sgt. Rudloff." (ROA.926.) After detaining one protestor, Rusanowsky believed that Sgt. Rudloff "noticed that [Rusanowsky] had [his] camera trained on [Sgt. Rudloff]." (ROA.927.) According to Rusanowsky, Sgt. Rudloff pointed at Rusanowsky and said, "[y]ou are going to jail, too." (ROA.927.) Rusanowsky presented his press credentials to Sgt. Rudloff, but in response, Sgt. Rudloff allegedly said "Yeah yeah, press press. You are going to jail." (ROA.927.) Sgt. Rudloff then "threw" Rusanowsky to the ground. (ROA.927.) Rusanowsky "understood in that moment that [he] was being arrested." (ROA.927.) Another officer, Cpl. Pillar, handcuffed Rusanowsky, and he was transferred to jail. (ROA.927.) He

was held overnight for "approximately 26 hours" before being released. (ROA.927.)

Rusanowsky testified that he never entered "the traffic lanes of the freeway or obstruct[ed] traffic on the Interstate." (ROA.928.) He also believe[d] that he was "arrested for documenting Sgt. Rudloff's use of force against the protestors." (ROA.928.)

## B.    Sgt. Rudloff's Testimony

Among the officers present, Sgt. Rudloff was the supervisor on the scene of arrest. (ROA.681.) Prior to the arrest at issue, police radio informed Sgt. Rudloff that protestors had "shut down" I-35. (ROA.680.) On the way to the scene, Sgt. Rudloff witnessed hundreds of people on the highway, blocking it. (ROA.680.) He witnessed protestors "on the freeway defacing vehicles" by "breaking vehicle windows and spray-painting multiple vehicles." (ROA.680.) DPD officers, including Sgt. Rudloff, arrived on the west side of I-35 (the south-bound lanes); the protestors were on the east side of I-35 blocking the north-bound lanes. (*See* ROA.681.) Sgt. Rudloff and several other officers parked their cars on the west side of I-35 and began moving east to get the protestors "off the freeway and to stop them from damaging vehicles, as well as to

prevent potential violence." (ROA.680.) Many within the group on the freeway began throwing rocks, glass bottles, full water bottles, and other items at the officers. (ROA.680.) Individuals within the group shouted insults, like "Fuck the police" and "fuck 12." (ROA.680.)

Sgt. Rudloff specifically witnessed Rusanowsky on the freeway. (ROA.680.)

At this point, Sgt. Rudloff did not yet have clear direction from command staff about whether officers were to arrest the individuals on the freeway or whether officers were to move on to deploy police resources elsewhere. (ROA.680.) Therefore, Sgt. Rudloff radioed command staff and said something to the effect of, "Someone is going to need to clarify what we do with the people on the freeway." (ROA.680.) DPD Deputy Chief Thomas Castro, who had direct authority over Sgt. Rudloff, came on police radio and said something to the effect of "[w]e need to round those folks up," instructing Sgt. Rudloff and the officers at the scene to start arresting these individuals. (ROA.680.)

Once Sgt. Rudloff and the other officers made it to the east side of I-35, they began arresting individuals who had been on the freeway. (ROA.680.) Another officer, Cpl. Pillar, arrested Rusanowsky. (ROA.681.)

Cpl. Pillar informed Sgt. Rudloff that Rusanowsky was putatively a journalist. (ROA.681.) This was the first time Sgt. Rudloff learned Rusanowsky was a journalist. (ROA.681.) Sgt. Rudloff told Rusanowsky that he still had no right to have been out on the freeway. (ROA.681.)

Sgt. Rudloff never filled out any reports regarding Rusanowsky and had no idea who ultimately charged Rusanowsky. (ROA.681.) Sgt. Rudloff did not know what crime, if any, Rusanowsky was later charged with. (ROA.681.) Sgt. Rudloff thereafter moved onto "other scenes of violent rioting." (ROA.681.) Sgt. Rudloff testified he never intentionally sought to restrict anyone's constitutional rights, and only acted to move violent protestors off I-35. (ROA.681.)

### C.    Cpl. Barrett's Testimony

Cpl. Barrett was with Sgt. Rudloff on May 30, 2020. (ROA.683.) Cpl. Barrett witnessed hundreds of protestors on I-35. (ROA.683.) He likewise saw individuals on the freeway defacing vehicles and breaking vehicle windows. (ROA.683.) With Sgt. Rudloff, he began moving east onto the freeway to clear the individuals from the freeway and stop them from defacing vehicles. (ROA.683.) People within the group on the freeway began cursing and throwing objects at the police. (ROA.683.)

The crowd began to move east off the freeway after we began our attempt to clear the freeway. Once we were on the east side of I-35 on the grass, I was addressing a crowd that had been on the freeway that was using a wall as cover while throwing rocks, bottles, and other materials at us. Another group of individuals then came up from the freeway over the guardrails of I-35 towards us. This group included the photographer I later learned was Mr. Rusanowsky, whom I also saw coming from the freeway over the guardrails.

(ROA.683.)

The officers then began arresting the individuals on a grassy section on the side of I-35 who had been on the freeway. (ROA.683.) Cpl. Barrett never witnessed anyone obstructed from exercising their rights to protest or cover the news. (ROA.683.) As part of his sworn testimony, Cpl. Barrett provided a drawing of the DPD officers' route and place of arrest. (ROA.685.)

### D.    Cpl. Pillar's Testimony.

Cpl. Pillar was with Sgt. Rudloff on May 30, 2020. (ROA.686.) Cpl. Pillar witnessed hundreds of protestors on I-35. (ROA.686.) He likewise saw many individuals on the freeway defacing vehicles and breaking vehicle windows. (ROA.686.) With Sgt. Rudloff, he began moving east onto the freeway to clear the individuals from the freeway and stop them from defacing vehicles. (ROA.686.) People within the group on the

freeway began cursing and throwing objects at the police. (ROA.686.) The officers then began arresting the individuals who had been on the freeway on a grassy area next to I-35. (ROA.686.) Cpl. Pillar arrested Rusanowsky:

> The small group we encountered on the grass appeared to be coming back to the highway. I recall seeing a man with two cameras within the group; at one point, he was in front of me on I-35. I took notice of this because members of the press usually stand to the side of crime scenes and police interactions with suspects. I later learned this was a photographer named Chris Rusanowsky. I arrested him.

(ROA.686.)

As part of DPD arrest protocol, officers are to take large items or items of value and place them in the DPD property room for safekeeping. (ROA.686.) Officers took Rusanowsky's camera only for that reason (ROA.686.) They never attempted to erase any pictures or tamper with Rusanowsky's camera. (ROA.686-87.) In fact, the officers specifically placed the cameras in the back of a patrol vehicle where they kept their own duty bags to ensure the cameras were not damaged. (ROA.687.) Everyone arrested at the scene was arrested for obstructing the highway and other crimes. (ROA.687.)

## SUMMARY OF ARGUMENT

Under settled law, the surrounding circumstances, including Rusanowsky's own admitted actions, created probable cause for his arrest. Rusanowsky attempts to muddy the waters and create questions of fact out of ancillary issues that do not impact the undisputed facts that he was on an illegally obstructed freeway during violent protests and was immediately arrested among those whom three DPD officers witnessed committing the illegal acts.

The Court should affirm the district court's judgment.

## ARGUMENT

**I.**  **A motion for summary judgment based on qualified immunity is reviewed de novo under a modified standard that changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> [W]here the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when 'there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted.

*Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hillman v. Loga*, 697 F.3d 299, 302 (5th Cir. 2012).

"Qualified immunity shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "In determining whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry." *Id.* "The first asks whether the facts, 'taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right.'" *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (cleaned up) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

"[T]he doctrine of qualified immunity attempts to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[A]pplying that standard involves significant departures from the norms of civil litigation—particularly summary judgment norms." *Id.* at 328-29. The doctrine of qualified immunity "changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden." *Id.* at 329.

The "scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues [the Court] review[s] *de*

*novo.*" *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001).

This Court accepts "plaintiff's version of the facts as true and [reviews the facts] through the lens of qualified immunity." *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018). "If the defendant would still be entitled to qualified immunity under this view of the facts, then any disputed fact issues are not material." *Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009). Conversely, "[i]f a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material . . . ." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

## II. The district correctly entered summary judgment for Sgt. Rudloff on Rusanowsky's Fourth Amendment claim.

Rusanowsky contends that he was arrested without probable cause in violation the Fourth and Fourteenth Amendment. (ROA.34-39.) This claim fails because, as the district court correctly found (ROA.1072-73, 1079-83), there was probable cause to arrest Rusanowsky.

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Simply, the Fourth Amendment does not prohibit all searches and seizures—only those that

are "unreasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990); *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).

This Court has held that probable cause exists "'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir.2001) (quoting *Spiller v. Tex. City*, 130 F.3d 162, 165 (5th Cir. 1997)). Whether probable cause existed is analyzed using an objective reasonable person standard. *Id.*

Probable cause is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (cleaned up). It turns "'on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* at 371 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Instead, courts must look to the "'totality of the circumstances' and decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer' demonstrate 'a probability or substantial chance of criminal

activity.'" *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). "But while probable cause 'is not a high bar, the belief of guilt must be particularized with respect to the person to be searched or seized." *Id.* (cleaned up).

Thus, to prevail on a section 1983 claim for false arrest, Rusanowsky must prove that Sgt. Rudloff did not have probable cause to arrest him. *See Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007); *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004). "Probable cause is established by facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019). This Court has stressed that "[i]n making a determination of probable cause, [the Court] do[es] not require a police officer to be perfect, nor do[es it] want him always to err on the side of caution out of the fear of being sued." *Martin v. Thomas*, 973 F.2d 449, 453 (5th Cir. 1992).

This Court has found whether the offense is a felony or a misdemeanor, or whether the offense was committed in the officer's

presence, is of no importance. *Sam v. Richard*, 887 F.3d 710, 715 n.6 (5th Cir. 2018). Likewise, whether an arrestee was ever charged or convicted of the crime for which the officer arrests him is irrelevant. *Cole v. Carson*, 802 F.3d 752, 766 (5th Cir. 2015), *cert. granted, judgment vacated sub nom. Hunter v. Cole*, 580 U.S. 994 (2016), *opinion reinstated in part*, 905 F.3d 334 (5th Cir. 2018). Rather, "to make out a Fourth Amendment claim under either a 'false arrest' or 'illegal detention' theory, the relevant actors must not be aware of facts constituting probable cause to arrest or detain the person for *any crime.*" *Id.* (emphasis added); *see also O'Dwyer v. Nelson*, 310 F. App'x 741, 745 (5th Cir. 2009) ("'[T]o prevail in a § 1983 claim for false arrest,' . . . [a]s applied to the qualified immunity inquiry, the plaintiff must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime.").

As demonstrated below, probable cause existed to arrest Rusanowsky for multiple crimes.

**A.** **Sgt. Rudloff had probable cause to arrest Rusanowsky; therefore, Rusanowsky's Fourth Amendment false arrest claim fails.**

Stripped of ancillary and immaterial details, the undisputed facts show that Sgt. Rudloff and other DPD officers found Rusanowsky on and near a freeway while violent protestors were obstructing the freeway. Under this Court's binding precedent—both recent and long-standing— more than sufficient probable cause existed to arrest Rusanowsky.

**1.** **This Court's recent case law demonstrates that probable cause existed for Rusanowsky's arrest for obstructing a highway or other passageway.**

On August 6, 2024, this Court issued its opinion in *Wade v. City of Houston*, 110 F.4th 797 (5th Cir. 2024) (per curiam), which concerned the constitutionality of the arrests of individuals who were "participants in (or were in the vicinity of) protests that occurred in downtown Houston following the death of George Floyd in May 2020." *Id.* 798.[2] *Wade* addressed whether there was probable cause to arrest "Plaintiffs for violating section 42.03 of the Texas Penal Code, which makes it illegal to

---

[2] Rusanowsky filed his brief on September 4, 2024, nearly a month after *Wade* was decided. Rusanowsky's brief fails to acknowledge this controlling authority. (*See generally* Appellant's Br.)

'obstruct[] a highway, street, sidewalk,' or other passageway." *Id.* at 799.

The Texas Penal Code provides:

> (a) A person commits an offense if, without legal privilege or authority, he intentionally, knowingly, or recklessly:
>
> (1) obstructs a highway, street, sidewalk, railway, waterway, elevator, aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access, or any other place used for the passage of persons, vehicles, or conveyances, regardless of the means of creating the obstruction and whether the obstruction arises from his acts alone or from his acts and the acts of others; or
>
> (2) disobeys a reasonable request or order to move issued by a person the actor knows to be or is informed is a peace officer, a fireman, or a person with authority to control the use of the premises:
>
>> (A) to prevent obstruction of a highway or any of those areas mentioned in Subdivision (1); or
>>
>> (B) to maintain public safety by dispersing those gathered in dangerous proximity to a fire, riot, or other hazard.
>
> (b) For purposes of this section, "obstruct" means to render impassable or to render passage unreasonably inconvenient or hazardous.

Tex. Penal Code § 42.03.

In *Wade*, this Court, in finding that probable cause existed to arrest the protestors in Houston for obstructing a roadway, found that "[i]t is implausible that a large group of protestors situated on a roadway or

sidewalk in downtown Houston for an extended period of time would not have obstructed the roadway or sidewalk on which the protest took place." 110 F.4th at 799. The facts in this case are indistinguishable from *Wade* such that it is controlling and dispositive of Rusanowsky's Fourth Amendment claim.

*First*, Rusanowsky's own testimony confirms that protestors were obstructing I-35, as well as the fact of his presence in the vicinity. (ROA.922-25.) He testified that minutes prior to his arrest, "the crowd [he] was following" moved toward I-35, where he witnessed "protestors who were spray painting and vandalizing some of the buildings nearby." (ROA.923.) He then saw "some of the crowd run up the freeway overpass and onto the interstate," and he took photographs of "this crowd." (ROA.923.) He testified that when he was near I-35, he "could see that traffic was stopped and a group of protestors within [his] line of sight were walking and standing directly in the traffic lanes." (ROA.924.) And critically, *Rusanowsky admitted to climbing over the concrete barrier and walking along the shoulder of the freeway as protestors obstructed it*. (ROA.924.) As in *Wade*, [t]he size and location of the protest[] at issue in this case . . . supplied the arresting officers with at least probable cause

34

to conclude that the protestors were rendering passage on the roadway[] . . . they occupied unreasonably inconvenient for purposes of section 42.03." 110 F.4th at 799.

*Second*, the pictures Rusanowsky took confirm not only that the highway was entirely obstructed, but that he was on—or mere inches from—the same road. (ROA.936-946.) Particularly telling is the photograph Rusanowsky took after he climbed the concrete barrier onto the shoulder of the freeway. The angle from which the photograph was taken plainly shows that Rusanowsky was among the protestors on the freeway:



(ROA.946.)

*Third*, every DPD officer on scene recalls seeing Rusanowsky on the highway. (ROA.680 [Sgt. Rudloff], 683 [Cpl. Barrett] 686 [Cpl. Pillar].) Although Rusanowsky quibbles with this testimony (discussed more fully below), his own testimony and photographic evidence corroborate their statements.

*Fourth*, Rusanowsky was found "in the vicinity," *Wade*, 110 F.4th at 798, of the freeway amongst the protestors that—only moments before—they had illegally obstructed.

Under *Wade*, Rusanowsky's Fourth Amendment claim is not viable because

> [t]he size and location of the protests at issue in this case . . .
> supplied the arresting officers with at least probable cause to
> conclude that the protestors were rendering passage on the
> roadways or sidewalks they occupied unreasonably
> inconvenient for purposes of section 42.03. Because they had
> probable cause to arrest Plaintiffs, the City's police officers did
> not violate the First, Fourth, or Fourteenth Amendments.

*Wade*, 110 F.4th at 799 (internal citations omitted).[3]

---

[3] The holding in *Wade* is in line with other circuits. *See, e.g.*, *Baude v. Leyshock*, 23 F.4th 1065, 1072 (8th Cir. 2022) ("Where there is a unit, the Fourth Amendment does not require a probable cause determination with respect to each individual in a large and potentially riotous group before making arrests.") (cleaned up); *Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012) (granting qualified immunity because "[i]t was reasonable for the officers to believe they could arrest those who were acting

Sgt. Rudloff, having witnessed Rusanowsky among a group who were plainly obstructing the freeway, had probable cause to arrest him under section 42.03 of the Texas Penal Code. Therefore, Rusanowsky's Fourth Amendment claims fails.[4]

Nonetheless, as discussed below, even without the benefit of *Wade*, Rusanowsky's claims would still fail.

> **2.  Rusanowsky admits, and the evidence confirms, that he was illegally on the shoulder of the freeway, such that there was probable cause to arrest him for his violation of the Texas Transportation Code.**

The district court correctly held that Rusanowsky's Fourth Amendment claims failed because Sgt. Rudloff had probable cause to

---

as a unit with the protestors"); *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009) ("A requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot, particularly when it is on the move—at night.")

[4] Sgt. Rudloff's summary judgment motion argued that probable cause existed to arrest Rusanowsky for multiple crimes, not just obstruction of a highway or other passageway pursuant to section 42.03 of the Texas Penal Code. Those other crimes included participating in a riot, Tex. Penal Code § 42.02, and violating section 552.006 of the Texas Transportation Code. (ROA.662-65.) The district court determined summary judgment on the ground that there was probable cause to arrest Rusanowsky for his violation of Texas Transportation Code section 552.006 and opted not to address Sgt. Rusanowsky's arguments concerning Texas Penal Code sections 42.02 and 42.03. (ROA.1080-86.)

arrest Rusanowsky for violating section 552.006 of the Texas Transportation Code. (ROA.1080-86.)

Under the Texas Transportation Code, with only some exceptions absent here, walking on the shoulder of a freeway in the manner that Rusanowsky did is against the law.

> (b)    If a sidewalk is not provided, a pedestrian walking along and on a highway shall if possible walk on:
>
> (1)    the left side of the roadway; or
>
> (2)    the shoulder of the highway facing oncoming traffic.

Tex. Transp. Code § 552.006(b).[5]

Rusanowsky admitted to walking on the *right* shoulder of I-35 in the same direction as traffic. (ROA.924.) As plainly seen in Rusanowsky's own pictures, he was on the *right side* of the freeway or shoulder. (*See, e.g.*, ROA.946.) Further, as illustrated in Cpl. Barrett's drawing, the arrest took place on the right side of the highway. (ROA.685.)

---

[5] Texas Transportation Code section 552.006 was amended effective September 1, 2023. Act of June 13, 2023, 88th Leg., R.S., ch. 815, § 1, sec. 552.006(b), 2023 Tex. Sess. Law Serv. ch. 815. The language above quotes section 552.006 as it existed at the time of Rusanowsky's arrest and is accurately reproduced in the addendum to Rusanowsky's brief.

Violation of section 552.006 is a misdemeanor in Texas that subjects individuals to arrest. *See Martinez-Cornelio v. State*, No. 06-19-00061-CR, 2019 WL 4891710, at *4 (Tex. App.—Texarkana Oct. 4, 2019, pet. ref'd) (finding probable cause for arrest where defendant was walking on the wrong side of the road, "[defendant] violated Section 552.006 of the Texas Transportation Code, a Class C misdemeanor."); *McBride v. State*, 359 S.W.3d 683, 693 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (finding officer had probable cause to arrest defendant for walking on the wrong side of the street in violation of Section 552.006 of the Texas Transportation Code); *Briseno v. State*, No. 04-19-00042-CR, 2020 WL 1866276, at *4 (Tex. App.—San Antonio Apr. 15, 2020, no pet.) (finding probable cause for arrest where officer witnessed defendant "walking on the wrong side of the road in violation of section 552.006 of the Transportation Code."); *see also State v. Patterson*, 291 S.W.3d 121, 122–23 (Tex. App.—Amarillo 2009, no pet.) (concluding that officer had reasonable suspicion to detain a pedestrian walking with his back to traffic because it was a traffic violation under Section 552.006.)

Emphasizing that section 552.006 requires pedestrians to travel on the left side of the road or on the shoulder facing oncoming traffic "if

possible," Rusanowsky takes issue with the district court's conclusion that Sgt. Rudloff could have inferred it was possible for Rusanowsky to cross the freeway to walk along on the proper side. (Appellant's Br. 30-32.) Rusanowsky asserts that it would have been unsafe for him to cross to the other side of the freeway, such that he had to walk along the shoulder of the right side of the freeway. (*Id.*) Rusanowsky's argument disavows the standard of review. The existence of probable cause to arrest Rusanowsky for a violation of section 552.006 is an objective inquiry—could Sgt. Rudloff have reasonably believed it was possible for Rusanowsky to cross to the proper side of the freeway to walk given that protestors had brought traffic to a halt? The district court correctly concluded that, yes, Sgt. Rudloff could have. Rusanowsky's subjective and granular assessment that he did not feel it safe to cross has no bearing on the objective inquiry under which probable cause is assessed.

As the Supreme Court has noted, "[o]fficers frequently must make 'split-second judgments' when deciding whether to arrest . . . ." *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 98 (2018)). Here, Sgt. Rudloff and/or other officers made the decision to arrest Rusanowsky during a large protest after seeing him on

an obstructed freeway. (ROA.681.) And Sgt. Rudloff's workday was not over: he "then moved on to further scenes of violent rioting." (ROA.681.) The same was true for Cpl. Barrett and Cpl. Pillar, as they were required to continue the process of quelling disturbances throughout the City. (ROA.683-84; 686-87.)

In sum, as the district court correctly found, probable cause existed to arrest Rusanowsky for his admitted entry onto freeway's right-side shoulder.

## B. Rusanowsky's appellate arguments fail to point to evidence in the record that create any disputed issue of material fact as to probable cause.

Rusanowsky does not point to evidence that contradicts any of the salient facts in this case: as were the protestors in *Wade*, he was on (or in the vicinity of) a violently obstructed freeway. However, Rusanowsky attempts to create a fact issue as to whether probable cause existed for his arrest essentially by two means: (1) arguing that there are "contradictions" and indicia of unreliability in the officers' testimony, and (2) questioning whether the officers who testified that they saw Rusanowsky on the freeway (where he admittedly was) really saw him.

Both arguments fail because, at most, they point to immaterial discrepancies concerning minor details between the various renditions of events; they do not point to any materially disputed facts that "might affect the outcome of the suit under the governing law." *See Anderson*, 477 U.S. at 248. Instead, Rusanowsky attempts to muddy the waters to improperly "show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. But as this Court has held, "'[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (quoting *Anderson*, 477 U.S. at 249-50.)

**1. Rusanowsky has not created a fact issue as to the officers' reliability, as their testimony is in fact corroborated by evidence.**

Rusanowsky's attempts to discredit the officers' testimonies require numerous leaps in logic and assumptions not based in the evidence. Principally, Rusanowsky asserts that, because several of the officers recalled seeing him at different specific places (one claimed to have seen him *on* the freeway, another coming across the guardrail *from* the

freeway) their testimony presents a "physical impossibility." (Appellant's Br. 25-26.)

This assumes too much: it assumed that (1) all of the officers were not only moving in complete unison but also had their gazes fixed upon him at the exact same place and time, and (2) Cpl. Barrett's testimony that he saw Rusanowsky at some point coming *from* the freeway negates both Sgt. Rudloff's (ROA.680) and Cpl. Pillar's testimony (ROA.686) that they witnessed him *on* the freeway. In fact, read in unison, each bolsters the other's plausibility and credibility.

Here, Cpl. Barrett's drawing of the scene provides needed context. The grassy area where the arrest occurred is mere feet from the freeway. (ROA.685.) Even assuming a strained reading of Cpl. Barrett's testimony to be that he first saw Rusanowsky while Cpl. Barrett was on the grassy area, this in no way creates a fact issue as to Sgt. Rudloff's and Cpl. Pillar's testimony that they observed Rusanowsky on the freeway. The testimony of all three officers is also consistent with Rusanowsky's concession that he was in fact on the shoulder of the freeway.

In sum, all three officers testified that they were in the same area and all saw Rusanowsky either on or coming from the freeway at various

points in time. As noted above, Rusanowsky's entry onto and walking along the shoulder of freeway, however brief, is a crime in Texas—a crime for which the officers had probable cause to arrest Rusanowsky. It is also a crime that Rusanowsky has not provided so much as an inferential argument that he did not commit.

Rusanowsky also infers the officers were untruthful in their testimony because their account of the event is not entirely consistent with his, at least with respect to minute details. For example, he alleges that the officers remember certain ancillary events, like the order of the arrest of others in relation to a deployment of a PepperBall, as discrediting for summary judgment purposes. (Appellant's Br. 26.) Further, Rusanowsky claims that Sgt. Rudloff's recollection that his first time interacting with him at the time of his arrest is contradicted by photographic evidence that the two had, in fact, interacted at some point shorty before Rusanowsky's arrest. (Appellant's Br. 28.) Rusanowsky's complaints about the minutiae of the officers' testimony does not raise a material fact issue.

Certainly, "when the circumstances at issue are conducive to *lying*, well-supported suspicion of mendacity may serve as a legitimate basis for

the factfinder's reasonable inferences concerning the ultimate facts at issue." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (emphasis added). In a handful of cases, this Court has found circumstances where "questions about the credibility of key witnesses loom . . . large," and that the evidence thus permitted the trier-of-fact to treat their testimony with "skeptical scrutiny." *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000). For example, in *Deville*, numerous facts within the record showed that the officer (Tarver) might well have been lying about whether the plaintiff was speeding, thus precluding summary judgment based on the basis of Tarver's testimony:

> Tarver admitted that he has a history of problematic arrests and that citizens have made complaints against him. The Evangeline Parish Sheriff asked him to resign his position as a sheriff's deputy (which he held simultaneously with his position with the Village of Turkey Creek) because of a complaint of excessive force in an unrelated case. More directly implicating his credibility, Tarver admits the parish district attorney asked him to resign from the Turkey Creek police department because he filed a false charge of possession of marijuana against an individual who in fact did not have marijuana (that incident is also otherwise unrelated to the instant case). And although Tarver testified that the radar gun had the ability to "lock-in" a detected speed, he did not "lock-in" the speed in the Deville case—and, as a result, he was unable to verify the speed when asked by Deville's husband to do so. In light of this discrediting evidence— especially evidence that Tarver has falsified other charges— and Deville's sworn testimony that she was not speeding

because her cruise control was set on 40mph, a reasonable jury could disbelieve Tarver's testimony and find that he lacked probable cause for the first arrest.

567 F.3d at 165-66.

Unlike the plaintiff in *Deville*, Rusanowsky puts forth no such evidence to contradict the material facts within the officers' testimony (that they observed Rusanowsky on the obstructed freeway), nor any evidence that the officers have manufactured false charges in the past such that a jury would likely disbelieve them. And unlike the plaintiff in *Deville*, Rusanowsky also does not meaningfully disagree with the essential facts for the underlying offenses for which he was arrested. The plaintiff in *Deville* disputed that she was speeding; Rusanowsky does not dispute that he entered and walked along the shoulder of the freeway—he concedes it (ROA.924). That is, Rusanowsky speculates that the officers did not see him where he admits to being. This is insufficient. *See, e.g.*, *Aujla v. Hinds County*, 61 F. App'x 917, 2003 WL 1098839, at *4 (5th Cir. Feb. 11, 2003) ("Critically, plaintiff points to nothing in the summary judgment record that casts doubt on the veracity of the deputies' version of the events. At most, plaintiff's speculations might lead a jury to conclude that the deputies were negligent in the way they

decided to effect the arrest.") Even if the officers' declaration testimony lacked certain details, an officer's "failure to remember certain details does not amount to a 'well-supported suspicion of mendacity' undermining his credibility." *Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007) (quoting *Thomas*, 233 F.3d at 331).

Even in the light most favorable to Rusanowsky, his arguments amount only to speculative claims about the officers' truthfulness, but a "motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility." *Deville*, 567 F.3d at 165.

### 2. Rusanowsky cannot create a fact issue by speculating that the DPD officers did not see him.

Rusanowsky's other tack is not to deny being on the freeway, or at least inches away on the shoulder, but to speculate it was unlikely that the officers actually saw him commit the offense based on his personal recollection of crowd positioning.

> Because I was positioned at the rear of the protest group, and police approached from the front, it would have been extremely unlikely, if not impossible, for a police officer to have observed my presence in the vicinity of the interstate. It would have been even more unlikely that an officer observed my presence on the shoulder of the interstate during the approximately one minute of time that I was forced to step onto the shoulder for my safety.

(ROA.476; *see also* Appellant's Br. 27 [arguing it "was highly improbable" that the DPD officers saw Rusanowsky through "hundreds" of protestors].) Rusanowsky's argument is unavailing.

"Officers may have probable cause for an arrest even if they have observed no criminal activity and are unaware of the defendant's identity. The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause." *United States v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (cleaned up). Rusanowsky provided that basis.

*First*, Rusanowsky's own timeline places the officers in his vicinity when he would have been on the freeway. He testified as follows:

- From 8:29 to 8:31 pm, he took pictures of protestors while he was at the "exterior of the barrier of the protestors on the highway." (ROA.924.)

- Noticing a large group of protestors "crowding around" him, he stepped "over the barrier" and "walked tightly along" for "approximately one minute." (ROA.924.)

- During this "approximately one minute" of walking on the shoulder, he "heard a loud sound resembling gunfire and observed the crowd on the highway begin running in [his] direction." (ROA.924.) He then jumped back over the freeway barrier. (ROA.924.)

- At 8:32 pm, he saw a woman fall and took a photograph of those assisting her. Then, "[a]s [he] got nearer, [he] noticed for the first

time several police, some of them wearing tan pants, moving in the direction" of the group he was photographing. (ROA.924.)

Based on his own timeline, Rusanowsky (illegally) ventured onto the freeway and personally witnessed the officers less than one minute after he claims to have left the freeway. This places the officers exactly where they claimed to have been. That Rusanowsky did not observe the officers while he admits to being on the shoulder of the freeway in no way undermines the officers' testimony that they observed him.

*Second*, photographs that Rusanowsky took plainly place him in the vicinity of—if not on—the very same freeway protestors were obstructing. (*See* ROA.489-97.) Critically, Rusanowsky also took multiple photographs that place the officers mere feet from him while he was on the "grassy area" in the vicinity of the freeway. (ROA.539-43.) In other words, Rusanowsky provides uncontestable evidence that, under *Wade*, provided the officers with probable cause to arrest him for obstruction of a roadway.

### 3. Rusanowsky's reliance on *Ybarra* and its progeny is unavailing.

Rusanowsky does not deny that he was—at the very least—on the shoulder of the obstructed freeway. (ROA.924.) He claims he first saw

Sgt. Rudloff on a grassy area directly beside the freeway where Rusanowsky sought refuge as "the crowd of people escaping the highway ran past." (Appellant's Br. 17-18.) Photographs Rusanowsky took confirm that the grassy area at issue is directly beside the freeway. (*See, e.g.*, ROA.986.)

His principal argument appears to be that there is at least a fact question about whether the officers actually saw him on the freeway or shoulder. (*See* Appellant's Br. 58.) Not so.

*First*, Rusanowsky's argument requires multiple inferences that are simply unsupported by the record and fail to create a fact issue. He contends: (1) because he did not recall seeing police officers "within his line of sight" among the hundreds of protestors, they could not have been there, and (2) he was in the back of a crowd when officers approached, so they necessarily could not have seen him. Rusanowsky's lack of observation says nothing of what the officers observed. Moreover, this is quite an odd defense, which is, fundamentally: "When I first became aware police were there, I do not believe they could have seen me commit the crime I just had or was committing."

*Second*, Rusanowsky's reliance on authorities that provide a person's proximity to someone else who is committing a crime does not give probable cause for the person's arrest is misplaced. Rusanowsky avers that even if officers saw him on the freeway shoulder, his "mere propinquity to others independently suspected of criminal activity d[i]d not, without more, give rise to probable cause" to arrest him. (Appellant's Br. 44 [quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)].) In essence, he argues that under *Ybarra*, even if Rusanowsky had been *in* the group of those who had just moments before obstructed the freeway, there was no probable cause to believe he was *of* those who had just obstructed the freeway. Rusanowsky is wrong.

As the Supreme Court summarized years later, *Ybarra* stands for the proposition that proximity to criminality *alone* does not provide probable cause:

> In *Ybarra,* police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance. Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra. Inside a cigarette pack retrieved from Ybarra's pocket, an officer found six tinfoil packets containing heroin. We stated:
>
> > "[A] person's mere propinquity to others independently suspected of criminal activity does

not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be."

We held that the search warrant did not permit body searches of all of the tavern's patrons and that the police could not pat down the patrons for weapons, absent individualized suspicion.

*Pringle*, 540 U.S. at 372–73 (internal citations omitted).

Notably, in *Pringle*, the Court found that probable caused existed for arrest of passengers in a car where drugs and money were found:

Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Id.* at 373.

The critical distinction between the facts in *Ybarra* and here is that *Ybarra*'s tavern patrons were *present near* criminal activity; here, Rusanowsky's *presence was* the criminal activity. *See* Tex. Penal Code

§ 42.03; Tex. Transp. Code § 552.006.[6] Circuit courts have had no trouble distinguishing between the circumstances of *Ybarra* and those of large groups engaged in illegal activity. *See, e.g.*, *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015) ("If a group or crowd of people is behaving as a unit and it is not possible (as it was in *Ybarra*) for the police to tell who is armed and dangerous or engaging in criminal acts and who is not," police could have reasonable suspicion.); *Bernini*, 665 F.3d at 1003 (distinguishing *Ybarra*, finding that "[w]hat is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons.").

Nor is this similar to the shootout in *Terwilliger*. There, motorcyclists gathered at the Twin Peaks in Waco. *Terwilliger*, 4 F.4th at 277. All were eventually arrested following a shootout and were

---

[6] In a useful contrast, this Court recently grappled with "geofence warrants," which can violate the Fourth Amendment due to their sweeping up of information of millions of individuals without any particularized suspicion of a single individual in hopes of finding suspects near a crime scene. *United States v. Smith*, 110 F.4th 817, 822, 837 (5th Cir. 2024). The Fourth Amendment was designed to prevent old English system's absolute "discretion of the executing officials the decision as to which persons should be arrested." *Id*. at 836 (citations omitted). Here, the officers witnessed Rusanowsky among a handful of individuals who had violently obstructed traffic. This is not the kind of police action that concerned the Founders. *See, e.g.*, Brian L. Owsley, *The Best Offense Is A Good Defense: Fourth Amendment Implications of Geofence Warrants*, 50 Hofstra L. Rev. 829, 860–63 (2022) (detailing historical background of Fourth Amendment).

arrested pursuant to the same "form warrant affidavit" that was presented to the magistrate judge as the basis for the arrest warrants. *Id.* at 277-79. But for the subject's name, which was simply filled in on a blank line, each affidavit was identical. *Id.* In total, 177 individuals were arrested using this identical "fill-in-the-name" affidavit. *Id.* at 279. This Court found that simply using gang insignia similar to those actually committing the crime was "insufficient to establish particularized probable cause." *Id.* at 283. Here, the officers did not arrest Rusanowsky because, for example, he wore similar clothes or carried similar signs to those actually obstructing the freeway. Instead, even discounting all three officers' consistent testimony that they witnessed Rusanowsky illegally on the freeway, Rusanowsky was (1) in "the vicinity" of the obstructed freeway, and (2) in a group that all agree had just been on the freeway. *See generally Wade*, 110 F.4th at 797.

A recent decision from the Eighth Circuit further confirms that officers possessed more than sufficient probable cause to arrest Rusanowsky. In *Dunn v. Does 1-22*, Des Moines police arrested numerous individuals after ordering dispersal from the State Capitol during a George Floyd protest. 116 F.4th 737, 743-44 (8th Cir. 2024). After

protestors initially complied with the order and moved to the local "Court Avenue District bar scene" area, some subsequently began looting a store around 2:25 a.m.; by 2:37 a.m., officers swept the area and rendered the situation "mostly peaceful." *Id.* at 744. The plaintiffs were arrestees who, as the opinion shows, were arrested from 2:49-4:00 a.m. at various locations in Des Moines, including many blocks away from the looted store. *Id.* at 744-45. Unlike the DPD officers here, the Des Moines officers' contention was that they had blanket "probable cause to arrest anyone in the vicinity of the Court Avenue District" for various criminal violations, including failure to disperse. *Id.* at 746. The Eighth Circuit found the Des Moines officers lacked particularized suspicion because, in part, of the vast temporal and geographic attenuation from the bad acts and arrests:

> The district court found that "officers did nothing to control ingress or egress to the area," so it wasn't just looters and rioters filling the streets of downtown Des Moines—an area home to apartment buildings, hotels, and a lively bar scene. There were people going about their normal lives. Even among the protesting crowds, many were "merely standing around, mingling and dancing." No reasonable officer would have believed that *every* person he encountered hours after giving dispersal orders and blocks away had violated Iowa law.

*Id.* at 747.

The court distinguished that situation from one of its earlier opinions, *Bernini*, that found no Fourth Amendment violations for those arrested in a crowd without pinpoint particularized suspicion:

> But this isn't *Bernini*. There, outnumbered officers confronted a group at the intersection of a busy roadway who "chanted in unison, lined up directly across from the police, donned gasmasks and other face coverings as if preparing for a confrontation, and were otherwise acting or moving as a unit or group." Because it was "impractical for [the officers] to detain immediately the dozens of individuals present at the intersection," we said that it was reasonable for them to move the unit to a park and make a "mass arrest." As they did, the unit began to envelop innocent bystanders. Given the actions of the unit and the exigencies, we held that the officers' allegedly mistaken belief that some of the plaintiffs caught up in the move were part of the unit was objectively reasonable. The officers did not act indiscriminately. Once they got to the park, they tried to figure out "who had been part of the unit at the intersection and released" about half of those seized.

*Id.* (cleaned up).

Here, unlike in *Dunn*, Sgt. Rudloff and the other officers likewise did not act "indiscriminately" by arresting anyone who may or may not have been on the freeway hours—or even minutes—before. As this Court has explained, while *Ybarra* requires more than proximity to establish probable cause, "proximity is not irrelevant; reasonable inferences may be drawn from a person's connection to the criminal activity." *Hearn*, 563 F.3d at 103. Even somehow discounting their testimony that they

witnessed Rusanowsky on the freeway, at the very least, the officers saw him on the grass directly next to the freeway contemporaneously with those who inarguably had been obstructing the freeway. Rusanowsky admitted to illegally being on the freeway's shoulder, but even assuming (incorrectly) that he was an "innocent bystander" swept up in a mass arrest as in *Bernini*, it was more than reasonable for the officers to believe he was among the group that had just exited the freeway.

The Supreme Court has observed that "[p]olice officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.'" *Nieves*, 587 U.S. at 403 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Critically, and quite relevant here, the Court employs only a reasonableness standard "[t]o ensure that officers may go about their work without undue apprehension of being sued." *Id*. Under the circumstances, Rusanowsky's arrest was more than reasonable.

### 4. Supposed fact issues over the identity of the arresting officer are immaterial.

Lastly, Rusanowsky tries to create fact issues over immaterial facts when he claims that a discrepancy exists between Sgt. Rudloff's recollection and Rusanowsky's over who specifically arrested him. As he

summarizes: "Simply put, Rusanowsky says Rudloff arrested him. Rudloff says he didn't, and has no idea what Rusanowsky was arrested for. This is a clear factual dispute" for a jury. (ROA.66.) However, what Rusanowsky was arrested for is not a relevant inquiry.

The Supreme Court has made clear there is "no basis in precedent or reason" to examine whether the "known facts bearing upon the offense actually invoked at the time of arrest . . . be 'closely related' to the offense that the officer invoked." *Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004). This is because an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153. Whatever Rusanowsky was arrested for, which of the DPD officers physically arrested him, and whether Sgt. Rudloff correctly remembers the exact charge is immaterial. Rusanowsky sued Sgt. Rudloff in federal court for allegedly arresting him without probable cause; the only salient question is whether the "facts and circumstances within [Sgt. Rudloff's] knowledge" were not "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi*, 919 F.3d at 897. Here,

assuming Sgt. Rudloff was the one to place Rusanowsky under arrest, Sgt. Rudloff had more than sufficient probable cause to arrest Rusanowsky. Sgt. Rudloff is not required to remove all metaphysical doubt that Rusanowsky was innocent of the crime with which he was ultimately charged. *See* Teressa Ravenell & Riley H. Ross III, *Policing Symmetry*, 99 N.C. L. Rev. 379, 387 (2021) (arguing "it is nonsensical to 'prove probable cause beyond a reasonable doubt' or 'prove probable cause by a preponderance of the evidence.'").

## III. The district court correctly entered summary judgment for Sgt. Rudloff on Rusanowsky's First Amendment retaliation claim.

It is unclear whether Rusanowsky is in fact appealing the district court's entry of summary judgment for Sgt. Rudloff on Rusanowsky's first amendment retaliation claim. At one point of his brief, Rusanowsky states: "The district court also assessed whether Rusanowsky's First Amendment retaliation claim could proceed despite the existence of probable cause to arrest him. *Appellant does not appeal that determination* . . . ." (Appellant's Br. 36 n.4 [emphasis added].) However, at the end of his brief, Rusanowsky claims his retaliation claim should be restored. (Appellant's Br. 68-72.) Citing this Court's case law that long

preceded the Supreme Court's holding in *Nieves*, he claims that his evidence met the three traditional elements of a retaliatory arrest claim. (Appellant's Br. 69-72 [citing *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002)].)

To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the officer's actions injured him, and (3) "the officers' adverse actions were substantially motivated against Plaintiff's exercise of constitutionally protected conduct." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017). In a recent opinion, this Court explained how a plaintiff can prove such a claim:

> A retaliation claim is only available when non-retaliatory grounds are in fact insufficient to provoke the adverse consequences. It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured— the motive must *cause* the injury. It must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

> Thus, in the context of retaliatory arrest or prosecution, to prove causation, a plaintiff generally must show that the officers lacked probable cause to make the arrest. We have likewise held that if an officer has a reasonable suspicion to initiate a seizure, the objectives of law enforcement take primacy over the citizen's right to avoid retaliation. A plaintiff may also prove causation if he or she can produce objective evidence that he was arrested when otherwise similarly

situated individuals not engaged in the same sort of protected speech had not been.

*Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024) (cleaned up).

Somehow, to Rusanowsky, Sgt. Rudloff's disclaiming knowledge of who, on that chaotic day, ultimately arrested Rusanowsky is sufficient to create a fact issue about retaliatory motive. (ROA.71.) Rusanowsky cites no evidence of actual retaliatory motive. He only claims that "the moment Sgt. Rudloff realized" he "had been photographing him using force" that could be "damaging" if published, Sgt. Rudloff arrested him. (ROA.71.) In addition to failing to cite to the actual record for this, Rusanowsky's assertions are based on pure speculation—not evidence based on statements from Sgt. Rudloff or other officers at the scene, no investigatory findings of bias, nor even media reports of same.

Further, the evidence in the record shows others in Rusanowsky's position were arrested, as well. Sgt. Rudloff testified that when instruction came from DPD command on what to do with protestors on the highway, DPD command instructed them to "round those folks up." (ROA.680.) He also recounts the arrest of others who had come off the freeway, none of whom were alleged to be "journalists." (ROA.680-81.) Cpl. Barrett also explained that once the DPD officers were off the

freeway, they "then began arresting those in the group that had come over the guardrails from the freeway." (ROA.683.) Cpl. Pillar likewise stated that they "began to take in [sic] custody those that were part of the same group" they had seen come from the highway. (ROA.686.) And especially damaging to Rusanowsky's conclusory allegation of retaliatory intent, is his acknowledgement that other photojournalists on the scene who had not climbed over the barrier onto the freeway but who subsequently photographed the arrest of Rusanowsky and others *were not arrested*. (*See* ROA.927.)

Further, Rusanowsky is wrong that he was "engaged in constitutionally protected activity" when he was on the freeway. (ROA.69.) He was violating the law.

Without a doubt, the First Amendment's explicit protection of journalists' right to report events as clear. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.") But while members of the press enjoy protections from governmental interference, "(t)he publisher of a newspaper has no special immunity from the application of general laws. He has no special

privilege to invade the rights and liberties of others." *Associated Press v. NLRB*, 301 U.S. 103, 132-33, 57 (1937).

This is because, as has also been long recognized, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 688, 690 (5th Cir. 2017) (holding that like all rights, the newsgathering "right is not absolute" and "is not without limitations.") (citing *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)). While recording police actions is, undeniably, a protected speech activity, "[l]ike all speech, filming the police 'may be subject to reasonable time, place, and manner restrictions.'" *Turner*, 848 F.3d at 690 (quoting *Glik*, 655 F.3d at 84)). Indeed, as the Supreme Court has stated:

> [d]espite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. *Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded*, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.

*Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972) (emphasis added.)

Rusanowsky had a First Amendment right to cover the 2020 protests as a journalist and/or attend them as a participant, but he did not have a First Amendment right to be on an obstructed freeway. *See Utley v. City of Houston*, No. 21-20623, 2022 WL 2188529, at *1 (5th Cir. June 17, 2022) (per curiam) ("And Utley was not engaged in constitutionally protected activity when he was arrested—he was obstructing a roadway in violation of Tex. Penal Code § 42.03—so his First Amendment retaliation claim fails."), *cert. denied sub nom. Utley v. City of Houston, Texas*, 143 S. Ct. 429 (2022); *Singleton v. Darby*, 609 F. App'x 190, 193 (5th Cir. 2015) (per curiam) ("The First Amendment does not entitle a citizen to obstruct traffic or create hazards for others. A State may therefore enforce its traffic obstruction laws without violating the First Amendment, even when the suspect is blocking traffic as an act of political protest.")

As the district court noted, the evidence showed that while Sgt. Rudloff acknowledged that Rusanowsky was a member of the press, it was not why he was being arrested: "After learning that Mr. Rusanowsky was a member of the press, Sgt. Rudloff retorted, 'Yeah yeah, press press.

You are going to jail.' He added that Mr. Rusanowsky 'still had no right to be illegally on the freeway.'" (ROA.1076 [citations omitted].)

Further, the record is devoid of requisite comparator evidence, which is fatal to Rusanowsky's retaliation claims. *See Degenhardt*, 117 F.4th at *759 ("The [plaintiffs] have likewise failed to plead comparator evidence. Accordingly, they have not pleaded sufficient facts to show [the officers'] non-retaliatory grounds for the seizures were insufficient to provoke their actions."). While a plaintiff does not have to plead and prove that "virtually identical" examples of otherwise similarly situated individuals who were not arrested, there must be something more than speculation that others were not targeted for arrest as the plaintiff was. *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (finding sufficient comparator evidence where "no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past.").

Here, the evidence showed that (1) multiple people were arrested, and (2) that the situation was novel. Rusanowsky's own evidence shows

that the officers on scene arrested multiple protestors at the scene, none of whom were purported to be journalists, and that journalists who had not entered the freeway were not arrested. (ROA.925-26.)[7] Further, Rusanowsky's arrest came during a time of unprecedented, nationwide protests where many were arrested in the City and beyond during novel circumstances. *See Wade*, 110 F.4th 799 (numerous protestors claiming false arrest for May, 2020 protests in Houston); *Lance v. City of San Antonio*, No. SA-21-CV-00837-JKP, 2024 WL 714327, at *16 (W.D. Tex. Feb. 20, 2024) (lawsuit related to arrests and use of force at May 30, 2020 George Flod protests in San Antonio); *Monacelli v. City of Dallas*, No. 3:21-CV-2649-L, 2022 WL 4668054, at *2 (N.D. Tex. Sept. 30, 2022) (journalist alleging that DPD officers unlawfully arrested "him and hundreds of other people" at the Margaret Hunt Hill Bridge near downtown Dallas); *see also Jeffery v. City of New York*, 113 F.4th 176, 178 (2d Cir. 2024) (constitutional challenge to a nighttime curfew imposed throughout New York City for the one-week period between June 1 and

---

[7] This Court has examined allegations of Sgt. Rudloff arresting others at this same scene, as well. *See Verastique*, 106 F.4th at 431 (detailing arrests of 5-6 individuals arrested at the same "grassy area" as Rusanowsky's arrest.)

June 7, 2020, "in response to violence and destruction attending certain public demonstrations protesting" death of George Floyd.)

In sum, the First Amendment provides journalists protections, not special privileges. Even if there was no probable cause for Rusanowsky's arrest (there was), there is no evidence that retaliation was the cause.

## IV. The district court correctly entered summary judgment for the City on Rusanowsky's *Monell* claim.

Rusanowsky argues that, should his Fourth Amendment claims revive, so too should his *Monell* claims against the City. (Appellant's Br. 72-73.) Fatal for him, however, is this Court's ruling in *Verastique*.

In this case, the *Monell* "pattern" Rusanowsky's complaint cites is the same exact nineteen "department investigations" cited in the *Verastique* complaint that this Court determined could not establish a pattern for purposes of *Monell*.[8] *Compare* (ROA.27-29), *with Verastique*, 106 F.4th at 432 ("Though the complaint lists nineteen incidents involving [Sgt. Rudloff], those incidents do not constitute *any* pattern of conduct—much less a pattern of similar violations.").

---

[8] The same counsel for the plaintiffs in *Verastique* represent Rusanowsky. The complaints' *Monell* allegations are substantively carbon copies.

The district court dismissed all of Rusanowsky's theories of *Monell* liability at the 12(b)(6) stage, save Rusanowsky's theory that the City had a custom of failing to supervise or discipline Sgt. Rudloff specifically. (ROA.414-24.) Since that time, however, this Court decided *Verastique*, which expressly rejects the Rusanowsky's only remaining failure to supervise or discipline theory. In other words, the only facts alleged for *Monell* liability in Rusanowsky's complaint that survived dismissal on the pleadings have now been found to not to state a claim. *Verastique*, 106 F.4th at 432-33. As such, regardless of the state of Rusanowsky's Fourth and First Amendment claims against Sgt. Rudloff, the Court should affirm the summary judgment for the City on Rusanowsky's *Monnell* claim.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Respectfully submitted,

TAMMY L. PALOMINO
City Attorney

JENNIFER C. HUGGARD
Chief of Litigation

NICHOLAS D. PALMER
Chief of Appellate Section

/s/ *J. Cheves Ligon*
J. CHEVES LIGON
Texas Bar No. 24070147
Assistant City Attorney
john.ligon@dallas.gov

CITY ATTORNEY'S OFFICE
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
Telephone: 214-670-3519
Telecopier: 214-670-0622

ATTORNEYS FOR APPELLEES

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d) and Fifth Circuit Rule 25.2, I hereby certify that on November 4, 2024, the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit, using the electronic filing system of the Court. I further certify that I have complied with the privacy and redaction requirements of Federal Rule of Appellate Procedure 25(a)(5) and Fifth Circuit Rule 25.2.13; that the electronic submission is an exact copy of the paper document; and that the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Additionally, on November 4, 2024, a true and correct copy of the foregoing document was served via ECF electronic notice through the Court's Notice of Docket Activity upon counsel for Appellants, who has consented in writing to accept such notice as service of this document by electronic means.

_/s/ J. Cheves Ligon_
Attorney for Sgt. Rudloff and
the City of Dallas

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface requirements and Type Style Requirements

1.   This brief complies with the type volume limitation of Fed. R. App.
     P. 32(a)(7)(B) because:

     ☐   this brief contains 11,593 words, excluding the parts of the
         brief exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App.
     P. 32(a)(5) and the type style requirements of Fed. R. App. P.
     32(a)(6) because:

     ☐   this brief has been prepared in a proportionally spaced
         typeface using Microsoft Word for Microsoft 365 MSO in 14-
         point Century Schoolbook.


                              /s/ *J. Cheves Ligon*
                              Attorney for Sgt. Rudloff and
                              the City of Dallas


Dated:  November 4, 2024